DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:  ZACHARY BANNON
       JACOB LILLYWHITE
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2728/2800
Fax:     (212) 637-2750
Email: zachary.bannon@usdoj.gov
Email: jacob.lillywhite@usdoj.gov

LETITIA JAMES
New York State Attorney General
By:  JANE LANDRY-REYES
       Assistant Attorney General
       BRENT MELTZER, Chief,
       Housing Protection Unit
28 Liberty Street
New York, NY  10005
Tel.:    (212) 416-8220/6096
Email: jane.landry-reyes@ag.ny.gov
Email: brent.meltzer@ag.ny.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA and THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, New York State Attorney General,

        Plaintiffs,

   v.

LILMOR MANAGEMENT LLC, MORRIS LIEBERMAN, 45-55 REALTY LLC, 55 WINTHROP ST LLC, 130 CLARKSON REALTY LLC, 250-251 E 29 REALTY LLC, 251 E 29 ST LLC, 1590 W 8 ST LLC, 105 AVE P REALTY LLC, 888 REALTY LLC, 100 LINDEN REALTY LLC, 131 REALTY LLC, C & Z REALTY LLC, 2003 REALTY LLC, 1429 CARROLL STREET LLC, 59 LOGAN ST LLC, 1269 E 18 STREET REALTY LLC, 334 EASTERN PKWY REALTY LLC, 840 REALTY LLC, 1909 REALTY LLC, 333 REALTY LLC, 1633 WEST 10TH REALTY LLC, ALIT REALTY LLC, 1301 AVENUE K REALTY LLC, 1311 AVENUE K REALTY LLC, P BIGG REALTY LLC, 354 E 21ST ST REALTY CORP, E & S REALTY MANAGEMENT LLC, 915 84TH STREET LLC, 2001 AVENUE P LLC, 2065 OCEAN AVENUE LLC, 1690 PRESIDENT STREET LLC, 645 REALTY LLC, 3402 REALTY LLC, 1439 REALTY LLC, 103-25 120 ST REALTY LLC, 20-30 MERLE REALTY LLC, 1921 REALTY LLC, 410 WESTMINSTER LLC, 580-585 REALTY LLC, 2251 REALTY LLC, 209 REALTY LLC, 40-71 REALTY LLC, 712 REALTY LLC, 723 REALTY LLC, 2420 REALTY LLC, 1684 REALTY LLC, 1660 REALTY LLC, 1011 NEILSON REALTY LLC, 1012 NAMEOKE REALTY LLC,

        Defendants.

---

**COMPLAINT**

24 Civ. 9520

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 3

PARTIES ............................................................................................................................. 3

BACKGROUND .................................................................................................................. 4

I.              Unsafe Housing and Public Health ............................................................... 4

II.             The Lieberman/Lilmor Portfolio of Substandard Housing ........................... 7

III.            Federal Lead Paint Safety Regulations ........................................................ 8

IV.            State and Local Lead Paint Safety Regulations ......................................... 14

V.             State and Local Housing Quality Laws ....................................................... 18

VI.            State General Business Law: Deceptive Business Practices ...................... 21

VII.           State Executive Law: Fraud or Illegality .................................................... 21

VIII.          Public Nuisance .......................................................................................... 22

DEFENDANTS' VIOLATIONS OF LEAD PAINT SAFETY REGULATIONS ..................... 23

I.              Defendants' Violations of the Lead Disclosure Rule ................................... 24

II.             Lilmor and Lieberman's Violations of the RRP Rule ................................. 26

III.            Defendants' Violations of State and Local Lead-Based Paint Law ........... 32

IV.            At Least 130 Children Have Suffered Lead Poisoning in These Buildings 35

DEFENDANTS SUBJECT THEIR TENANTS TO UNSAFE AND UNSANITARY
CONDITIONS; VIOLATE STATE AND LOCAL HOUSING LAW; AND MAINTAIN A
PUBLIC NUISANCE ...................................................................................................... 36

DEFENDANTS ENGAGED IN DECEPTIVE AND FRAUDULENT BUSINESS PRACTICES
............................................................................................................................................ 43

CLAIMS FOR RELIEF .................................................................................................... 44

PRAYER FOR RELIEF .................................................................................................... 54

Plaintiff the United States of America (the "United States" or the "Government"), on behalf of the U.S. Environmental Protection Agency ("EPA") and the U.S. Department of Housing and Urban Development ("HUD") on the counts indicated below, by its attorney, Damian Williams, United States Attorney for the Southern District of New York, and Plaintiff the People of the State of New York (the "State" or the "State of New York"), by their attorney, Letitia James, New York State Attorney General, allege as follows:

## INTRODUCTION

1.      Across more than 2,500 apartments in New York City, landlord Morris Lieberman ("Lieberman"), his management company Lilmor Management LLC ("Lilmor"), and owners of properties managed by Lilmor (the "LLC Defendants"[1]) have disregarded federal, state, and local lead paint safety laws, failed to meet basic health and safety standards, and maintained a public nuisance.  Many apartments that Lieberman rents are riddled with peeling lead paint and lead dust; infested by rats, mice, and roaches; damp from perpetual leaks and covered with growing mold; and otherwise a danger to human health.  His victims, first and foremost, are his residents, many of whom are people of limited means and live in communities disproportionately burdened by environmental and other health hazards.

2.      Lead paint is toxic.  There is no level of lead in the human body that is safe for children.  When children ingest lead paint flakes or dust from deteriorated lead paint, they can suffer lifelong neurological and other severe injuries.  To avoid these devastating consequences, most housing built before 1978—including about 2,500 apartments in buildings controlled by Lieberman and managed by Lilmor (and hundreds more apartments that Lieberman formerly

---

[1] The LLC Defendants are those entities listed in the caption of this case, apart from Lilmor and Lieberman.

controlled or Lilmor formerly managed)—is subject to strict federal lead paint regulations that require landlords to warn tenants of this severe health risk and to take precautions to reduce the risk of poisoning by lead dust generated when performing maintenance.  New York state and New York City law impose additional lead paint safety regulations requiring investigation and remediation activities.  For years, Defendants have flouted these federal, state, and local lead paint safety regulations.  At least 130 children have suffered lead poisoning while living in Lieberman's buildings since 2012, according to New York City Department of Health and Mental Hygiene ("DOHMH") records—a number that almost certainly understates the total number of poisoned children.

3.     Beyond the failure to comply with federal, state, and local lead paint safety regulations, Lieberman and Lilmor maintain dangerous and unsanitary conditions in their buildings.  Many tenants live without proper heat in the winter; with mold on their walls and ceilings; collapsing ceilings due to unaddressed leaks; and cockroach and rodent infestations. Since 2012, New York City's Department of Housing Preservation and Development ("HPD") has issued thousands of violations for unsafe conditions in Defendants' buildings.  These conditions present a direct threat to the health and safety of tenants and amount to a public nuisance.

4.     The United States brings this civil action to redress the unsafe and unsanitary conditions in these buildings.  It seeks injunctive and other equitable relief for violations of the federal Lead Disclosure Rule (24 C.F.R. part 35, subpart A, and 40 C.F.R. part 745, subpart F) and the Renovation, Repair, and Painting Rule (40 C.F.R. part 745, subpart E), and an order requiring Defendants to abate the public nuisance.

5.     The State joins this civil action, seeking injunctive and other equitable relief for Defendants' repeated violations of the New York City Childhood Lead Poisoning Prevention Act

("Local Law One"), *see* NYC Admin. Code § 27-2056.1 *et seq.*; the NYC Asthma Free Housing Act ("Local Law 55"), *see* NYC Admin. Code § 27-2017 *et seq.*; the NYC Housing Maintenance Code (the "Housing Maintenance Code" or "HMC"), *see* NYC Admin. Code § 27-2001, *et seq.*; the New York State Multiple Dwelling Law (the "Multiple Dwelling Law" or "MDL"), *see* MDL § 25 *et seq.*, and the New York State Real Property Law (the "Real Property Law" or "RPL"), *see* RPL § 235-b.  The State also seeks disgorgement of ill-gotten profits, restitution on behalf of tenants, and civil penalties from Defendants for their repeated and persistent violations of the local and state housing codes; relief for violating New York State General Business Law ("GBL") § 349 through deceptive business practices relating to these matters; and an order requiring Defendants to abate the public nuisance.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of the federal claims in this action pursuant to 15 U.S.C. § 2616, 28 U.S.C. §§ 1331, 1345, and 42 U.S.C. § 4852d.  It has subject matter jurisdiction over the State's claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district pursuant to 15 U.S.C. § 2616(a)(2) and 28 U.S.C. § 1391(b)(1), (c)(2), and (d), because all Defendants reside in this State and at least one resides in this district; because certain of the violations alleged in the complaint occurred in this district; and because some or all Defendants transact business or may be found in this district.  Furthermore, Defendants have expressly consented to venue in this district in a consent decree to be filed contemporaneously with this complaint.

## PARTIES

8.      Plaintiffs are the United States of America and the People of the State of New York.

9.     Defendant Morris Lieberman has owned—in whole or part, through special purpose vehicles—and has controlled residential multi-family apartment buildings in New York City, including in the Southern District of New York.

10.     Defendant Lilmor Management LLC is a residential property management company controlled and partially owned by Lieberman.  It has managed buildings owned by Lieberman in New York City, including in the Southern District of New York, as well as buildings owned by third parties.

11.     The LLC Defendants are special-purpose vehicles that have nominally owned buildings in New York City, including in the Southern District of New York, that are managed by Lilmor.  In many cases these LLCs are owned in whole or part by Lieberman.

## BACKGROUND

### I.     Unsafe Housing and the Public Health

12.     Environmental hazards in the home threaten millions of people in the United States.

13.     Chief among these hazards is lead paint.[2]  Lead is toxic, and lead poisoning—particularly in children—can have devastating, lifelong effects.  Children are easily poisoned in the home when they put lead paint flakes in their mouths or ingest lead-contaminated dust.  A child's exposure to even small amounts of lead can cause irreversible neurological problems, including learning disabilities, reduced attention span, and behavioral problems.  Even for adults, ingestion of small amounts of lead can cause or exacerbate serious health conditions, including cancer, hypertension, and kidney failure.

---

[2] The terms "lead paint" and "lead paint hazards" as used in this complaint shall have the same meaning as, and are used interchangeably with, the terms "lead-based paint" and "lead-based paint hazards," respectively, as defined in 24 C.F.R. §§ 35.86 and 35.110 and 40 C.F.R. §§ 745.103 and 745.223, as applicable to federal claims, and NYC Admin. Code § 27-2056.2(7)(b) and 28 R.C.N.Y. § 11-01(t)(2), as applicable to state and local claims.

14.     In 1992, Congress found that "low-level lead poisoning is widespread among American children, afflicting as many as 3,000,000 children under age 6, with minority and low-income communities disproportionately affected," 42 U.S.C. § 4851(1), and that even "at low levels, lead poisoning in children causes intelligence quotient deficiencies, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and behavior problems," *id.* § 4851(2).

15.     In 2004, the New York City Council found that childhood lead poisoning from paint was a preventable public health crisis.

16.     Beyond lead paint, other substandard living conditions threaten residents' health, including by exacerbating asthma.  In 2018, in response to high incidence of debilitating asthma rates, especially amongst children in low-income communities of color, New York City enacted Local Law 55, which requires owners of multiple dwellings with three or more dwelling units to keep their tenants' apartments free of mold and pests, including by fixing underlying conditions that lead to these problems.  *See* NYC Admin. Code §27-2017 *et seq.*  One study suggests that close to 80% of asthma in children is exacerbated by poor housing conditions such as from deteriorated paint and walls, mold, and presence of cockroaches, mice and other pests.[3]

17.     Other deficient housing conditions also impact health and safety of occupants.  For example, a lack of heat in winter threatens the health of the elderly in particular as they have high rates of cold-related hospitalizations.

---

[3] The Coalition for Asthma Free Homes, *The Impact of Poor Housing Conditions on the Health of Asthmatic New Yorkers*, 4, last https://takerootjustice.org/wp-content/uploads/2019/06/CAFHReport_20may09.pdf (accessed July 3, 2024).

18.     It has long been "the policy of the United States" to "promote the goal of providing decent and affordable housing for all citizens."  42 U.S.C. § 1437(a)(4).  While the responsibility to ensure decent housing is shared among federal, state, tribal, and local governments and the private sector, "the Federal Government should act where there is a serious need that private citizens or groups cannot or are not addressing responsibly."  42 U.S.C. § 1437(a)(3).  Federal efforts to ensure  occupants have safe living conditions include EPA's and HUD's lead-based paint regulations.  *See infra* Part III.  More generally, however, the law has long recognized that widespread, substandard housing conditions may constitute a public nuisance, and the United States may sue to compel the abatement of nuisances that affect federal interests.  *See infra* Part VII(a).

19.     Similarly, state and local policy underscore the importance of safe and affordable housing, including as provided by Local Law One (for lead paint) and Local Law 55 (for asthma), and other essential health and safety requirements of the City's Housing Maintenance Code and the State's Multiple Dwelling Law. *See infra* Parts IV & V.  The New York State Attorney General also has authority to sue to enjoin "repeated fraudulent or illegal acts" or "persistent fraud or illegality" in "the carrying on, conducting or transaction of business," Executive Law § 63(12), including non-compliance with local housing quality laws; to sue to enjoin deceptive acts or practices in the conduct of business, GBL § 349(b), including with respect to deceptive communications regarding housing quality issues; and to sue for abatement of a public nuisance under both Executive Law § 63(12) and as *parens patriae*.

20.     Moreover, both the federal and state governments recognize that unsafe and unsanitary housing may impact overburdened and underserved populations, including low-income populations.

## II.     The Lieberman/Lilmor Portfolio of Substandard Housing

21.     Lieberman owns, controls, and profits from a residential real estate portfolio that subjects residents to deficient conditions, including systematic violations of federal, state, and local lead paint safety regulations.  Lieberman's agent has been included in the New York City Public Advocate's list of the worst landlords in New York City.

22.     Lieberman controls—and, in most cases, owns in whole or in part indirectly through special purpose vehicles—about 2,500 rent-regulated apartments in 47 residential buildings in New York City.  At other times since 2012, he has also owned and/or controlled about 250 additional apartments in nine other apartment buildings.  These combined 56 buildings are listed in Exhibit A to this complaint.  The buildings are largely located in communities where families have low to moderate incomes and that are disproportionately burdened by environmental and other health hazards.

23.     Lieberman exercises much of his control over these buildings through Defendant Lilmor.  Lieberman founded and personally controls Lilmor; Lieberman and his wife are each 50% owners of the firm.

24.     Lilmor is the current building manager for each of the buildings on Exhibit A that are identified as currently managed or controlled by Lieberman.  For the buildings identified on Exhibit A no longer managed or controlled by Lieberman, Lilmor was the building manager when it was managed or controlled by Lieberman.  As building manager, Lilmor is responsible for key functions relevant to health and safety in these buildings, including performing maintenance and repairs, as well as for acting as the owner's agent for the purpose of making legally required disclosures to tenants regarding lead paint.  Lilmor receives tenant requests regarding necessary repairs or maintenance in the buildings, as well as notices of violations of health, safety, and

housing standards from local government agencies.   Lilmor, as an agent of Lieberman and the LLC Defendants, executes leases with residents in these buildings.

25.    The LLC Defendants are special purpose vehicles that, at various points since 2012, have nominally owned buildings Lieberman controls or controlled, as indicated on Exhibit A. Lieberman also owns, in whole or part, and controls the majority of the LLC Defendants that appear on Exhibit A.

26.    As described below, Lieberman and Lilmor's violations of federal, state, and local lead laws; their violation of state and local housing codes; and their maintenance of a public nuisance arise from policies and practices that impact and have impacted the entire Lieberman/Lilmor residential portfolio.

### III.    Federal Lead Paint Safety Regulations

27.    In 1977, the federal government banned the use of lead-containing paint in residences built in 1978 or later.  16 C.F.R. Part 1303.  Lead paint had been frequently used in residences prior to that date and continues to be present in pre-1978 residential buildings across the country.

28.    Lead poisoning is a serious health problem in the New York metropolitan area. Each year, thousands of children under the age of six test are reported with elevated blood lead levels.[4]

---

[4] For the purpose of this complaint, the terms "lead poisoning" and "elevated blood lead level" refer to blood lead levels that equal or exceed 5 micrograms per deciliter, the applicable blood lead level reference value established by the Centers for Disease Control and Prevention ("CDC") between 2012 and 2021.  In 2021, the CDC reference value was lowered further to 3.5 micrograms per deciliter. Elevated blood lead levels are also currently defined by local law as 3.5 micrograms per deciliter or above.

29.     In 1992, Congress enacted a "broad program to evaluate and reduce lead-based paint hazards in the Nation's housing stock," and "to ensure that the existence of lead-based paint hazards is taken into account . . . in the sale, rental, and renovation of homes and apartments."  42 U.S.C. § 4851a(2), (4).

30.     Among other things, Congress directed EPA and HUD to promulgate regulations requiring disclosure of information concerning lead paint to tenants and purchasers of pre-1978 property and amended the Toxic Substances Control Act to provide for EPA to promulgate additional lead paint safety regulations applicable to the general public.  Residential Lead-Based Paint Hazard Reduction Act of 1992, Public Law 102-550, Title X, § 1018 (codified at 42 U.S.C. § 4852d); *id.* § 1021 (codified at 15 U.S.C. subch. IV).

31.     Pursuant to these authorities, EPA and HUD promulgated the key federal lead paint regulations at issue here: the Lead Disclosure Rule and the Renovation, Repair, and Painting Rule.

A.  *The Lead Disclosure Rule*

32.     In 1996, HUD and EPA promulgated substantively identical versions of the "Lead Disclosure Rule."  24 C.F.R. part 35, subpart A (HUD's Lead Disclosure Rule); 40 C.F.R. part 745, subpart F (EPA's Lead Disclosure Rule).

33.     The Lead Disclosure Rule requires landlords and their agents to provide disclosures concerning lead paint to prospective tenants prior to signing a new lease (or, in some cases, a renewal lease) in "target housing."  "Target housing" means most housing constructed before 1978.  Housing for the elderly or persons with disabilities and zero-bedroom dwellings (unless any child who is less than 6 years of age resides or is expected to reside in such housing) are currently excepted.  42 U.S.C. § 4851b(17); 15 U.S.C. § 2681(17).

34.     Among other things, the Lead Disclosure Rule requires a landlord to provide the following information and documentation to prospective tenants prior to entering into a lease:

- [A]n EPA-approved pamphlet that warns prospective tenants about the dangers of lead-based paint and provides advice on how to limit those risks.  24 C.F.R. § 35.88(a)(1); 40 C.F.R. § 745.107(a)(1).

- A "lead warning statement" contained in federal regulations that warns prospective tenants of the dangers of lead paint.  24 C.F.R. § 35.92(a)(1); 40 C.F.R. § 745.113(b)(1).

- "[A]ny . . . information available [to the landlord] concerning . . . known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces." 24 C.F.R. § 35.88(a)(2); 40 C.F.R. § 745.107(a)(2).

- All records or reports regarding lead-based paint and/or lead-based paint hazards, including the results of inspections.  24 C.F.R. § 35.88(a)(4); 40 C.F.R. § 745.107(a)(4).

35.    The information required to be disclosed by the Lead Disclosure Rule includes not only information related to the prospective tenant's apartment but also information relating to common areas accessible to a tenant of that apartment.  24 C.F.R. § 35.88(a)(4); 40 C.F.R. § 745.107(a)(4).

36.    The purpose of the Lead Disclosure Rule is to enable tenants to take steps to protect themselves and their families in light of the knowledge of the potential or actual presence of lead-based paint or lead-based paint hazards in their apartments.

37.    For example, before a family becomes a tenant in an apartment that has lead-based paint or lead-based paint hazards, it may decide not to become obligated under the lease and not move in.  Alternatively, the family may attempt to reach agreement with the landlord, prior to signing the lease or occupying the apartment, to control any hazards or abate lead paint as a condition to the effectiveness of the lease.

38.    Even after moving into a unit with actual or potential lead paint or lead paint hazards, families can take specific steps to minimize the risks posed by lead paint, as described in

the *Protect Your Family From Lead in Your Home* pamphlet that is required to be provided to prospective tenants under the Lead Disclosure Rule.  These measures include the following:

- Always keep painted surfaces in good condition to minimize deterioration.

- Keep painted surfaces clean and free of dust.  Clean floors, window frames, windowsills, and other surfaces weekly.  Use a mop or sponge with warm water and a general all-purpose cleaner.

- Thoroughly rinse sponges and mop heads often during cleaning of dirty or dusty areas, and again afterward.

- Carefully clean up paint chips immediately without creating dust.

- Talk to the landlord about fixing surfaces with peeling or chipping paint.

39.    Moreover, the pamphlet recommends specific steps that tenants can take to minimize risks to children:

- Wash children's hands often, especially before they eat and before nap time and bedtime.

- Keep play areas clean.  Wash bottles, pacifiers, toys, and stuffed animals regularly.

- Keep children from chewing windowsills or other painted surfaces.

- Take precautions to avoid exposure to lead dust when remodeling.

40.    Finally, the pamphlet also contains the critical recommendation that families should "consult their health care provider about testing their children for lead."

B.  *The Renovation, Repair, and Painting Rule*

41.    Renovation and maintenance work that disturbs lead paint can expose tenants, visitors, and workers to toxic lead dust and debris.

42.    To address this health threat, in 2008, EPA promulgated the Renovation, Repair, and Painting ("RRP") Rule, 40 C.F.R. part 745, subpart E.  For renovations (including maintenance work) covered by the rule, the RRP Rule imposes strict requirements regarding (a) training and

certification; (b) notice to tenants; (c) preparation of the work area; (d) work practices used to disturb the painted surface; (e) cleaning of the work area; and (f) recordkeeping.

43.     The rule applies to "renovations" for compensation in pre-1978 "target housing," except where the work area has been tested and found to be free of lead.  40 C.F.R. § 745.82. Target housing is thus presumed to contain lead-based paint unless testing has demonstrated to the contrary.

44.     "Renovation" is defined broadly to include "the modification of any existing structure, or portion thereof, that results in the disturbance of painted surfaces" and includes work such as "the removal of building components (e.g., walls, ceilings, plumbing, windows)" and "[t]he removal, modification or repair of painted surfaces or painted components (e.g., modification of painted doors, surface restoration, window repair, surface preparation activity (such as sanding, scraping, or other such activities that may generate paint dust))."  40 C.F.R. § 745.83.  Certain *de minimis* work referred to as "minor repair and maintenance activities" is excluded from the definition of "renovation," including most interior work affecting six or fewer square feet of painted surfaces.  *Id.*

45.     The RRP Rule requires that a firm performing covered renovations obtain an EPA certification and assign an EPA-certified renovator to perform certain specified tasks and to supervise or direct the work generally.  *Id.* §§ 745.81(a)(3), 745.89(d)(2), 745.90(a).  The certified renovator must provide on-the-job training in lead-safe work practices to all workers performing renovations who are not themselves certified renovators.  *Id.* §§ 745.81(a)(3), 745.89(d)(1).  The rule also requires distribution to tenants of information about lead-safe work practices and the dangers of lead hazards, *id.* § 745.84; requires renovation firms to obtain written acknowledgement

of receipt of such information by tenants, *id.* § 745.84; and requires the posting of warning signs, *id.* §§ 745.84(b)(2)(ii), 745.85(a)(1).

46.     Before renovation work begins, the RRP Rule requires that the work area be isolated to contain lead dust, *id.* § 745.85(a)(2), including (when inside an apartment), by covering the floor surface in the work area with plastic sheeting or similar protection, *id.* § 745.85(a)(2)(i)(D); by removing all objects from the work area or covering them, *id.* § 745.85(a)(2)(i)(A); by closing and covering all ducts in the work area, *id.* § 745.85(a)(2)(i)(B); and by closing windows and doors in the work area and covering such doors with plastic sheeting, *id.* § 745.85(a)(2)(i)(C).

47.     The RRP Rule also prohibits the use of certain methods and machines that generate dust or debris. *Id.* § 745.85(a)(3).

48.     As waste is generated during renovations, the RRP Rule requires that it be contained and disposed of in a manner that prevents the release of dust and debris outside the work area. *Id.* § 745.85(a)(4).

49.     After the renovation work is complete, the RRP Rule requires that the work area be cleaned to eliminate all dust, debris, and residue, *id.* § 745.85(a)(5), including (when inside an apartment) by collecting and sealing paint chips and debris, *id.* § 745.85(a)(5)(i)(A); carefully removing and disposing of the protective sheeting used to isolate the work area, *id.* § 745.85(a)(5)(i)(B); cleaning the walls with a damp cloth or HEPA vacuum, *id.* § 745.85(a)(5)(ii)(A); vacuuming, with a HEPA vacuum, all remaining surfaces and objects, including furniture, *id.* § 745.85(a)(5)(ii)(B); and wiping all remaining surfaces and objects with a damp cloth and mopping uncarpeted floors, *id.* § 745.85(a)(5)(ii)(C).

50.     To ensure cleaning of the work area was adequate, the RRP Rule requires careful verification of cleaning by a certified renovator, *id.* § 745.85(b), including (when inside an apartment) visual inspection to determine whether dust, debris, or residue remains, *id.* § 745.85(b)(1)(i); and the wiping of windowsills, uncarpeted floors, and countertops in the work area with a cloth and comparison of the color of the wiped cloth to the color of an EPA cleaning verification card, *id.* § 745.85(b)(1)(ii).

51.     Finally, the RRP Rule requires that the firm conducting renovation work document its compliance with the RRP Rule and maintain those records for at least three years. *Id.* § 745.86.

## IV.    State and Local Lead Paint Safety Regulations

52.     The NYC Childhood Lead Poisoning Prevention Act, otherwise known as Local Law One, imposes obligations on owners of multi-family residential properties related to notice and management of lead-based paint. NYC Admin. Code § 27-2056.1 *et seq.* Local Law One focuses on "primary prevention, which means eliminating lead hazards before children are exposed" because that is an "essential tool to combat childhood lead poisoning," and on identifying children who are most at risk. *See* NYC Admin. Code § 27-2056.1 (Statement of Findings and Purposes).[5]

53.     The Act establishes a rebuttable presumption that the paint in apartments that were built prior to January 1, 1960 (when New York City first imposed limits the level of lead in paint

---

[5] In 1992, the State amended existing Public Health Law to authorize the State Health Commissioner as well as local county health departments and local housing code agencies to order removal of paint "conditions conducive to lead poisoning" and also to require mandatory blood lead level screenings for children. N.Y. Public Health Law §§ 1370–1376-a. In New York City, Local Law One, together with the New York City Health Code, 24 R.C.N.Y. § 173.13-14, governing safety standards for work that disturbs lead paint, exceed the minimum requirements of the corresponding New York state law. Accordingly, references herein to state and local lead paint safety regulations will be to New York City local law.

used in homes), where a child under six resides, is "lead based paint." *Id.* § 27-2056.5; *see also* 24 R.C.N.Y. § 173.14(b). The presumption may be rebutted, or a building maybe exempted from some requirements of the Act, if the owner submits evidence to HPD that there is no lead-based paint in the building. NYC Admin. Code § 27-2056.5(a), (b).

54. The Act requires owners of these apartment buildings where children under six reside "to prevent the reasonably foreseeable occurrence" of lead-based paint hazards and expeditiously remediate those hazards. *Id.* § 27-2056.3.

55. As of January 1, 2020, "resides" means that a child routinely spends 10 or more hours per week in an apartment. *Id.* § 27-2056.2(12); *see also* 28 R.C.N.Y. §11-01(bb).

56. The term "owner" includes an "agent, or any other person, firm or corporation, directly or indirectly in control of a dwelling." *Id.* § 27-2004(45).

57. As explained below, among other things, Local Law One imposes obligations on owners of multi-family residential properties to provide notice of potential lead paint hazards and also imposes additional affirmative obligations to inquire about whether any children under six years of age reside in apartments under an owner's control, and to investigate, inspect, and remediate and/or abate any lead-based paint to eliminate lead hazards before children are exposed or lead poisoned. NYC Admin. Code § 27-2056.1 *et seq.*

A. *Occupant Inquiry and Investigation Requirements*

58. The annual inquiry and investigation requirements of Local Law One apply to apartment buildings with at least three apartments that were either: (1) built before January 1, 1960 (unless the presumption of lead-based paint has been rebutted or the building or apartment has been exempted by HPD); or (2) built between January 1, 1960 and January 1, 1978 if the owner has actual knowledge of the presence of lead paint. NYC Admin. Code § 27-2056.4(a).

59.     Owners of these apartment buildings are required to ascertain whether a child under six resides in a dwelling unit by providing a notice to tenants inquiring as to whether a child under the age of six resides or will reside in the apartment.  NYC Admin. Code § 27-2056.4(d)(1). Owners are required to make these inquiries at the signing of an initial lease, at renewal leases, or upon any agreement to lease.  *Id.*; *see also* 28 R.C.N.Y. § 11-03(a)(1).

60.     Thereafter, between January 1 and January 16 of each year, the owner must again send this notice to tenants inquiring as to whether a child under six years old resides within a unit. NYC Admin. Code § 27-2056.4(e)(1).  If the owner does not receive a response from the occupant by February 15 and the owner does not "otherwise have actual knowledge" as to whether a child under the age of six resides therein, the owner must "at reasonable times and upon reasonable notice," inspect the occupant's apartment to determine whether a child of applicable age lives there.  NYC Admin. Code § 27-2056.4(e)(3)(i). Owners are obligated "when necessary, [to] conduct an investigation in order to make that determination."  *Id.*  If the owner's investigation is unsuccessful by March 1, they are required to notify DOHMH.  *Id.* § 27-2056.4(e)(3)(i); s*ee also* 28 R.C.N.Y. § 11-03(b).

B.  *Lead-Based Paint Investigation Requirement*

61.     Local Law One further requires owners to conduct investigations at least annually for "peeling paint, chewable surfaces, deteriorated sub surfaces, friction surfaces, and impact surfaces" in apartments and common areas of buildings subject to Local Law One where they have been notified or they have actual knowledge that a child under six resides.  NYC Admin. Code § 27-2056.4(a).  Owners must expeditiously remediate all lead-based paint hazards and underlying defects identified.  *Id.* § 27-2056.3.  As discussed above, the owner must take steps to ascertain whether a child under six years old resides within a dwelling unit, if unknown.

62.    Local Law One also imposes an additional investigation requirement that must be conducted by an EPA-certified inspector or risk assessor (who is not an agent of the owner or a contractor hired to remediate lead-paint hazards) to assess the presence of lead-based paint within a unit using an "x-ray fluorescence analyzer." NYC Admin. Code § 27-2056.4(a-1). This investigation is required to be completed: (1) by August 9, 2025; (2) within a year of a child under six years old coming to reside in the unit; or (3) as required by an order of DOHMH, whichever is earliest. *Id.*

63.    For both of these investigations, owners are required to provide the results of the investigation to the unit's occupant in writing, including providing the occupant with any report generated during the investigation, and the owner must also keep a copy of any such report for at least ten years. NYC Admin. Code § 27-2056.4(f); *see also* 28 R.C.N.Y. § 11-04(c)(1) (the record of the investigation shall "include the location of such inspection and the results of such inspection for each surface").

*C. Turnover and Remediation/Abatement Requirements*

64.    Local Law One also imposes requirements on an owner of qualifying buildings to conduct specified lead-based paint remediation and abatement work upon the earlier of: (i) turnover of any unit; (ii) by July 1, 2027 for any unit where a child of applicable age resides as of January 1, 2025; or (iii) within 3 years of the date a child of applicable age begins to reside in any unit. NYC Admin. Code § 27-2056.8(a).

65.    The requirement work includes: (1) remediating all lead-based paint hazards and any underlying defects; (2) making all bare floors, windowsills, and window wells in the unit smooth and cleanable; (3) providing for the removal or permanent covering of all lead-based paint on all friction surfaces on all doors and door frames; and (4) providing for the removal or permanent covering of all lead-based paint on all friction surfaces on all windows, or provide for

the installation of replacement window channels or slides on all lead-based painted friction surfaces on all windows.  NYC Admin. Code § 27-2056.8(a)(1)-(4).

66.     After an owner has completed this work, a lead dust clearance test must be performed by a certified third party (neither the owner nor the individual or company that performed any repairs or construction to prepare the apartment for turnover).  NYC Admin. Code §§ 27-2056.11(a)(3), 2056.11(b); *see also* 28 R.C.N.Y. §§ 11-06(b)(2)(iii), (3)(ii), (4), and (g)(3).

67.     Owners must certify compliance with the requirements above in a notice provided to a new occupant upon signing of their lease (including renewal leases) if any, or upon any agreement to lease, or commencement of occupancy if there is no lease.  28 R.C.N.Y. § 11-05(d). The owner must also provide the occupant with a pamphlet developed by the DOHMH about the prevention of lead-based paint hazards.  28 R.C.N.Y. § 11-03(a)(1).

68.     Any owner who fails to comply with the requirements to perform work at turnover or prior to turnover in the case of a child of applicable age residing in a unit and subsequent clearance testing is liable for a class C immediately hazardous violation.  NYC Admin. Code § 27-2056.8(c).

## V.     State and Local Housing Quality Laws

69.     State and local law impose numerous requirements on property owners to ensure their buildings are free from conditions other than lead.  As relevant here and as discussed below, these laws include Local Law 55, the New York State Multiple Dwelling Law, the New York State Real Property Law, and the New York City Housing Maintenance Code.

### A.  NYC Asthma Free Housing Act (Local Law 55 of 2018)

70.     The NYC Asthma Free Housing Act (a/k/a Local Law 55) requires owners of multiple dwellings with three or more dwelling units to keep their tenants' apartments free of mold and pests, including by fixing underlying conditions that lead to these problems.  Owners have

both an obligation to remediate any condition constituting an indoor allergen hazard under the law, *and* are responsible for proactively preventing the "reasonably foreseeable occurrence of such conditions." NYC Admin Code § 27-2017.1. Local Law 55 thus imposes obligations to investigate for the existence of such conditions, to ensure that asthma triggers are removed after a tenant moves out and before a subsequent tenant moves in, and to use safe work-practices while conducting that remediation.

71.    <u>Investigation and Remediation</u>: Local Law 55 directs owners to conduct investigations at least annually in all occupied units and in common areas for any conditions that are reasonably foreseeable to cause an indoor allergen hazard (such as mice, cockroaches, rats and mold) and to respond when an occupant makes a complaint or when HPD issues a notice of violation for condition likely to cause an indoor allergen hazard. NYC Admin. Code § 27-2017.2(b).

72.    Owners must remediate pest infestations and violations for pests using integrated pest management practices to safely control pests and to fix conditions leading to pest problems. NYC Admin. Code § 27-2017.8(a); *see also* 24 R.C.N.Y. §151.02.

73.    Upon vacancy and prior to re-occupancy, an owner must remediate all visible mold and pest infestations and underlying defects in a unit and by thoroughly cleaning and vacuuming all carpeting and furniture (if provided by the owner). NYC Admin. Code §27-2017.5(a). The owner must also certify in writing to the incoming occupant that the unit is in compliance with this mandate. NYC Admin. Code §27-2017.5(b).

74.    <u>Work Practices</u>: When remediating mold or mold hazards, owners must follow work practices that include (1) covering any furniture or items that cannot be removed with plastic sheeting; (2) minimizing dust and debris dispersion; (3) cleaning an area with soap or detergent

and water; (4) removing and discarding materials that cannot be properly cleaned; and (5) leaving the work area dry and visibly free from mold, dust and debris. NYC Admin. Code § 27-2017.9. Owners must certify that the required work practices were followed when certifying correction of a violation. *Id.* § 27-2017.9(c).

75.     Notices:  All leases offered to prospective tenants must contain a notice advising them of obligations of the owner and tenant pursuant to Local Law 55. NYC Admin. Code § 27-2017.2(c).  Owners must also provide prospective tenants with a DOHMH pamphlet outlining information about indoor allergens for tenants and requirements imposed on owners to keep dwelling units free of pests and mold. *Id.*

B.  The MDL, the RPL, and the HMC:  Maintenance, Services and Utilities

76.     New York State Multiple Dwelling Law applies to residential buildings with three or more dwelling units in cities, including New York City.  The MDL sets out a tenants' right to have their unit, including common areas, be kept in good repair by the owner.  MDL § 78.

77.     New York State Real Property Law § 235-b provides that in every lease or rental agreement for a residential dwelling there is an implied warranty of habitability.  RPL § 235-b. Under this implied warranty, a landlord has a non-delegable duty to make sure that occupants are not subject to conditions that are dangerous, hazardous, or detrimental to their life, health, or safety. RPL § 235-b(1).

78.     The statutory warranty of habitability is incorporated by operation of law into the local NYC Housing Maintenance Code (NYC Admin. Code § 27-2001 *et seq.*).  The HMC applies to all residential apartments in New York City and sets out minimum standards for owners' duties to repair and maintain safe and sanitary housing conditions, including for lead-based paint abatement, the control of pests and other asthma allergen triggers (described above), the collection of waste, and for the provision of heat and hot water.  Violations of the HMC are classified as "A"

(non-hazardous), "B" (hazardous) and "C" (immediately hazardous).  NYC Admin. Code § 27-2115.  The penalties provided for in the HMC include the imposition of fines for false certification of correction of violations.  *Id.* § 25-2115(a)(4).

**VI.    State General Business Law: Deceptive Business Practices**

79.    Deceptive acts or practices in the conduct of any business or in the furnishing of any service in New York state are unlawful.  GBL § 349(a).

80.    The New York State Attorney General is authorized to bring actions to enjoin persons or entities from engaging in deceptive acts or practices in the conduct of business.  GBL § 349(b).  The New York State Attorney General is also authorized to seek restitution of any money or property obtained directly or indirectly by any such unlawful acts or practices, as well as civil penalties of up to $5,000 per violation.  *See* GBL § 350-d.

81.    A deceptive act or practice in the conduct of business and furnishing of a service can include the misrepresentation that an apartment is habitable and free of health and safety hazards when it is not, or the failure to make required certifications or disclosures to tenants under federal and local lead paint disclosure rules and/or the false representation that qualified work has been performed and code violations were corrected.

82.    The State has timely served Defendants with a pre-litigation notice pursuant to GBL § 349(c) and/or Defendants have waived notice.

**VII.    State Executive Law: Fraud or Illegality**

83.    New York Executive Law § 63(12) authorizes the New York State Attorney General to commence an action for injunctive and other relief, including penalties related to any underlying statute, against any person or business entity that has engaged in "repeated fraudulent or illegal acts" or "persistent fraud or illegality" in "the carrying on, conducting or transaction of business."

84.    "Illegal" conduct under Executive Law § 63(12) includes the violation of any federal, state, or local law or regulation, including those related to lead-based paint and safe housing.

**VIII.  Public Nuisance**

85.    A public nuisance exists where there is a substantial and unreasonable interference with a right common to the general public. This includes circumstances where a landlord significantly interferes with the public health, the public safety, the public comfort, or the public convenience, by failing to provide safe and sanitary living conditions to thousands of residents.  It includes conduct that is continuous and longstanding, involves repeated violations of law, and is undertaken by a landlord who knows or should have known that the conduct significantly affects the public health.

86.    The United States has standing to sue to abate a public nuisance that impacts significant federal interests.  Significant federal interests are affected by the conduct at issue in this complaint, which affects interstate commerce, including but not limited to the following: the United States' interests in promoting decent and affordable housing; the United States' interest in preventing conduct or conditions proximate to federally subsidized units that exist in more than a dozen of these buildings and may come to exist in others from impacting those units; and the United States' interest in avoiding additional costs caused by the public nuisance, including increased costs to federal health care programs from the adverse impact of the conditions on the health of individuals insured by federal health care programs such as Medicare or Medicaid.

87.    The State of New York, by its Attorney General, has authority to bring an action seeking to enjoin nuisance conditions which affect its residents.  The term "nuisance" as defined by Multiple Dwelling Law:

. . . shall be held to embrace public nuisance as known at common law or in equity jurisprudence.  Whatever is dangerous to human life or detrimental to health, and . . . whatever renders the air…unwholesome, are also severally, in contemplation of this law, nuisances.  All such nuisances are unlawful.

MDL § 309(1)(a).

88.     The City of New York has adopted the same definition of nuisance in its Health Code.  *See* NYC Admin. Code § 17-142.  Further, NYC Administrative Code § 7-701 *et. seq.* (popularly known as the "Nuisance Abatement Law") was enacted to prohibit the use of property in ". . . flagrant violation of the building code . . . health laws . . . multiple dwelling law. . . all of which interfere with the quality of life[,] . . .  public health, safety and welfare of the people of the city [of New York] . . . ." *Id.* § 7-701.  The Nuisance Abatement Law mirrors the Health Code definition of nuisance amongst the types of nuisances for which a permanent injunction may be sought.  *Id.* § 7-703, 7-706(a), and 7-714.  Section 7-706(h) of the Nuisance Abatement Law provides that a penalty may be awarded against a defendant who intentionally conducted, maintained, or permitted a public nuisance.

89.     Finally, a state-common-law public nuisance is an offense against the State when the conduct leading to the nuisance condition amounts to a substantial interference with the exercise of a common right of the public or endangers the health, safety or comfort of a considerable number of people.

## DEFENDANTS' VIOLATIONS OF
## LEAD PAINT SAFETY REGULATIONS

90.     Defendants have systematically violated federal, state and local lead paint safety rules.  Their conduct puts tenants—particularly children under six—and workers at increased risk of lead poisoning.  As described below, *see infra* ¶¶ 132-135, since 2012, at least 130 children living in Defendants' buildings in New York City have suffered lead poisoning.

I.    **Defendants' Violations of the Lead Disclosure Rule**

91.    Since at least 2012, Defendants have routinely violated the Lead Disclosure Rule.

92.    Lilmor and the LLC Defendants have admitted that they systematically violated the

Lead Disclosure Rule from at least June 1, 2012, through November 15, 2020, including by:

- Failing to "disclose the presence of any known lead-based paint and/or lead-based paint hazards in target housing . . . to purchasers or lessees of such housing before selling or leasing the housing, as is required under 24 C.F.R. § 35.88(a)(2)";

- Failing to "disclose 'any additional information available concerning the known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces,' to prospective purchasers or lessees of target housing, as required under 24 C.F.R. § 35.88(a)(2)"; and

- Failing to "provide records and reports available to them pertaining to lead-based paint and/or lead-based paint hazards to prospective purchasers and lessees of target housing—including records and reports regarding common areas and other residential dwellings in multifamily target housing, as is required under 24 C.F.R. § 35.88(a)(4)."

93.    In addition to these admitted violations, the Government's investigation revealed

other failures in Defendants' Lead Disclosure Rule practices.  For example, in 103 lease files

reviewed by the Government, addressing certain units through 2018, Defendants never provided

tenants with a lead disclosure form including a lead warning statement informing tenants about the

dangers of lead paint.  And in 64 of these 103 files, Defendants made no disclosures despite

knowing that the apartments contained lead-based paint, based on citations previously received for

violations of New York City's Housing Maintenance Code.

94.    Defendants' systematic failure to warn their tenants about lead paint violated the

Lead Disclosure Rule and put their tenants, particularly pregnant tenants and young children, at

risk.  If tenants knew the peeling paint in their apartment contained lead, they could have declined

to rent the apartment entirely or, if they decided to rent anyway, they would have been better able

to protect themselves and their families.  Even if Defendants themselves did not know specifically of the existence of lead paint or lead paint hazards, their providing the Lead Disclosure Form with the required lead warning statement and providing the EPA's pamphlet would have enabled tenants to guard against the risk of harm, as Congress intended.

95.    Unfortunately, these risks were not just theoretical.  For example, in April 2015, the LLC Defendant that owned one of Defendants' buildings received five violations from HPD for lead-based paint hazards in a unit at that address.



96.    In May 2015, Lilmor hired an abatement firm to address the specific areas that had been identified by HPD.  The firm abated the violations by a mix of removal (which eliminates lead-based paint from a surface) and enclosure (which leaves the lead-based paint in place). Because that abatement process intentionally left lead in the unit, Lilmor had actual knowledge of the presence of lead in the unit.

97.    Nevertheless, when the LLC Defendant, through Lilmor, entered a new lease with the tenants of the unit in February 2016, it did not (1) inform the tenants that Defendants knew that their unit continued to contain lead paint; or (2) provide the tenants with available records reflecting lead paint violations and the abatement that included leaving lead paint in place.  The Lead Disclosure Rule required Defendants to provide their tenants with this information.

98.    Sadly, ten months later, in December 2016, blood testing performed on the tenants' one-year-old child showed elevated blood-lead levels.  Had the tenants been warned about lead in the unit, as required by law, they could have taken steps to protect themselves or insisted that Defendants' eliminate existing hazards in the apartment.

99.    Since 2012, Lieberman has been ultimately responsible for ensuring that residential units managed by Lilmor comply with the Lead Disclosure Rule.  Throughout this period, he maintained operational control over Lilmor, and the Lilmor employees responsible for leasing and regulatory compliance reported up a chain of command that ended with Lieberman.  Although he had the power to ensure Lilmor's compliance with the Lead Disclosure Rule, he failed to do so even after the Government began investigating his company.

100.    In light of Defendants' systematic non-compliance, they are likely to continue violating the Lead Disclosure Rule in the absence of an injunction.

## II.    Lilmor and Lieberman's Violations of the RRP Rule

101.    In addition to their widespread non-compliance with the Lead Disclosure Rule, Lilmor and Lieberman have violated the RRP Rule throughout their portfolio, both during routine maintenance work conducted by Lilmor superintendents and in large-scale renovation projects conducted by other entities under their control.

A. *Lilmor's Superintendents Conduct Maintenance Work in Violation of the RRP Rule.*

102.    Lilmor has never been certified as a renovation firm pursuant to the RRP Rule, nor have its superintendents been trained and certified as certified renovators pursuant to that rule.

103.    Despite lacking certifications and related training, Lilmor has routinely relied on its superintendents to conduct paint-disturbing work covered by the requirements of the RRP Rule. For example, Lilmor's internal work order database reflects that, on July 20, 2016, the superintendent of one of Defendants' buildings conducted work described in the database as "REPAIR PRIVATE HALLWAY AND ENTIRE APT BULGING WALL." As noted above, the RRP Rule governs "modification or repair of painted surfaces or painted components (e.g., modification of painted doors . . .)" above de minimis levels.

104.    In another example, the work order database reflects that the superintendent of another building conducted work described as "SCRAPE OFF PEELING PAINT FROM BDRM CEILING—DONE" on December 23, 2015. Again, the RRP Rule governs "surface preparation activity (such as sanding, scraping, or other such activities that may generate paint dust)."

105.    In interviews, Lilmor tenants have confirmed that Lilmor's superintendents conducted the kind of work described above. One tenant told investigators that "[t]he superintendent is sent to make almost all repairs." Another tenant described a large recurring leak in her bathroom ceiling for which the building's superintendent would routinely come to cut out portions of the ceiling that were leaking and patch them with plywood.

106.    Because Lilmor's superintendents have not been trained or certified to conduct work under the RRP Rule, between 2012 and the present they did not follow the RRP Rule's requirements: They did not distribute informational pamphlets to tenants; post warning signs; exclude tenants from work areas; follow lead-safe work practices; or maintain records of

compliance. Lilmor's failure to take these basic, mandatory steps put its tenants, visitors, and workers at risk of exposure to dust containing lead during maintenance projects in their units.

107.   Although it is not always possible to trace the origin of lead exposure, Lilmor's documents reflect instances where its superintendents disturbed lead paint in a unit without complying with the RRP Rule and shortly after a child within the unit suffered lead poisoning.

108.   For example, in January of 2020, the superintendent of one building performed substantial repairs within a tenant's apartment, as reflected in the following work order:

```
26-                                    211171  01/23/20  Finished   SUPER
Addr▮                                       by: BK                 T:
Prob: REPAIR COUNTERBALANCE @ NORTH WNDW IN 3RD ROOM      Resol:
Prob: REPAIR/REPLACE SMOKE & CARBIN MONOX DETEC          Resol:
Prob: REPAIR & PAINT CEILING IN THE 3RD ROOM             Resol:
```

Less than two months later, blood testing of a two-year old child living in that apartment showed elevated blood lead levels.

109.   Similarly, in June of 2012, the superintendent of another building conducted significant work in an apartment within that building, including the repair of bathroom wall tiles and of a hole in the kitchen ceiling, as reflected in the work order below:

```
44-                                    143241  06/26/12  Finished   SUPER
Addr▮                                       by: BK                 T:
Prob: REPAIR BATHTUB FAUCET                              Resol:
Prob: REPAIR BATHROOM WALL TILES                         Resol:
Prob: REPAIR HOLE IN KITCHEN CEILING                     Resol:
```

110.   In November of 2012, blood testing of a child living in that apartment showed elevated blood lead levels the day before his second birthday.

111.   The employees at Lilmor responsible for the hiring and training of superintendents, as well as for decisions about what work should be conducted by superintendents and what work should be outsourced to contractors, reported through a chain of command that ended with Morris

Lieberman. At all times relevant to this complaint, Morris Lieberman had final decision-making authority over hiring decisions, training decisions, and decisions regarding whether work would be conducted by in-house employees or contractors, and could have but did not take action to cause compliance.

### B. Lilmor and Lieberman Violated the RRP Rule in Larger Renovation Projects.

112.    When Lilmor needed to conduct renovation projects larger in scale than those that it required its superintendents to conduct, it would often hire a purported independent contractor—"Individual A"—to perform the renovations.

113.    Individual A conducts renovation work through an LLC in which he is the only employee, sometimes with the assistance of a limited number of independent contractors that he employs. Individual A's firm is a "mom and pop shop," as described by the Lilmor employee with responsibility for facilitating apartment repairs and renovations. Individual A's LLC derives substantially all (if not all) of its income from projects assigned to it by Lilmor.

114.    Individual A conducts renovation projects in Lilmor housing under the direct supervision and control of Lilmor employees. When Lilmor tasks Individual A with a project, he goes to the apartment, takes pictures of the anticipated worksite, and sends them to the Lilmor employee responsible for managing repairs and renovations. That Lilmor employee would then instruct Individual A on how to perform the project. Once completed, Individual A would send photographs of the worksite to the Lilmor employee, who would approve the work and authorize payment.

115.    Lilmor also assumed authority over Individual A's compliance with the RRP Rule. When the RRP Rule's certification requirement first came into effect in 2010, Lilmor scheduled Individual A for individual renovator training and arranged for his LLC's certification. After

Individual A's and his LLC's certifications lapsed in 2015, Lilmor did not cause either to be renewed until February 2021.

116.    Despite the fact that Individual A's LLC's certification had lapsed, between 2015 and 2021, Lilmor continued to use Individual A to conduct renovation projects subject to the RRP Rule.

117.    For example, in December of 2019, Individual A repaired the condition pictured below on a window within an apartment in 1311 Avenue K:



118.    And as another example, in June of 2019, Individual A removed a large section of crumbling ceiling from the bathroom of an apartment in 55 Winthrop, replaced the sheetrock, and repainted it, as pictured below:



119.    Individual A has admitted in communications with the Government that when he conducted this kind of renovation work on behalf of Lilmor, he did not provide tenants with the EPA pamphlet on lead safety that is required to be distributed under the RRP Rule, nor did he maintain any records of compliance with other aspects of the RRP Rule.  Furthermore (and as mentioned above), these projects were conducted by a firm and renovators who were not certified to conduct work under the RRP Rule.  Upon information and belief, Individual A did not follow the work practice requirements of the RRP Rule during these renovations, either.

120.    Lilmor's work order database reflects numerous examples of Individual A being used by Lilmor to conduct comparable work in Lilmor apartments.

121.    As with the work conducted by Lilmor's superintendents, projects undertaken by Individual A were sometimes followed closely in time by children testing positive for elevated blood lead levels.

122.    In January 2020, for example, Individual A conducted a renovation project in an apartment that involved the repair of missing tiles within a bathroom and the replacement of a damaged door, as reflected in the work order below:



In June 2020, blood testing of a child who was less than a year old showed elevated blood lead levels in the same apartment.

123.    In another apartment, Individual A conducted multiple renovation projects over the course of late 2015 through mid-2016, including the removal of mold from painted surfaces and the repair of a hallway ceiling.



In November 2016, blood testing of an eight-year-old child who had been living in the apartment during those prior renovation projects showed elevated blood lead levels.

124.    The Lilmor employees responsible for managing the work conducted by Individual A reported through a chain of command that ended with Morris Lieberman.  At all times relevant to the complaint, Lieberman had authority to ensure that Individual A conducted work in compliance with the RRP Rule (or to stop assigning work to Individual A altogether), but he failed to exercise that authority.

### III.    Defendants' Violations of State and Local Lead-Based Paint Law

125.    For years after its passage, Defendants failed to comply even nominally with its obligations under Local Law One, with the result that HPD has placed over 1,500 violations across Defendants' buildings from 2012 to date for lead paint hazards alone.

### A.    Defendants' Failure to Certify Turnover Lead Paint Abatement and Distribute the DOHMH Pamphlet on Lead Based Paint Hazards

126.    Like their failure to comply with the Lead Disclosure Rule, until at least 2020, Defendants ignored their obligation to certify in initial and renewal leases to its rent-stabilized tenants that work to remediate lead-based paint hazards had been done at the vacancy or turnover of their units in compliance with NYC Admin. Code § 27-2056.8 and 28 R.C.N.Y. § 11-05(d).

Defendants' practice, as demonstrated by the sample below, was simply to leave that certification (and their related certification that they had distributed the relevant DOHMH pamphlet) completely blank:



127.    For example, in January 2018, a tenant who moved into an apartment signed a lease and notified Defendants that a child under six *would* be residing in the apartment.  As shown above, Defendants failed to certify that lead paint abatement and remediation work was done before the family moved in.  They also failed to certify that the DOHMH pamphlet, which would have given the tenant basic information about how to identify and prevent lead based paint hazards, was provided.

128.    The premises of that apartment were built in 1922 and therefore are presumed under the law to contain lead based paint.  In fact, Defendants were aware that tests had come back positive for lead based paint in multiple other units at that building before entering into a new lease with the tenants.  Defendants failed to properly inform the tenant at lease signing of the hazards of

lead based paint when they were aware that lead-based paint had been found at the premises and that a child under six years old would be moving in.

### B. *Defendants' Failure to Conduct Investigations*

129.    For every child under six years old that came to reside in an apartment in Defendants' portfolio, Defendants were obligated within one year to "cause an investigation to be made for peeling paint, chewable surfaces, deteriorated subsurfaces, friction surfaces and impact surfaces" to determine any lead-based paint hazards needing remediation or abatement pursuant to its obligation under Local Law One. *See* NYC Admin Code § 27-2056.4(a). From at least 2015 to at least 2019, Defendants failed to conduct these required investigations.

130.    In fact, Defendants made no effort to investigate the residence of the child under six who came to reside in the same apartment discussed in Paragraphs 126 and 127, above.

131.    Nor did Defendants comply with their further obligation to ascertain whether the child who lived in that apartment in 2018 continued to live there into 2019, even after the February 15, 2019, deadline to do so had passed. This violation of Local Law One's obligations had serious consequences. Nine months later, on October 2, 2019, HPD issued three violations for positive lead paint in that apartment as shown below:



132.    Between 2016 and 2021 there were multiple HPD violations placed for positive lead paint hazards across no less than 17 apartments in that building alone.  Approximately 15 children residing in that building have been tested and found to have elevated blood-lead since 2012.

### IV.    At Least 130 Children Have Suffered Lead Poisoning in These Buildings

133.    Defendants' widespread violation of the Lead Disclosure Rule, the RRP Rule, and the NYC Childhood Lead Poisoning Prevention Act puts their tenants at risk, exposing tenants, their visitors, and workers to lead dust and depriving tenants of information that would help them protect themselves and their children.

134.    Since 2012, blood tests performed on at least 130 children living in apartments controlled by Lieberman, Lilmor and the relevant LLC Defendants, and owned by Lieberman and/or the LLC Defendant, have shown elevated blood lead levels and had those results reported to DOHMH.  At least 14 of those test results occurred between January 1, 2022, and May 1, 2024, the latest information available to the Government.

135.    These numbers likely understate the number of poisoned children in Lilmor's buildings.  Many children never receive tests for lead poisoning, even in New York where health care providers are required to test children for lead at one and two years of age.  *See* N.Y. Public Health Law § 67-1.2.  DOHMH has recently estimated that in New York City, 20% of three-year-old children had never been tested, and half had not been tested at ages one and two, as required. Lower-income individuals who have reduced access to medical care may have particular challenges in obtaining testing on this schedule.

136.    The Government reviewed the DOHMH files for several instances in which DOHMH investigated apartments following the lead-poisoning of a child living in them, including by visually assessing the apartments for paint that was not intact or was subject to friction and

taking paint samples for laboratory analysis for lead. In every case, DOHMH inspectors identified lead hazards in the apartment.

### DEFENDANTS SUBJECT THEIR TENANTS TO UNSAFE AND UNSANITARY CONDITIONS; VIOLATE STATE AND LOCAL HOUSING LAW; AND MAINTAIN A PUBLIC NUISANCE

137.    Defendants have maintained unsafe and unsanitary conditions across the buildings they control, not just violating federal, state and local lead paint safety regulations, but also subjecting tenants to incessant leaks; pervasive mold; chronic heat outages; and infestations of roaches, mice, and rats, as well as other serious threats to their health and safety. From 2012 to date, Defendants were cited for 15,680 hazardous or "B" violations and over 7,770 immediately hazardous or "C" violations of the NYC Housing Maintenance Code by HPD.

138.    In January of 2024, U.S. Department of Housing and Urban Development Office of the Inspector General ("HUD-OIG") agents conducted inspections of a dozen units within the Lilmor portfolio and found numerous health and safety issues.

139.    For example, one tenant directed HUD-OIG to multiple issues in his apartment, including a water leak in his living room and mold growing over the bathroom window, pictured below:



The tenant informed HUD-OIG that he had sent pictures of the mold to Lilmor six months earlier, but that it had yet to fix the problem.

140. As another example, a tenant informed HUD-OIG agents that his apartment has faced continuous mold problems that Lilmor had once painted over, but that had recurred through the paint. He also reported a leak from the upstairs unit and an extreme problem with mice, providing these pictures to substantiate his experience:



141. The Government's interviews with tenants confirmed that they routinely complained of the conditions in their apartments to Lilmor, but their complaints were often met without response or were remediated through temporary fixes that only exacerbated the unsafe and unsanitary living conditions in their apartments.

142. For example, one tenant has lived in a Lilmor apartment for ten years with a crumbling ceiling in his closet caused by a long-existent leak. His superintendent would occasionally come to plaster the damaged ceiling, but without addressing the root cause of the problem. One night in 2020, his ceiling collapsed, sending a rush of water through the apartment. At that point, Lilmor finally sent a plumber to address the leak but, when the tenant spoke to Government investigators one month later, nothing had been done to fix the collapsed ceiling. One

of the tenants had to clean the fallen plaster from a closet floor themselves.  Lilmor knew from prior HPD violations that the paint in that closet was lead-based paint.

143.    Tenants with young children particularly susceptible to mold and lead paint fare no better under Lilmor's management.  Tenants in one building who were interviewed by the Government grew concerned about peeling paint on their apartment door after the birth of their son and called both Lilmor and HPD.  Although Lilmor's employees told the tenants not to worry about it, HPD inspectors identified peeling lead paint in several areas in the apartment.  The contractors hired by Lilmor to remediate the lead paint violations were unprofessional, according to the tenants' account, and one of the tenants himself went out to purchase appropriate plastic sheeting to protect the work areas after researching the proper way to remediate lead-based paint.  These tenants, too, had a ceiling collapse in one of their closets as water crashed through from a leaking pipe.

144.    Tenant complaints to Lilmor's central office email account help highlight the full extent of Lilmor's failures to ensure safe and sanitary conditions in tenants' apartments.  In April 2021, a tenant sent the following picture of peeling paint on a window to Lilmor's email inbox:



145.    She explained that she had "emailed before" about this issue and that although the superintendent "looked at it," he "never came back to fix it [for] more than a month now!"

146.    The tenant explained her sentiment about her treatment in no uncertain terms: "It's very frustrating, I'm 6 months pregnant and I've been trying to get this fix before I go into labor. I don't know if the paint that's falling all on my curtains and floors have lead, I need it fixed ASAP! . . . When I email I get no response of what's going to happen . . . I shouldn't have to work months for repairs to be done."

147.    Lilmor's inbox is replete with similar complaints of unresponsive superintendents and delayed repairs.  For example, on May 6, 2020 at 3:03 P.M., a tenant emailed Lilmor to say "[i]t looks like the ceiling may collapse" due to a leak in the bathroom ceiling.  At 7:43 P.M., the tenant followed up, saying "[t]he ceiling has collapsed," but that "[t]he super has told us that a plumber will be coming tomorrow morning to fix it."

148.    But on June 9, 2020, the same tenant sent Lilmor the following picture:



149.    The tenant's message to Lilmor was simple: "It has been over a month and no repair has been done. We have contacted the Super and nothing has been done. My family and I had to duck tape a plastic bag to stop debris from falling on our heads while using the bathroom. This is unacceptable and outrageous."

150.    Some of the conditions faced by tenants shock the conscience.  In October of 2020, a tenant emailed Lilmor to request repairs to his apartment.  Lilmor scheduled a repair for December of 2020, but when the repair workers came, they only addressed some of the apartment's issues, which the tenant informed Lilmor on January 1, 2021.

151.    In March, the tenant emailed Lilmor back with the subject line "URGENT!"  That email noted that "[t]he bedroom where [the tenant's] 2 year-old son" sleeps "is also covered in mold on the ceiling that has gotten worst over time."  The mold in question is pictured below:

 

152.    The tenants' email—five months after he first contacted his landlord—ended with the following plea: "This is unfair and these repairs need to be addressed IMMEDIATELY before they get worse."

153.    HUD-OIG inspections, tenant interviews, and Lilmor's own work order database and email inbox establish that stories like those of the tenants discussed above are not isolated incidents within Lilmor's portfolio—hundreds of tenants have been subjected to unsafe and unsanitary conditions, with no or inadequate responses from Lilmor.

154.    Between 2019 and the present, HPD issued thousands of violations for unsafe and unsanitary conditions within the 56 buildings that were owned or controlled by Defendants during this period.  Over 2,300 violations were issued related to rat, mice, and roach infestations.  Over 1,400 were issued related to mold and over 1,400 violations were issued for water leaks.  Over 900 were for lead-paint violations under City law.  And over 80 were issued where tenants had no heat. Defendants' violation rate was so high during this period that Lieberman's agent was declared New York City's "Worst Landlord" in 2019 and 2020 by New York City's Public Advocate, climbing from ninth worst in 2018.

155.    Conditions were especially dire in a handful of Lilmor and Lieberman's worst maintained buildings.  The buildings located at 192 Nagle Avenue, 200 Nagle Avenue, 1311 Avenue K, 1435 Carroll Street, 575 Herkimer Street, and 1616 President Street each averaged over eight violations *per unit* between 2016 and 2021.

156.    Because the hazardous and immediately hazardous violation counts for mold and water leaks were so high in several buildings, those buildings were selected by HPD for mandatory participation in the "Underlying Conditions" program.  This program identifies approximately fifty to one hundred of the worst buildings *citywide* for these violation types in the year before selection that remain uncorrected.  In October 2019, Defendants' buildings occupied six of those spots.[6]

---

[6] The six buildings that entered the Underlying Conditions program in October 2019 were 200 Nagle Avenue, 3402 Avenue I, 776 Crown Street, 250 East 29th Street, 575 Herkimer Street, and 271 Parkside Avenue.

157.    The persistently poor condition of apartments in Lilmor's portfolio results from Defendants' complete failure to conduct any kind of preventive maintenance or even to proactively identify problems when they arise.   When interviewed by the Government in 2021, the Lilmor employee responsible for coordinating apartment repairs stated that "you can be proactive all you want, [but HPD is] going to issue violations."   She continued: "We're not looking for issues . . . We're not going to check unless we have reason to check."

158.    Defendant Morris Lieberman, who bears ultimate responsibility for the staffing and funding decisions that give rise to the unsafe and unsanitary conditions and who directly supervises the Lilmor personnel responsible for managing unit-by-unit repairs, is unmoved by the suffering of his tenants, as callously reflected in the email correspondence regarding 30 insufficient heat complaints from the winter of 2020, set forth below:



159.    Health and safety violations like leaks and mold persisted in Defendants portfolio in part because Defendants failed abysmally to address these indoor allergen triggers in any comprehensive manner, as required by Local Law 55.  Defendants took none of the legally required steps to (i) annually inspect all apartments for indoor allergen hazards, including for pests and mold and keep records of those inspections; (ii) properly remediate indoor allergen hazards using safe work practices as defined by the law; (iii) clean units at vacancy to ensure that they are free of pests and mold and using a HEPA vacuum where indicated; (iv) timely establish Integrated Pest

Management plans, as required by law, in many buildings in the portfolio; or (v) provide a copy

of the DOHMH Fact Sheet "What Tenants Should Know About Indoor Allergens" with all tenants'

initial and renewal leases.

160.    Additionally, the overall numbers of Housing Maintenance Code violations in

Defendants' buildings were high enough to land the buildings in another of HPD's mandatory

oversight programs, the Alternative Enforcement Program ("AEP").  Based on their high violation

count, HPD selects approximately 200 buildings citywide on January 31st of each year to

participate.  The selected buildings undergo frequent inspections to monitor correction of

violations and if the owner fails to act, HPD will make the repairs and bill the owner.  Between

2019 and 2022, ten of Defendants' buildings were required to participate in the AEP program.[7]

## DEFENDANTS ENGAGED IN DECEPTIVE AND FRAUDULENT BUSINESS PRACTICES

161.    In addition to the repeated and persistent violations of laws governing lead-based

paint and housing conditions, Defendants have engaged in deceptive and fraudulent business

practices in violation of NYS GBL § 349 by (1) their complete failure to establish proper policies

and practices for addressing lead-based paint hazards, including their use of uncertified workers

to perform renovations of actual or presumed lead paint; (2) their persistent failure to disclose

known lead paint hazards to new and existing tenants; (3) their failure to sign required

certifications with initial and renewal leases that lead paint inspection and remediation work has

been properly done in the units they lease; and (4) their chronic misrepresentation of the

habitability of the apartments they lease to the public.

---

[7] 192 Nagle Avenue, 200 Nagle Avenue, 250 East 29th Street, 251 East 29th Street, 1439 Ocean Avenue, 3402 Avenue I, 776 Crown Street, 575 Herkimer Street, 271 Parkside Avenue, and 1616 President Street.

## CLAIMS FOR RELIEF

## COUNT ONE: LEAD DISCLOSURE RULE
### (ON BEHALF OF UNITED STATES)
### (AGAINST ALL DEFENDANTS)

162.    The United States repeats and realleges the allegations in paragraphs 1 through 161.

163.    The United States brings this count on behalf of EPA and HUD.

164.    Morris Lieberman is a lessor within the meaning of the Lead Disclosure Rule, either directly or through his control of alter egos and agents.  Each of the LLC Defendants is also a lessor within the meaning of the Lead Disclosure Rule.

165.    Lilmor is an agent of a lessor within the meaning of the Lead Disclosure Rule.

166.    Morris Lieberman is a corporate officer of Lilmor and most of the LLC Defendants. He had the authority to cause, and was responsible for causing, those entities to comply with the Lead Disclosure Rule.

167.    Between 2012 and the present, Defendants have systematically violated the Lead Disclosure Rule.  They will continue to violate the Lead Disclosure Rule absent injunctive relief.

168.    These violations of the Lead Disclosure Rule threaten irreparable harm to the health and safety of children and others living in Lilmor's buildings and frequent visitors to these buildings.

169.    Violation of the Lead Disclosure Rule is a "prohibited act" under and a violation of TSCA, 15 U.S.C. § 2689, as well as a violation of the Residential Lead-Based Paint Hazard Reduction Act of 1992, Public Law 102-550, Title X ("Title X"), 42 U.S.C. § 4852d.

170.    Section 17(a) of TSCA, 15 U.S.C. § 2616(a), provides federal district courts with jurisdiction to restrain any violation of Section 409 of TSCA, 15 U.S.C. § 2689, and Title X authorizes the Secretary of HUD to seek an injunction of violations of the Lead Disclosure Rule, 42 U.S.C. § 4852d(b)(2).

171.    Defendants have obtained unjust profits from their violations of the Lead Disclosure Rule, TSCA, and Title X, which unjust profits fund further violations by Defendants.

172.    Pursuant to 15 U.S.C. § 2616(a) and 42 U.S.C. § 4852d(b)(2), the Court should issue an order (i) enjoining Defendants to comply with the Lead Disclosure Rule going forward; (ii) directing Defendants to provide remedial disclosures to tenants and former tenants who have not previously received proper disclosure, (iii) directing Defendants to take specified steps to mitigate harm to tenants or others from prior violations, and (iv) requiring Defendants to disgorge unjust profits that they have received in connection with their violations of the Lead Disclosure Rule, to the extent authorized by law.  The Court should award other appropriate equitable relief, including appointment of a special master, monitor, or receiver, to the extent necessary or appropriate to ensure compliance.

### COUNT TWO: RRP RULE
### (ON BEHALF OF UNITED STATES)
### (AGAINST MORRIS LIEBERMAN AND LILMOR)

173.    The United States repeats and realleges the allegations in paragraphs 1 through 172.

174.    The United States brings this count on behalf of EPA.

175.    Lilmor is a "firm" "performing renovations" "for compensation" in "target housing" within the meaning of the RRP Rule.

176.    Lieberman, who directs and oversees this work in violation of the RRP Rule, is a "firm" "performing renovations" "for compensation" in "target housing" within the meaning of the RRP Rule through his control of Lilmor with respect to compliance with the RRP Rule.  He is also a responsible corporate officer of Lilmor and its alter egos.

177.    Lieberman had the authority to cause, and was responsible for causing, Lilmor and its agents and alter egos to comply with the RRP Rule.

178.    Between 2012 and the present, Lieberman and Lilmor have systematically violated the RRP Rule.

179.    Lieberman and Lilmor will continue to violate the RRP Rule absent injunctive relief.

180.    These ongoing violations of the RRP Rule threaten irreparable harm to the health and safety of children, others living in Lilmor's buildings, visitors to these buildings, and workers in these buildings.

181.    Lieberman and Lilmor have obtained unjust profits from their violations of the RRP Rule, which profits fund further violations by Defendants.

182.    Violation of the RRP Rule is a "prohibited act" under and violation of TSCA, 15 U.S.C. § 2689.

183.    Section 17(a) of TSCA, 15 U.S.C. § 2616(a), provides federal district courts with jurisdiction to restrain any violation of Section 409 of TSCA, 15 U.S.C. § 2689.

184.    Pursuant to 15 U.S.C. § 2616(a), the Court should issue an order (i) enjoining Lieberman and Lilmor to comply with the RRP Rule going forward; (ii) ordering them to take specified steps to mitigate harm to tenants or others from prior violations; and (iii) requiring them to disgorge unjust profits that they have received in connection with their violations of the RRP Rule, to the extent authorized by law.  The Court should award other appropriate equitable relief, including appointment of a special master, monitor, or receiver, to the extent necessary or appropriate to ensure compliance.

**COUNT THREE: REPEATED AND PERSISTENT VIOLATION OF STATE/LOCAL LEAD-BASED PAINT LAW UNDER EXECUTIVE LAW § 63(12)
(ON BEHALF OF NEW YORK)
(AGAINST ALL DEFENDANTS)**

185.    The State repeats and realleges paragraphs 1 to 184.

186.     Defendants are persons engaged in carrying on, conducting, or transaction of business for purposes of Executive Law § 63(12).

187.     Defendants are "owners" of the residential buildings and apartments they manage and/or own because they are either an "agent" and/or a "corporation" that is "directly or indirectly in control" of those buildings and apartments. *See* NYC Admin. Code § 27-2004(45).

188.     Defendants repeatedly and persistently violated multiple provisions of the NYC Childhood Lead Poisoning Prevention Act (Local Law One of 2004) NYC Admin. Code § 27-2017 *et seq*. by failing to:

- Annually investigate whether a child under six years resides in an apartment where the landlord was unable make the determination through annual inquiry.

- Annually investigate for peeling paint, chewable surfaces, deteriorated sub surfaces, friction surfaces, and impact surfaces in multi-family buildings where a child under six years lives including in apartments for which Defendants had actual notice that a child under six resided in the apartment;

- Notify tenants in writing of the results of those investigations.

- Safely and expeditiously remediate and abate all lead-based paint hazards and underlying defects using proper work methods.

- Take remedial measures to address lead-based paint hazards on the turnover of tenants in a building constructed prior to 1960.

189.     Defendants, who participated in the conduct and had knowledge of the facts and events herein, have persistently violated the NYC Childhood Lead Paint Poisoning Act constituting repeated illegality under Executive Law § 63(12).  They will continue to violate Local Law One absent injunctive relief.  These ongoing violations caused and threaten harm to the health and safety of children and others residing in Defendants' buildings and frequent visitors to the buildings.

190.     Defendants are liable, pursuant to the New York Attorney General's Executive Law § 63(12) authority, for injunctive relief, for civil penalties for violations related to lead paint conditions and recordkeeping pursuant to NYC Admin Code § 27-2115(a), as well as for an additional civil penalty of up to $1,500.00 for each violation of NYC Admin Code § 27-2056.4 and § 27-2056.8.

191.     Defendants have obtained unjust profits from their violations of Local Law One and the Attorney General seeks  disgorgement of the monies Defendants received in connection with their violations of Local Law One.  The Court should award other appropriate equitable relief, including appointment of a special master, monitor, or receiver, to the extent necessary or appropriate to ensure compliance.

### COUNT FOUR: VIOLATIONS OF STATE/LOCAL HOUSING LAW UNDER EXECUTIVE LAW § 63(12) (ON BEHALF OF NEW YORK) (AGAINST ALL DEFENDANTS)

192.     The State repeats and realleges the allegations in paragraphs 1 through 191.

193.     Defendants are persons engaged in the carrying on, conducting, or transaction of business for purposes of Executive Law § 63(12).

194.     Defendants are "owners" of the residential buildings and apartments they manage and/or own because they are either an "agent" and/or a "corporation" that is "directly or indirectly in control" of those buildings and apartments.  *See* NYC Admin. Code § 27-2004(45).

195.     Defendants repeatedly and persistently violated  the Warranty of Habitability of the apartments they leased which is guaranteed by NYS RPL § 235-b and for which the obligation to repair is set out in NYS MDL §78.  Defendants also repeatedly and persistently violated housing standards set out in the NYC HMC (Admin. Code of the City of NY, tit. 27, ch. 2, subch. 2, § 27-2001 *et seq*. and including but not limited to Admin. Code of the City of NY, tit. 27, ch. 2, subch.

2, Art. 4 Control of Pests and Other Asthma Triggers, § 27-2017-2019).  These violations constitute repeated illegality under Executive Law § 63(12).

196.    Defendants have violated and continue to violate the state and local housing law and code.  They will continue to violate these laws absent injunctive relief.

197.    These ongoing violations of the state and local housing law and code have caused and threaten harm to the health and safety of children and others residing in Lilmor's buildings and frequent visitors to these buildings.

198.    Defendants are liable for injunctive relief of total remediation and repair of all open violations of record and substandard conditions as well as for remediation of any indoor allergen triggers and compliance with inspection and notice requirements of the Asthma Free Housing Act.

199.    Defendants are liable for restitution to the former and current tenants and occupants of the dwellings they own and manage under Executive Law § 63(12).

200.    Defendants are liable for damages pursuant to their breach of the Warranty of Habitability

201.    Defendants have obtained unjust profits from their violations of the state and local housing laws and codes, which unjust profits fund further violations by Defendants.

202.    The Attorney General  seeks disgorgement of the monies Defendants received in connection with their violations of state and local housing law and code as equitable relief..

203.    Defendants are also liable for civil penalties that accrued for HPD violation issuance as well as daily penalties accruing for both open and closed HPD violations.

204.    The Court should award other appropriate equitable relief, including appointment of a special master, monitor, or receiver, to the extent necessary or appropriate to ensure compliance.

**COUNT FIVE: VIOLATION OF**
**NYS GENERAL BUSINESS LAW**
**(ON BEHALF OF NEW YORK)**
**(AGAINST ALL DEFENDANTS)**

205.    The State repeats and realleges the allegations in paragraphs 1 through 204.

206.    GBL § 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  Defendants' failure to certify compliance with the turnover requirements of the NYC Childhood Lead Poisoning Prevention Act when entering into hundreds, if not thousands of lease and renewal lease agreements with their tenants was a fraudulent and deceptive business practice which would mislead a reasonable tenant into believing that Defendants either complied with the turnover requirements of the Lead Poisoning Prevention Act or that lead-based paint hazards were not present.  These false certifications violate GBL § 349(a). Additionally, Defendants' false representations that hundreds of apartments or more in their portfolio are habitable, when they are not, constitutes a deceptive business practice.

207.    Defendants have violated General Business Law § 349(a) by their actions and omissions and will continue to violate the General Business Law absent injunctive relief.

208.    These deceptive business practices have caused and threaten  harm to the health and safety of children and others residing in Defendants' buildings.

209.    Defendants are liable for restitution to the former and current tenants and occupants of the dwellings they own and manage for their violations of GBL § 349(a).

210.    Defendants have obtained unjust profits from their violations of the General Business Law § 349(a), which unjust profits fund further violations by Defendants.

211.    The Attorney General seeks disgorgement of the monies Defendants received in connection with their violations of GBL § 349(a).

212.    Defendants are also liable for civil penalties, pursuant to GBL §§ 349, 350-(d), of up to $5,000 per violation or $10,000.00 pursuant to GBL § 349-c(2) for fraudulent conduct perpetrated against one of more elderly persons.

213.    The Court should award other appropriate equitable relief, including appointment of a special master, monitor, or receiver, to the extent necessary or appropriate to ensure compliance.

**COUNT SIX: PUBLIC NUISANCE**
**(ON BEHALF OF UNITED STATES)**
**(AGAINST ALL DEFENDANTS)**

214.    The United States repeats and realleges the allegations in paragraphs 1 through 213.

215.    Defendants, directly and through agents, have and continue to substantially and unreasonably interfere with the public health, the public safety, the public comfort, and the public convenience including, in particular, the health and welfare of thousands of past, present, and future tenants of Defendants' buildings.

216.    This interference is continuous and longstanding and involves repeated violations of federal, state, and local law.

217.    Defendants knew or should have known that the conduct at issue significantly affects the public health.

218.    Defendants' conduct, which affects interstate commerce and implicates significant federal interests, including but not limited to the United States' interests in promoting decent and affordable housing; the United States' interest in preventing conduct or conditions proximate to federally subsidized units from impacting conditions in those units; and the United States' interest in avoiding additional costs caused by the public nuisance, including increased costs to federal

health care programs from the adverse impact of the conditions on the health of individuals insured by federal health care programs.

219.    Defendants have obtained unjust profits from their maintenance of the public nuisance, which fund further violations by Defendants.

220.    Pursuant to the common law of nuisance, the Court should issue an order (i) enjoining Defendants to correct living conditions in the buildings that constitute a public nuisance; (ii) directing Defendants to mitigate prior injuries resulting from the public nuisance; and (iii) directing Defendants to disgorge their unjust profits, to the extent authorized by law.  The Court should award other appropriate equitable relief, including appointment of a special master, monitor, or receiver, to the extent necessary or appropriate to ensure compliance.

**COUNT SEVEN: PUBLIC NUISANCE**
**(ON BEHALF OF NEW YORK)**
**(AGAINST ALL DEFENDANTS)**

221.    The State repeats and realleges the allegations in paragraphs 1 through 220.

222.    Defendants' intentional conduct in maintaining, or permitting the existence of conditions conducive to lead poisoning, mold and pest infestation and other conditions hazardous to safety and health around Defendants' properties is a public nuisance under state and local law. NY CLS Mult D §309 (1)(a); NYC Admin. Code § 17-142.

223.    The People of the State of New York, the counties in which the buildings are located, and the City of New York have a common right to be free from the detrimental effects of lead in, on and around Defendants' residential rental properties.  By allowing these conditions to proliferate across its 56 multi-family rental properties in New York City over a period of more than ten years, Defendants have created and contributed to a public nuisance on a community-wide scale.

224.    As a direct and proximate result of Defendants' conduct, conditions conducive to lead poisoning, mold and pest infestations also leading to the exacerbation of indoor allergen conditions, as well as other conditions that are dangerous to health and safety are present in, on and around Defendants' properties and over 2,500 units of housing.

225.    As a direct and proximate result of Defendants' conduct, the City of New York and State of New York have incurred and will continue to incur substantial expenses from the presence of conditions conducive to lead poisoning and asthma in, on and around Defendants' properties, including but not limited to costs of monitoring for and treating children suffering from lead poisoning and asthma; addressing the special educational needs of children with lead poisoning and enforcing the law.

226.    Defendants have violated and continue to violate the Nuisance Abatement Law and have created and maintained a common law nuisance.  They will continue to violate the law and maintain a nuisance absent injunctive relief.

227.    Defendants ongoing public nuisance has caused and threatened  harm to the health and safety of children and others residing in Defendants' buildings, to frequent visitors to these buildings and to the surrounding community.

228.    The Attorney General is authorized under Executive Law § 63(12) and pursuant to NYC Admin Code § 7-706(a) and § 7-714 and the Attorney General's *parens patriae* power, to bring an action to enjoin Defendants' public nuisance.  Defendants are also liable pursuant to Section 7-706(h) of the Nuisance Abatement Law for a civil penalty in an amount up to one thousand dollars ($1,000) for each day that the nuisance occurred.

229.    Defendants have obtained unjust profits from their maintenance of the public nuisance, which fund further violations by Defendants.

230.    The Attorney General is seeking disgorgement of the monies Defendants received in connection with their violations of the public nuisance laws.

231.    The Court should enjoin Defendants' nuisance conduct, award other appropriate equitable relief, including appointment of a special master, monitor, receiver, or temporary receiver pursuant to NYC Admin Code §7-713, to the extent necessary or appropriate to ensure compliance.

## PRAYER FOR RELIEF

WHEREFORE, on Counts One, Two, and Six, the United States respectfully requests that the Court:

(i)    Enjoin Defendants to comply with the Lead Disclosure Rule, make remedial disclosures, mitigate the effect of past violations, and disgorge unjust profits resulting from such violations, to the extent authorized by law;

(ii)    Enjoin Lilmor and Lieberman to comply with the RRP Rule, mitigate the effect of past violations, and disgorge unjust profits resulting from such violations, to the extent authorized by law;

(iii)    Enjoin Defendants to correct living conditions in the buildings that constitute a public nuisance, mitigate prior injuries resulting from the public nuisance, and disgorge unjust profits, to the extent authorized by law;

(iv)    Award other appropriate equitable relief, including appointment of a special master, monitor, or receiver to the extent necessary or appropriate to ensure compliance; and

(v)    Order such further relief as the Court may deem just and proper.

And WHEREFORE, on Counts Three, Four, Five, and Seven, the People of the State of New York respectfully request that the Court:

(i)     Order Defendants to inspect, within 30 days of the judgment, through a qualified third party inspector, each dwelling unit and common areas of each residence they now own or control or in the future own or manage in New York for lead paint hazards and conditions conducive to lead poisoning. Further direct Defendants to remedy all such conditions in compliance with Local Law One and all other local, state and federal laws within 30 days of such inspection or sooner as required by law;

(ii)    Order Defendants to comply with Local Law One requirements for certification of lead paint turnover work and annual inquiry and investigation of children under 6 years residing in dwelling units under their ownership and control, and retain records of the result of their investigations;

(iii)   Order Defendants to inspect for and correct, within 30 days of the judgment or sooner as required by law, each dwelling unit and common areas of each residence they now own or control or in the future own or manage in New York for conditions, including but not limited to indoor allergen conditions, that constitute violations of the NYC HMC and/or constitute a public nuisance;

(iv)    Order Defendants to follow the direction of a special master, monitor, or receiver to be appointed by the Court at Defendants' expense and file compliance reports to that monitor and the Plaintiffs;

(v)     Permanently enjoin Defendants from further illegal acts relating to the claims enumerated in the complaint herein;

(vi)    Order disgorgement of all profits Defendants have realized from their repeated and persistent violations of law and fraud in carrying out their residential property leasing and management business;

(vii)   Order Defendants to pay restitution to current and former tenants and occupants for their repeated and persistent violations of law and fraud in carrying out their residential property leasing and management business;

(viii)  Award civil penalties, in an amount to be determined at trial, for Defendants violations of the NYC Housing Maintenance Code and the NY General Business Law;

(ix)    Award damages for the injuries sustained by the Plaintiffs;

(x)    Award Plaintiffs costs and disbursements

(xi)    Order Defendants to pay all additional allowances authorized by CPLR § 8803.

(xii)    Retain jurisdiction over this matter until Defendants have fully complied with their obligations to inspect and remedy all existing conditions that threaten health and safety at the buildings they own or manage;

(xiii)    Award other appropriate equitable relief,  to the extent necessary or appropriate to ensure compliance; and

(xiv)    Order such further relief as the Court may deem just and proper.

Dated: December 13, 2024
      New York, New York

                        DAMIAN WILLIAMS
                        United States Attorney for the
                        Southern District of New York
                        *Attorney for the United States*
                        *(As to Counts One, Two, and Six)*

                        ZACHARY BANNON
                        JACOB LILLYWHITE
                        Assistant United States Attorneys
                        86 Chambers Street, Third Floor
                        New York, New York 10007
                        (212) 637-2728/2639
                        zachary.bannon@usdoj.gov
                        jacob.lillywhite@usdoj.gov

OF COUNSEL:

Jeannie Yu
Assistant Regional Counsel
Naomi Shapiro
Associate Regional Counsel
U.S. Environmental Protection Agency, Region II

Lee Ann Richardson
Acting Assistant General Counsel
U.S. Department of Housing & Urban Development

Dated: 12/3/2024
New York, New York

LETITIA JAMES
New York State Attorney General
(As to Counts Three, Four, Five, and Seven)

By:

JANE LANDRY-REYES
Assistant Attorney General
Housing Protection Unit
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8220
Email: jane.landry-reyes@ag.ny.gov

&

BRENT MELTZER
Chief, Housing Protection Unit
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6096
Email: brent.meltzer@ag.ny.gov

**Exhibit A**

| Building Previously Managed by Lilmor and/or Controlled by Lieberman | Building Currently Managed by Lilmor and/or Controlled by Lieberman | LLC Defendant Associated with Building |
|---|---|---|
| 192-198 Nagle Avenue, New York, NY 10034 | | |
| 200-208 Nagle Avenue, New York, NY 10034 | | |
| 776 Crown Street, Brooklyn, NY 11213 | | |
| 200 East 19th Street, Brooklyn, NY 11226 | | |
| 271 Parkside Avenue, Brooklyn, NY 1122 | | |
| 1616 President Street, Brooklyn, NY 11213 | | |
| 575 Herkimer Street, Brooklyn, NY 11213 | | |
| 354 East 21st Street, Brooklyn, NY 11226 | | 354 E 21th Street Realty Corp. |
| 2077 East 12th Street, Brooklyn, NY  11229 | | P Bigg Realty LLC |
| | 45 Hawthorne Street, Brooklyn, NY 11225 | 45-55 Realty LLC |
| | 55 Winthrop Street, Brooklyn, NY 11225 | 55 Winthrop St LLC |
| | 130 Clarkson Avenue, Brooklyn, NY 11226 | 130 Clarkson Realty LLC |
| | 250 East 29th Street, Brooklyn, NY 11226 | 250-251 E 29 Realty LLC |
| | 251 East 29th Street, Brooklyn, NY 11226 | 251 E 29 St LLC |
| | 1590 West 8th Street, Brooklyn, NY 11204 | 1590 W 8 St LLC |
| | 105 Avenue P, Brooklyn, NY 11204 | 105 Ave P Realty LLC |
| | 888 Montgomery Street, Brooklyn, NY 11213 | 888 Realty LLC |
| | 100 Linden Blvd, Brooklyn, NY 11226 | 100 Linden Realty LLC |
| | 131 Lincoln Road, Brooklyn, NY 11225 | 131 Realty LLC |

| Building Previously Managed by Lilmor and/or Controlled by Lieberman | Building Currently Managed by Lilmor and/or Controlled by Lieberman | LLC Defendant Associated with Building |
|---|---|---|
| | 1629 West 10th Street, Brooklyn, NY 11223 | C & Z Realty LLC |
| | 2003 Avenue J, Brooklyn, NY 11210 | 2003 Realty LLC |
| | 1429 Carroll Street, Brooklyn, NY 11213 | 1429 Carroll Street LLC |
| | 59 Logan Street, Brooklyn, NY 11208 | 59 Logan St LLC |
| | 1269 East 18th Street, Brooklyn, NY 11230 | 1269 E 18 Street Realty LLC |
| | 334 Eastern Parkway, Brooklyn, NY 11225 | 334 Eastern Pkwy Realty LLC |
| | 840 East 17th Street, Brooklyn, NY 11230 | 840 Realty LLC |
| | 1909 Quentin Road, Brooklyn, NY 11229 | 1909 Realty LLC |
| | 333 Neptune Avenue, Brooklyn, NY 11235 | 333 Realty LLC |
| | 1690 President Street, Brooklyn, NY 11213 | 1690 President Street LLC |
| | 645 Ocean Parkway, Brooklyn, NY 11230 | 645 Realty LLC |
| | 3402 Avenue I, Brooklyn, NY 11210 | 3402 Realty LLC |
| | 1439 Ocean Avenue, Brooklyn, NY 11230 | 1439 Realty LLC |
| | 103-35 120th Street, Richmond Hill, NY 11419 | 103-35 120 St Realty LLC |
| | 20-30 Merle Place, Staten Island, NY 10305 | 20-30 Merle Realty LLC |
| | 1921 Avenue I, Brooklyn, NY 11230 | 1921 Realty LLC |
| | 410 Westminster Road, Brooklyn, NY 11218 | 410 Westminster LLC |
| | 585 East 16th Street, Brooklyn, NY 11226 | 580-585 Realty LLC |
| | 580 East 17th Street, Brooklyn, NY 11226 | |
| | 2251 81st Street, Brooklyn, NY 11214 | 2251 Realty LLC |
| | 209 East 16th Street, Brooklyn, NY 11226 | 209 Realty LLC |

| Building Previously Managed by Lilmor and/or Controlled by Lieberman | Building Currently Managed by Lilmor and/or Controlled by Lieberman | LLC Defendant Associated with Building |
|---|---|---|
| | 40-71 Elbertson Street, Elmhurst, NY 11373 | 40-71 Realty LLC |
| | 712 East 27th Street, Brooklyn, NY 11210 | 712 Realty LLC |
| | 723 East 27th Street, Brooklyn, NY 11210 | 723 Realty LLC |
| | 2420 Glenwood Road, Brooklyn, NY 11210 | 2420 Realty LLC |
| | 1684 West 10th Street, Brooklyn, NY 11223 | 1684 Realty LLC |
| | 1660 East 21st Street, Brooklyn, NY 11210 | 1660 Realty LLC |
| | 1011 Neilson Street, Far Rockaway, NY 11691 | 1011 Neilson Realty LLC |
| | 1012 Nameoke Street, Far Rockaway, NY 11691 | 1012 Nameoke Realty LLC |
| | 1633 West 10th Street, Brooklyn, NY 11223 | 1633 West 10th Realty LLC |
| | 1902 Avenue L, Brooklyn, NY 11230 | Alit Realty LLC |
| | 1301 Avenue K, Brooklyn, NY 11230 | 1301 Avenue K Realty LLC |
| | 1311 Avenue K, Brooklyn, NY 11230 | 1311 Avenue K Realty LLC |
| | 1173 52nd Street, Brooklyn, NY 11219 | E&S Realty Management LLC |
| | 915 84th Street, Brooklyn, NY 11228 | 915 84th Street LLC |
| | 2001 Avenue P, Brooklyn, NY 11229 | 2001 Avenue P LLC |
| | 2065 Ocean Avenue, Brooklyn, NY 11230 | 2065 Ocean Avenue LLC |