USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___5/28/2025___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA, and
PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the
State of New York

      Plaintiffs,

              v.

LILMOR MANAGEMENT LLC and MORRIS
LIEBERMAN, *et al.*,

      Defendants.

---

24 Civ. __9520__


**<u>CONSENT DECREE</u>**

# TABLE OF CONTENTS

I.      RECITALS ............................................................................................................................. 1
II.     JURISDICTION AND VENUE ............................................................................................ 2
III.    ADMISSIONS ....................................................................................................................... 2
IV.     DEFINITIONS ...................................................................................................................... 5
V.      APPLICABILITY ............................................................................................................... 11
VI.     TRANSFERS OF INTEREST ............................................................................................ 12
VII.    PENALTY AND RESTITUTION PAYMENT .................................................................. 13
VIII.   HOUSING SPECIALIST .................................................................................................... 14
IX.     INJUNCTIVE REQUIREMENTS ...................................................................................... 17
X.      RESTITUTION FUND ....................................................................................................... 31
XI.     DEFENDANTS' REPORTING REQUIREMENTS .......................................................... 31
XII.    APPROVAL OF PLAN AND OTHER DELIVERABLES; PERMITS .............................. 32
XIII.   STIPULATED PENALTIES ............................................................................................... 33
XIV.    FORCE MAJEURE ............................................................................................................. 34
XV.     DISPUTE RESOLUTION .................................................................................................. 35
XVI.    INFORMATION COLLECTION AND RETENTION ....................................................... 37
XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........................................... 39
XVIII.  COSTS ................................................................................................................................. 40
XIX.    NOTICES ............................................................................................................................ 40
XX.     EFFECTIVE DATE ............................................................................................................ 42
XXI.    RETENTION OF JURISDICTION .................................................................................... 42
XXII.   MODIFICATION ................................................................................................................ 42
XXIII.  CERTAIN REPRESENTATIONS AND WARRANTIES ................................................. 42
XXIV.   PROPERTY REMOVAL AND TERMINATION ............................................................. 43
XXV.    PUBLIC PARTICIPATION ............................................................................................... 44
XXVI.   SIGNATORIES/SERVICE ................................................................................................. 45
XXVII.  INTEGRATION .................................................................................................................. 45
XXVIII. 26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION .............................................. 45
XXIX.   FINAL JUDGMENT .......................................................................................................... 45
XXX.    APPENDICES ..................................................................................................................... 45

# I.    RECITALS

1.      WHEREAS, plaintiffs United States of America ("United States") and People of the State of New York ("State") have filed a complaint (the "Complaint") asserting their respective claims against defendants Lilmor Management, LLC ("Lilmor"), Morris Lieberman, (Morris Lieberman, together with Lilmor, the "Lilmor Defendants"), and the entities listed in Appendix A (together with the Lilmor Defendants, "Defendants").

2.      WHEREAS, the United States on behalf of the U.S. Environmental Protection Agency ("EPA") and the U.S. Department of Housing and Urban Development ("HUD") asserts in the Complaint that, between 2012 and the present, Defendants have routinely violated the Lead Disclosure Rule, 24 C.F.R. Part 35, Subpart A, and 40 C.F.R. Part 745, Subpart F, and therefore Section 1018 of the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4852d, and Section 409 of the Toxic Substances Control Act ("TSCA" or the "Act"), 15 U.S.C. § 2689, by, among other things, failing to provide tenants entering new and (where required) renewal leases with (i) known information relating to lead-based paint or lead-based paint hazards and/or (ii) records in the possession or control of Defendants relating to lead-based paint or lead-based paint hazards.

3.      WHEREAS, the United States on behalf of EPA further asserts in the Complaint that Defendants have violated the Renovation, Repair, and Painting Rule ("RRP Rule") and therefore TSCA by, among other things: (i) between 2012 and the present, allowing superintendents employed by Lilmor to conduct renovations subject to the RRP Rule without appropriate firm or renovator certifications and without maintaining records required to be maintained by the RRP Rule; and (ii) between 2015 and 2020, employing and controlling the work of entities for large-scale renovation projects that lacked appropriate firm or renovator certifications and failed to maintain records required to be maintained by the RRP Rule.

4.      WHEREAS, the United States also alleges in the Complaint that Defendants have maintained a public nuisance relating to substandard conditions in housing owned or controlled by Defendants.

5.      WHEREAS, the United States further asserts that Defendants are liable for civil administrative penalties to EPA and HUD pursuant to 15 U.S.C. § 2615 and 42 U.S.C. § 4852d, on account of the violations of the Lead Disclosure Rule alleged in the Complaint, and to EPA pursuant to 15 U.S.C. § 2615, on account of the violations of the Renovation, Repair, and Painting Rule alleged in the Complaint.

6.      WHEREAS, the State alleges in the Complaint, pursuant to its N.Y. Exec. Law § 63(12) authority, that Defendants have repeatedly and persistently violated the N.Y.C. Housing Maintenance Code ("HMC") (N.Y.C. Admin. Code §§ 27¬-2001 et seq.; "Lead Poisoning Prevention and Control", N.Y.C. Admin. Code §§ 27-2056.1–2056.18 [a/k/a "The New York City Childhood Lead Poisoning Prevention Act", Local Law 1 of 2004]; "Control of Pests and Other Asthma Allergen Triggers," §§ 27-2017–2019 [a/k/a "The New York City Asthma Free Housing Act", Local Law 55 of 2018]); "Consumer Protection from Deceptive Acts and Practices," N.Y. Gen. Bus. Law§ 349, and "Warranty of Habitability," N.Y.  Real Prop. Law, § 235-b by, among

other things, failing to timely and correctly address substandard conditions, including, but not limited to, lead paint and indoor allergen triggers such as mold, and vermin infestations; by failing to properly follow local law relating to lead paint remediation, disclosure, certification, annual inquiry, investigations and record keeping as well as requirements for addressing indoor allergen triggers. Defendants are therefore liable for civil penalties and restitution damages pursuant to the local and state laws and rules described herein.

7.    WHEREAS, to avoid the time, expense, and burden of litigation, the Parties wish to resolve all of the United States' and the State's claims brought in this action by willingly entering into this Consent Decree.

8.    WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith by the Parties and is fair, reasonable, and in the public interest.

NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367, 15 U.S.C. § 2616, and 42 U.S.C. § 4852d.

10.    The Court has personal jurisdiction and venue lies in this District because all Defendants reside in this state and Defendant Lilmor resides in this district within the meaning of 28 U.S.C. § 1391(b)(1) and (c)(2).  For purposes of this action and Decree, or any action to enforce this Decree, the Parties consent to the Court's jurisdiction and to venue in this judicial district.

## III.    ADMISSIONS

11.    The Lilmor Defendants admit, acknowledge, and accept responsibility for the following:

    a.    Defendants own, control, or manage, in whole or in part, 49 residential buildings containing 2,539 units in New York City, all of which were built prior to 1978.

    b.    Government records show that, since 2012, more than 130 children have tested positive for elevated blood lead levels while living in an apartment owned or controlled by one or more of the Defendants.

***Disclosures and Lead Hazard Prevention***

    c.    Prior to November 2020, the Lilmor Defendants failed to provide tenants entering new and renewal leases with (i) known information relating to lead-based paint or lead-based paint hazards and/or (ii) records in the possession

2

or control of Defendants relating to lead-based paint or lead-based paint hazards, as required by the federal Lead Disclosure Rule.

d.    From at least the beginning of 2015 through at least the end of 2017, Defendants failed to keep evidence of the "Annual Notice for Prevention of Lead Based Paint Hazards – Inquiry Regarding Child" that they allege they provided to their tenants, as required by The New York City Childhood Lead Poisoning Prevention Act.

e.    In hundreds of the apartments it rented, the Lilmor Defendants knew of lead-based paint or previous lead-based paint hazards because of prior lead-based paint hazard violations issued by the New York City Department of Housing Preservation and Development ("HPD") or the New York City Department of Health and Mental Hygiene ("DOHMH"), but the Lilmor Defendants did not disclose this fact to tenants as required by the Lead Disclosure Rule and the NYC Childhood Lead Poisoning Prevention Act.

f.    Prior to the dates upon which government records show that children tested positive for elevated blood lead levels while residing in Defendants' apartments, Defendants had received citations for lead-based paint hazard violations from HPD or DOHMH for at least eighteen of these apartments but the Lilmor Defendants did not disclose the fact that these apartments contained lead-based paint to the tenants when they signed their leases or lease renewals.

### *Inspections, Inquiries, and Remediation*

g.    From at least 2015 to at least 2019, the Lilmor Defendants conducted no annual inquiries or investigations, as required by the NYC Childhood Lead Poisoning Prevention Act, to determine if a child under six years old resided in the apartments they rented. Since 2020, the Lilmor Defendants failed to conduct satisfactory annual investigations to determine if a child under six years old resided in the apartments.

h.    The Lilmor Defendants have in the past systematically failed, in violation of The New York City Childhood Lead Poisoning Prevention Act, to conduct annual inspections of apartments, including instances where the Lilmor Defendants had received notice that children under 6 years of age resided.

i.    The Lilmor Defendants have also, in the past, systematically failed to conduct proper lead paint inspection and remediation when apartments were vacated and turned over before new tenants moved in, as required by The New York City Childhood Lead Poisoning Prevention Act.  Because the Lilmor Defendants failed to conduct proper turnover work, they failed to properly certify in initial leases with new tenants that turnover work was

done in compliance with the local law, as required by The New York City Childhood Lead Poisoning Prevention Act.

***Lead-Safe Work Practices***

j.  The Lilmor Defendants lacked federal certification to conduct repairs and renovations that required lead-safe work practices pursuant to the RRP Rule, did not provide its maintenance staff with equipment necessary to perform RRP-Rule-compliant work, and did not train its maintenance staff on lead-safe work practices.  The Lilmor Defendants provided no instructions to its maintenance staff to prevent them from conducting work that was required to be performed in accordance with lead-safe work practices.  The Lilmor Defendants' work-order database nevertheless reflects that work subject to the RRP Rule was conducted by the Lilmor Defendants' maintenance staff.

k.  By failing to conduct repairs and renovations pursuant to the federal RRP Rule and other EPA requirements, the Lilmor Defendants also violated the requirements for lead safe work required by The New York City Childhood Lead Poisoning Prevention Act.

l.  Through at least 2020, the Lilmor Defendants failed to follow lead-safe work practices required by federal and local law in covered repair and renovation projects for which the Lilmor Defendants engaged an entity that worked solely or principally for the Lilmor Defendants. The Lilmor Defendants would assign work orders to this entity, an employee of the entity would send pictures of the work area to an employee of Lilmor, the employee of Lilmor would provide instructions on how to conduct the work, and the employee of the entity would take pictures once the work was completed and send them to the Lilmor employee for approval of the work. During this time, the entity did not employ lead-safe work practices. Furthermore, although Lilmor had arranged for this entity to receive EPA certifications required by the RRP Rule in 2010 and 2020, the entity was not certified to conduct work covered by the RRP Rule from 2015 to 2020.

***Indoor Allergen Hazard Prevention***

m.  The Lilmor Defendants have failed to implement a comprehensive inspection plan for identifying and remediating indoor allergens, including mold and vermin hazards.  In violation of the New York City Asthma Free Housing Act, the Lilmor Defendants failed to: (i) annually inspect all apartments for indoor allergen hazards, including for pests and mold and keep records; (ii) properly remediate indoor allergen hazards using safe work practices as defined by the law; (iii) clean vacant units at turnover to ensure that they are free of pests and mold and using a HEPA vacuum where indicated; (iv) timely establish Integrated Pest Management plans, as

4

required by law, in many buildings in the portfolio; (v) provide a copy of the NYC DOHMH Fact Sheet "What Tenants Should Know About Indoor Allergens (Local Law 55 of 2018)" with all tenants' initial and renewal leases.

### *Health and Safety Conditions*

n.   In a period spanning from 2019 to the present, HPD issued violations to Defendants under applicable housing code provisions:

   (1)   more than 966 times for lead-based paint hazards,

   (2)   more than 2331 times for rodent or roach infestations,

   (3)   more than 1492 times for leaks,

   (4)   more than 1465 times for mold, and

   (5)   more than 85 times for lack of heat.

o.   In a period spanning from 2019 to the present, 26 buildings Defendants own, control, or manage have been cited by HPD to be in violation of housing codes concerning living conditions like those above 100 times or more.

p.   In a period spanning from 2019 to the present, 25 buildings that Defendants own, control, or manage were cited by HPD to be in violation of housing codes concerning living conditions like those above two or more times *per unit*.

## IV.    DEFINITIONS

12.    Terms used in this Consent Decree that are defined in applicable statutes or regulations promulgated pursuant to those statutes shall have the meanings assigned to them in the statutes or such regulations, unless otherwise provided in this Decree.  Where applicable local, state, or federal statutes or regulations contain different definitions of terms, the applicable standard will be the most restrictive of those definitions.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.   "Abatement" and methods of abatement including replacement, removal, enclosure, and encapsulation have the meanings provided in 24 C.F.R. § 35.110 and 40 C.F.R. § 745.223.

b.   "Chewable, Friction, or Impact Surface" has the meaning of the definitions provided by NYC Admin. Code § 27-2056.2, 24 C.F.R. § 35.110, and 40 C.F.R. § 745.63, as applicable.

5

c.    "Clearance Examination" means an activity conducted after performance of (i) Abatement activities or (ii) other paint-disturbing activities where clearance is required (including but not limited to, for federally subsidized units, the Lead Safe Housing Rule) to determine that those activities are complete and that no Lead-Based Paint Hazards exist, in accordance with Chapter 15 of the HUD Guidelines, the Lead Based Paint Activities Rule at 40 C.F.R. § 745.227(e), the Lead Safe Housing Rule at 24 C.F.R. § 35.1340, and the New York City Childhood Lead Poisoning Prevention Act at N.Y.C. Admin. Code §§ 27-2056.1-2056.18. The appropriate clearance standards shall be the most restrictive of those set by: (i) N.Y.C. Admin. Code §§ 27-2056.1-2056.18; (ii) Section 403 of TSCA and its implementing regulations, 40 C.F.R. Part 745, Subpart D; or (iii) the HUD Lead Safe Housing Rule, 24 CFR §§ 35.1320, 35.1340(d), where more than one provision is applicable.

d.    "Common Area" has the meaning provided by 40 C.F.R. § 745.103, 24 C.F.R. § 35.86, and N.Y.C. Admin. Code § 27-2056.2, where applicable.

e.    "Complaint" means the complaint filed by the United States and the State in this action.

f.    "Completed Unit," "Completed Common Area," and "Completed Property" mean a Unit, Common Area, or Property that has achieved Work Completion; has been designated as a Completed Unit, Completed Common Area, or Completed Property pursuant to Paragraph 75 of this Decree; and has not had that designation removed pursuant to Paragraph 76 of this Decree.

g.    "Compliance Officer" means the person described in Paragraph 66 of this Decree below.

h.    "Consent Decree" or "Decree" means this Decree, including Appendices A through I.

i.    "Current Transfer Cap," at a given point in time, is equal to the Transfer Cap Base multiplied by the Current Unit Count, divided by the Initial Unit Count, and then rounded to the nearest whole number.

j.    "Current Unit Count" means the number of residential units within Properties (excluding Newly Acquired Properties) that are (a) owned or controlled, in whole or in part, directly or indirectly, by Defendants, or (b) managed, directly or indirectly, by Defendants, at a given point in time. For the avoidance of doubt, units within Removed Properties are not included.

k.  "Date of Lodging" means the date this Consent Decree is filed with the Court in advance of the period of public comment provided by Paragraph 155 of this Decree.

l.  "Day" means a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business on the next business day.

m.  "Deferred Unit" means a Unit designated by the Housing Specialist as a Deferred Unit in accordance with Paragraph 81 of this Decree.

n.  "Deferred Work" means any work in a Deferred Unit that Defendants were obligated to perform under this Consent Decree at the time the Unit became a Deferred Unit or during the time the Unit remained a Deferred Unit.

o.  "Defendants" means Lilmor, Morris Lieberman, and the entities listed in Appendix A.

p.  "Deteriorated Paint" shall have the meaning set forth in 40 C.F.R. § 745.223 and shall include any "deteriorated subsurface" as that term is defined in N.Y.C. Admin. Code § 27-2056.2.

q.  "Dispute Resolution" shall mean the process set forth in Section XV (Dispute Resolution).

r.  "DOHMH" means the N.Y.C. Department of Health and Mental Hygiene and any of its successor departments or agencies.

s.  "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

t.  "Effective Date" shall have the definition provided in Section XX (Effective Date).

u.  "Housing Specialist" means the person hired by Defendants pursuant to Paragraph 28 of this Decree.

v.  "HPD" means the N.Y.C. Department of Housing Preservation and Development and any of its successor departments or agencies.

w.  "HUD" means the United States Department of Housing and Urban Development and any of its successor departments or agencies.

x.  "HUD Guidelines" shall mean the edition of the "HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing" in effect on the date the work is conducted pursuant to this Consent Decree.

7

y.     "Indoor Allergen Triggers" or "Underlying Defect" shall mean those housing conditions which cause an indoor allergen hazard, such as a water leak or water infiltration from plumbing or defective masonry pointing or other moisture condition or causes an infestation of pests, including holes or entryway paths for pests requiring remediation measures to be implemented pursuant to the Asthma Free Housing Act, N.Y.C. Admin. Code §§ 27-2017 *et seq.*

z.     "Initial Unit Count" means 2,539 units.

aa.    "Interim Controls" shall have the meaning provided in 40 C.F.R. § 745.223.

bb.    "Lead-Based Paint Activities Rule" means the regulations at 40 C.F.R. Part 745, Subpart L.

cc.    "Lead-Based Paint" means paint or other surface coatings that contain lead equal to or exceeding the stricter of any federal, New York State, or New York City law in force at the relevant time.  For avoidance of doubt, that standard is currently 0.5 milligram per square centimeter as defined under N.Y.C. Admin. Code § 27-2056.2(7).

dd.    "Lead-Based Paint Inspection Determination" shall mean a written determination of a certified Lead-Based Paint inspector or risk assessor.

ee.    "Lead-Based Paint Hazards" shall mean the standards set in 40 C.F.R. § 745.65 and those set by N.Y.C .Admin. Code § 27-2056.2, as applicable.

ff.    "Lead-Based Paint Laws" means all federal, state, or local requirements relating to the protection of occupants and workers from Lead-Based Paint and Lead-Based Paint Hazards, including but not limited to the Lead Disclosure Rule, the Lead Safe Housing Rule, the RRP Rule, the Lead-Based Paint Activities Rule, and the New York City Childhood Lead Poisoning Prevention Act, N.Y.C. Admin. Code §§ 27-2056.1-2056.18.

gg.    "Lead-Based Paint Work" means Lead-Based Paint inspections, Lead-Based Paint risk assessments, Abatement, work to implement Interim Controls, work to which the RRP Rule or Lead Safe Housing Rule applies, the implementation of Lead Safe Work Practices, or any other work designed to identify, prevent or eliminate Lead-Based Paint Hazards.

hh.    "Lead Disclosure Rule" means the regulations set forth at 24 C.F.R. Part 35, Subpart A, and 40 C.F.R. Part 745, Subpart F.

ii.    "Lead Safe Housing Rule" means the regulations set forth at 24 C.F.R. Part 35, Subparts B through R.

8

jj.   "Lead Safe Work Practices" means work practices compliant with the Lead Safe Housing Rule, the RRP Rule, and The New York City Childhood Lead Poisoning Prevention Act, N.Y.C. Admin. Code §§ 27-2056.1-2056.18.

kk.   "Lead Warning Statement" means the statement described in 40 C.F.R. § 745.113, and 24 C.F.R. § 35.92(b)(1).

ll.   "Lilmor" means Lilmor Management, LLC, and all predecessor and successor entities, and all persons or entities controlled by Lilmor Management, LLC.

mm.   "Lilmor Defendants" means Lilmor and Morris Lieberman.

nn.   "Lilmor-Managed Property LLCs" means the Entities listed in Appendix A.

oo.   "Newly Acquired Properties" means residential properties in which, after the Effective Date, one or more Defendants come to hold a controlling interest in or come to operate, manage, or otherwise control, in whole or in part, directly or indirectly.

pp.   "Paragraph" means a portion of this Decree identified by an Arabic numeral.

qq.   "Parties" means the parties to this Consent Decree: the United States, the People of the State of New York and the Defendants.

rr.   "Plaintiffs" means the United States and the People of the State of New York.

ss.   "Previously Transferred Properties" means the residential properties listed in Appendix B.

tt.   "Properties" means (i) the residential properties listed in Appendix C, and (ii) the Newly Acquired Properties, except as provided in Section VI (Transfer of Interests) and Paragraphs 150-153 of this Decree.

uu.   "Removal" or "Removed Property" refers to a Property removed, pursuant to Section XXIV (Property Removal and Termination), from the list of Properties to which this Consent Decree applies, except as to any provision of this Consent Decree that expressly obligates Defendants for a period of time extending beyond the date of that Removal.

vv.   "Renovation, Repair, and Painting Rule" or "RRP Rule" means the Renovation, Repair and Painting Rule, promulgated at 40 C.F.R. Part 745, Subpart E.

ww.   "Section" means a portion of this Decree identified by a Roman numeral.

9

xx.    "Substandard Conditions" means conditions that violate applicable state or local housing, building or health codes (other than Lead-Based Paint Laws) or Indoor Allergen Trigger laws and include any nuisance conditions that are "dangerous to human life or detrimental to health" (N.Y.C. Admin. Code § 17-142). Substandard Conditions include widespread or recurring mold; infestations of vermin or pests; continued failure to provide adequate heat, hot water, or cooking gas; recurring failure to properly handle sewage or garbage; failing to timely remediate leaks or holes; unsafe electric wiring; fire safety hazards; recurring failure to maintain properly functioning elevators; continued failure to maintain functioning locks on both a building's and each apartment's front door and mailboxes; continued failure to maintain a functioning doorbell, buzzer, or intercom system; and continued failure to provide adequate lighting in Common Areas. "Substandard Conditions" do not include a third-party utility provider's failure to provide services to a Unit or Property where Defendants did not cause or contribute to that failure.

yy.    "Transfer Cap Base" means 800 minus the total number of units transferred pursuant to Paragraph 19 over the course of the Consent Decree.

zz.    "Two Excluded Multifamily Properties" means the residential properties identified as such in Appendix D. Morris Lieberman, Lillian Lieberman, and Lilmor each represent and warrant that these properties are held in a trust over which Morris Lieberman, Lillian Lieberman, and Lilmor have no control, and that Morris Lieberman, Lillian Lieberman, and Lilmor have never managed or exercised control over either of these properties.

aaa.    "Two Excluded Single-Family Properties" means the residential properties identified as such in Appendix E. Morris Lieberman, Lillian Lieberman, and Lilmor each represent and warrant that these properties are single-family houses that Lilmor has never managed or exercised control over.

bbb.    "Unit" means a residential apartment, excluding any Common Areas.

ccc.    "United States" means the United States of America.

ddd.    "Work Unit", "Work Common Area", or "Work Property" means a Unit, Common Area, or Property for which work remains to be performed pursuant to Paragraph 46 (Lead-Based Paint Inspection and Risk Assessment), Paragraph 49 (Comprehensive Abatement of Lead-Based Paint), Paragraph 60 (Current Substandard Conditions), or Paragraph 61 (Future Substandard Conditions) of this Decree.

eee.    "Work Completion," for a given Unit, Common Area, or Property means the time at which Defendants have completed all work to be performed at the Unit, Common Area, or Property pursuant to Paragraph 46 (Lead-Based

10

Paint Inspection and Risk Assessment), Paragraph 49 (Comprehensive Abatement of Lead-Based Paint), Paragraph 60 (Current Substandard Conditions), or Paragraph 61 (Future Substandard Conditions).

## V.    APPLICABILITY

13.    The obligations of this Consent Decree apply to and are binding upon the Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

14.    Defendants shall grant authority or access to one another and the Housing Specialist as needed to accomplish the work required by the Consent Decree. Defendants shall not take any action to frustrate or obstruct the work required by the Consent Decree, including but not limited to, by obstructing access to any Common Areas at the Properties that safely and in accordance with law may be used by tenants to hold tenant meetings relating to this Consent Decree or to receive updates from the Housing Specialist or its agents.

15.    Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents of Defendants whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained by a Defendant to perform work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree, whether the work is to be performed by the contractor or one or more subcontractors.

16.    In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

17.    Notwithstanding any other provisions in this Consent Decree: (a) Defendants' obligations under this Consent Decree with respect to Newly Acquired Properties shall be limited to: (*i*) Paragraphs 44, 51, 53-56, 59, 61, 64, 89, 91-94, and 125-131; (*ii*) Paragraphs regarding the Housing Specialist (including Paragraphs 28-43, 52, and 89-98) as they relate to obligations in the Paragraphs enumerated above in (*i*); and (*iii*) Sections XIII (Stipulated Penalties), XIV (Force Majeure), XV (Dispute Resolution), XVII (Effect of Settlement/Reservation of Rights), and XXIX (Final Judgment) as they relate to obligations in the provisions enumerated above in (*i*) and (*ii*); (b) the acquiring Defendants shall specifically request the transferor of Newly Acquired Properties to provide the acquiring Defendants with all documents and information for the Newly Acquired Properties that are required to be disclosed under 24 C.F.R. § 35.88(a)(2) and (4) and 40 C.F.R. § 745.107(a)(2) and (a)(4), and shall obtain a representation from the transferor that it has done so, and (c) the acquiring Defendant shall inform Plaintiffs and the Housing Specialist in writing of a Newly Acquired Property within 30 days of the property becoming acquired and confirm that the requirements of (b) have been satisfied. Newly Acquired Properties shall be treated as Completed Properties upon acquisition.

## VI.    TRANSFERS OF INTEREST

18.    No less than 30 Days before entering into any agreement that involves the transfer of any interest in any of the Properties (except as to any mortgage of the Properties), Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to the Plaintiffs in accordance with Section XIX (Notices).  Any transfer of ownership or operation of the Properties by Defendants without complying with this Paragraph constitutes a violation of this Decree, except as to any mortgage of the Properties.  No transfer of ownership or operation of the Properties by Defendants (including by foreclosure), whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to ensure that the terms of the Decree are implemented (subject to Defendants' being granted access in the case of foreclosure) unless the Plaintiffs consent, which consent may be contingent on the transferee's becoming a party to, and liable as Defendant under, this Decree.

19.    Notwithstanding Paragraph 18, Defendants may invoke this Paragraph in writing delivered to the Plaintiffs in accordance with Section XIX (Notices) to transfer their interests in a Property if (a) that Property is a Completed Property under Paragraphs 75 and 76 or would be a Completed Property but for the presence of one or more Deferred Units, and has been maintained as such for a period of no less than six months; (b) Defendants have provided the transferee (i) all documents and information that is required to be disclosed by the Defendants to the transferee pursuant to the Lead Disclosure Rule, including under 24 C.F.R. § 35.88(a)(2) and (4) and 40 C.F.R. § 745.107(a)(2) and (a)(4), and (ii) a list of any Deferred Units at the Property with a statement describing the work that has been deferred; (c) the transferee agrees to provide Defendants notice of the initial vacancy of any Deferred Units; (d) Defendants have provided the occupants of any Deferred Units with a notice in the form of Appendix F advising the occupants, with at least 60 days' notice, that obligations under this Consent Decree to complete the Deferred Work prior to vacancy will no longer apply after transfer if occupants do not provide access, and that Defendants will perform any Deferred Work for which occupants provide access after receiving this notice; (e) the Housing Specialist has confirmed that the tenants of any Deferred Units do not wish for the Deferred Work to be performed prior to transfer or the Housing Specialist determines that such tenants cannot be reached or made to respond; (f) the transfer would not reduce the value of any Financial Assurance, unless property or interests of equal value replace the value of the transferred Property; and (g) Properties containing, in aggregate, no more than the Current Transfer Cap are transferred pursuant to this Paragraph; provided that the Current Transfer Cap does not apply (1) for a Property that is not owned or controlled, in whole or in part, directly or indirectly, by any Defendant and for which Lilmor and Morris Lieberman have been removed from management by the owners; or (2) with respect to Properties not owned or controlled, in whole or in part, directly or indirectly, by any other Defendant, if Lilmor, Morris Lieberman, and Lillian Lieberman no longer remain engaged in the business of residential property management

12

or ownership, excepting direct or indirect minority[1] ownership interests in purely passive investments.  If, through transfers pursuant to this Paragraph, Defendants transfer their interests in a Property such that the Property is no longer owned or controlled, in whole or in part, directly or indirectly, by Defendants, then, upon such transfer, such Property shall no longer be considered a Property subject to this Consent Decree, except that Paragraph 126 shall continue to apply to such Property with "the termination of this Consent Decree" replaced by "the date of the last transfer pursuant to Section VI," and Defendants shall remain obligated pursuant to Paragraph 81 to perform the Deferred Work in a Deferred Unit upon vacancy (subject to Defendants' being granted access).  If Defendants are not granted access to such a transferred Deferred Unit upon vacancy, Defendants shall so advise the Housing Specialist (if prior to the termination of the Consent Decree), as well as the United States and the State, within seven days of the new owner's refusal; if, after speaking with the Housing Specialist, the United States, or the State, the new owner grants access to the Deferred Unit, Defendants shall complete the work pursuant to Paragraph 81.  Notwithstanding the foregoing, Defendants may satisfy their obligation to complete work in a transferred Deferred Unit by paying the new owner the reasonable cost of such work in return for an agreement by the new owner promptly to complete that work.

20.    For avoidance of doubt, nothing in this Consent Decree shall: (a) prohibit or place any restriction upon any current or future mortgage-holder's right or ability to foreclose on a mortgaged Property in an arms-length transaction not designed to remove that Property from the coverage of this Consent Decree, consistent with any mortgage agreements applicable thereto; or (b) place any obligations or restrictions upon a current or future mortgage-holder upon foreclosure of the Property or upon a subsequent third-party purchaser (not affiliated with Defendants) of a foreclosed Property, provided that Defendants are granted required access to the Property in the case of foreclosure.

## VII.   PENALTY AND RESTITUTION PAYMENT

21.    Within 30 Days after the Effective Date, Defendants shall pay the total sum of $3,250,000 as a civil penalty to the United States.  Fifty percent of this penalty shall be deemed paid on account of violations asserted in the Complaint on behalf of EPA and fifty percent shall be deemed paid on account of violations asserted in the Complaint on behalf of HUD.

22.    Within 180 Days after the Effective Date, Defendants shall pay the total sum of $325,000 to the State of New York, Office of the Attorney General as a civil penalty made payable to the N.Y.C. Department of Housing Preservation and Development.

23.    Within the timeframe provided by Paragraph 27, Defendants shall pay the total sum of $2,925,000 to the State of New York, Office of the Attorney General for restitution that the

---

[1] For purposes of this provision, Morris Lieberman and Lillian Lieberman shall qualify as having a "minority ownership interest" in a particular residential property only if their aggregated direct and indirect ownership interests—including interests held by any entities in which Morris Lieberman or Lillian Lieberman hold any direct or indirect interest, including as beneficiaries of a trust—amount to <u>less</u> than 50% of the ownership of that residential rental property.

State will make available to tenants affected by Defendants' conduct, as provided in Section X (Restitution Fund) below.

24.     Defendants shall pay the civil penalty described in Paragraph 21 to the United States at https://www.pay.gov to the U.S. Department of Justice account, in accordance with instructions provided to Defendants by the United States Attorney's Office for the Southern District of New York.  The payment instructions shall include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree.  At the time of payment, Defendants shall send notice to the United States by email and by regular mail in accordance with Section XIX (Notices). Such notice shall reference the CDCS number and DJ # 90-5-1-1-11797.

25.     Defendants shall pay $325,000 of the amount owing to the State described in Paragraph 22 as a civil penalty by certified bank check sent directly to the NYC Department of Housing Preservation and Development sent to Housing Litigation Division, 100 Gold Street, 6th Floor, New York, NY 10038, Attention: Tasonia Ragin, with simultaneous written notification to the Office of the Attorney General by email and regular mail in accordance with Section XIX (Notices).  Such notice shall reference the civil index number for this action.

26.     Defendants shall not deduct any penalties paid under this Decree pursuant to Paragraphs 21-25 or Section XIII (Stipulated Penalties) in calculating its federal, state or local income tax.

27.     <u>Restitution Payment.</u>  No later than the later of 180 Days after the Effective Date, Defendants shall pay $2,925,000 of the amount owing to the State described in Paragraph 23 as restitution by wire transfer, attorney check, or corporate or certified check or bank draft which shall be made payable to the "State of New York" (the "Restitution Fund"), to be distributed to tenants and permitted occupants of the Properties who meet the criteria for "Substandard Conditions Restitution" described in Section X (Restitution Fund).  At the time of payment, Defendants shall send notice to the State of New York by email and by regular mail in accordance with Section XIX (Notices).  Such notice shall reference the civil index number of this matter. Within 5 business days of receipt of payment, the State of New York shall release from escrow to Lilmor Defendants, the signed HPD letter agreement releasing them from civil penalty liability, an unsigned copy of which is attached to this Consent Decree at Appendix G.

## VIII.   HOUSING SPECIALIST

28.     <u>Housing Specialist.</u>  Defendants shall engage, at their own expense pursuant to the budget provisions below, as an independent contractor, a Housing Specialist chosen by Plaintiffs prior to the signing of this Consent Decree.  The Housing Specialist, which may be an individual or a firm, shall have expertise and experience with Lead-Based Paint Laws and with the commercial operation and management of housing.

29.     Within 30 days of the second anniversary of the Effective Date, and every two years thereafter until the termination of this Consent Decree, Plaintiffs shall either reappoint the current Housing Specialist or replace the Housing Specialist; provided that in the absence of such

reappointment or replacement by such date, the Housing Specialist shall continue in place until such reappointment or replacement occurs. In addition, the Housing Specialist may be removed or replaced by Plaintiffs on 60 days' notice, or for cause; the Housing Specialist may not be removed by Defendants, except that Defendants may request that Plaintiffs remove the Housing Specialist for cause. If the Housing Specialist position becomes vacant during the term of this Consent Decree, Plaintiffs shall promptly select a replacement. At least 30 days prior to choosing a new Housing Specialist, Plaintiffs shall provide notice to Defendants of their proposed Housing Specialist and permit Defendants an opportunity to provide their views to the Plaintiffs regarding the choice. Should Defendants disagree with Plaintiffs' choice, Plaintiffs shall meet with Defendants to discuss their concerns.

30.    In addition to the specific responsibilities set forth elsewhere in this Consent Decree, the Housing Specialist shall verify Defendants' compliance with the injunctive terms of this Decree.

31.    The Housing Specialist will exercise its judgment and discretion independently of Defendants, although it will consult with Defendants to the extent appropriate or necessary under this Decree. For avoidance of doubt, Defendants acknowledge that the Housing Specialist is not an employee of Defendants; that the Housing Specialist will not have an attorney-client relationship with any counsel for Defendants; that Plaintiffs may communicate with such Housing Specialist without including or notifying counsel for Defendants; and that the Housing Specialist need not share information with Defendants except as required by this Consent Decree.

32.    The Housing Specialist is not an agent or agency of Plaintiffs.

33.    The Housing Specialist will confer with the Defendants, tenants residing in Defendants' buildings, and tenant groups associated with Defendants' buildings to implement a tenant outreach plan for the purpose of educating tenants residing in Defendants' buildings about the provisions of the Consent Decree, the health and safety risks of lead paint, indoor allergens, and other substandard conditions, and tenant rights and responsibilities during the lead paint, indoor allergen, and substandard conditions abatement and remediation period.

34.    The Housing Specialist shall have full access to the Properties, Defendants' principals, employees, contractors, and subcontractors, and Defendants' files and information systems, as they reasonably pertain to matters addressed by this Consent Decree, for the purpose of performing its functions under this Consent Decree in a manner that does not unreasonably interfere with occupants' quiet enjoyment of the Properties or with the operation of Defendants' business subject to the parameters of this Consent Decree. This provision does not permit access to information protected by attorney-client privilege or attorney work product protection without Defendants' consent nor to information not relevant to the Housing Specialist's performance of its functions under this Decree.

35.    The Housing Specialist shall be charged with managing and disbursing funds from the Restitution Fund as provided in Section X (Restitution Fund), in consultation with and under the direction of the State of New York, Office of the Attorney General.

36.    <u>Housing Specialist Budget.</u>  Within 60 days of appointment and no later than 30 days before the beginning of each calendar year thereafter and in consultation with the Defendants, the Housing Specialist shall submit to the Plaintiffs a detailed budgetary estimate of anticipated fees, costs, and expenses for the calendar year for the Plaintiffs' review and approval (the "Budget"). Such fees, costs, and expenses shall be sufficient to allow the Housing Specialist to fulfill the Housing Specialist's duties for the calendar year pursuant to this Consent Decree in a reasonable and efficient manner, including by engaging staff, expert consultants, or other third parties. Defendants may submit an opposition to said budgetary estimate within two weeks of the Housing Specialist's submission to the Plaintiffs if they believe that any aspect is unreasonable. The Housing Specialist may respond to any opposition within one week. Plaintiffs may approve the budget in whole or part.  Once the Plaintiffs approve the Housing Specialist's budgetary estimate (or portion thereof), such estimate or portion thereof shall be deemed an "Operative Budget."

37.    The Housing Specialist's Budget may not increase by more than 15% from the previous calendar year without a showing that the costs are reasonably necessary to effectuate the purposes of this Consent Decree.

38.    If Defendants object to an approved Operative Budget, they may invoke the Dispute Resolution provisions set forth in Section XV (Dispute Resolution). The Operative Budget will remain in effect, and payments shall be made by Defendants thereunder, until Dispute Resolution has concluded.

39.    The Housing Specialist may amend the Operative Budget upon a showing of necessity; such amendment will be subject to the process set forth in Paragraphs 36-38.

40.    The Housing Specialist shall notify the Plaintiffs and Defendants when the Housing Specialist has spent 75% of the Operative Budget for the current calendar year.

41.    Within 30 days of receiving an invoice from the Housing Specialist for costs covered by an Operative Budget, Defendants shall pay that invoice. If the Housing Specialist incurs fees, costs, or expenses that are not covered by an Operative Budget but that are reasonably necessary to perform his or her duties under this Consent Decree, the Housing Specialist must amend the Operative Budget with a reasonable itemization of such increased fees, costs, or expenses and may not submit an invoice to Defendants for those costs until the amendment has been approved by Plaintiffs. The amendment may not result in an increase of the annual budget by more than 10% from the previous calendar year without a showing that the costs are necessary to effectuate the purposes of this Consent Decree.

42.    <u>Reporting by Housing Specialist.</u>  Each year, on the anniversary of the Effective Date, the Housing Specialist, after undertaking due diligence, shall submit a report to the Plaintiffs concerning Defendants' compliance with this Consent Decree (the "Annual Housing Specialist Report"). The Annual Housing Specialist Report will be made publicly available on a website maintained by the Housing Specialist.

43. <u>Consultation with Plaintiffs</u>. If requested by either Plaintiff, the Housing Specialist shall (i) provide copies of all documentation it receives from Defendants pursuant to this Consent Decree and (ii) consult with such Plaintiff prior to approving or disapproving any deliverable under this Consent Decree. A Plaintiff's request under this Paragraph shall be made by email or otherwise in writing and may address all documentation and deliverables under the Consent Decree; specific documentation or deliverables; or categories of documentation and deliverables. A Plaintiff may modify or withdraw a request previously made under this Paragraph. For avoidance of doubt, nothing in this Paragraph should be construed to alter the obligations of the Housing Specialist set forth in other Paragraphs of this Consent Decree.

## IX.    INJUNCTIVE REQUIREMENTS

### *Lead-Based Paint*

44. <u>Compliance In General</u>. Defendants shall fully comply with all applicable Lead-Based Paint Laws.

45. <u>Supplemental Lead-Based Paint Disclosure to Tenants.</u> Within 120 days of the Effective Date, Defendants shall provide by regular mail, email (where an email address is known by Defendants), or hand delivery signed for by a tenant, to every lessee of a Unit in the Properties, except for Units that would otherwise be exempt from the Lead Disclosure Rule, the following:

   a.    All information required to be provided to tenants upon the signing of an initial lease pursuant to 40 C.F.R. §§ 745.107 and 745.113(b), and 24 C.F.R. §§ 35.88 and 35.92(b), including a Lead Warning Statement, which Defendants shall request that tenants sign, date, and return.

   b.    An N.Y.C. DOHMH pamphlet "Lead Paint Hazards in the Home."

   c.    A written notice requesting that occupants report to Defendants Deteriorated Paint and, if applicable, failure of encapsulation or enclosure, including the name, address, telephone number, and email address of the Compliance Officer.

46. <u>Lead-Based Paint Inspection and Risk Assessment</u>. Within one year of the Effective Date, Defendants shall conduct: (1) through EPA-certified risk assessors and inspectors approved by the Housing Specialist, an inspection (within the meaning of 40 C.F.R. § 745.227(b)) and consistent with Chapters 5 and 7 of the HUD Guidelines and N.Y.C. Admin. Code § 27-2056.4) of all Units and Common Areas, except as to any Unit or Common Area that was subject to such an inspection by a certified Lead-Based Paint inspector to identify any Lead-Based Paint in that Unit or Common Area on or after December 1, 2021, provided documentation of such a prior inspection is provided to the Housing Specialist and found to meet the requirements of this clause (1); and (2) through EPA-certified risk assessors approved by the Housing Specialist, where the inspections in subsection (1) identify the presence of Lead-Based Paint in Units or Common Areas, a risk assessment of the Units or Common Areas in accordance with 40 C.F.R. § 745.227(d), N.Y.C. Admin. Code § 27-2056.4 and consistent with Chapter 5 of the HUD Guidelines (together,

17

the "Inspection and Risk Assessment"). Notwithstanding the foregoing deadline, the Inspection and Risk Assessment shall occur no later than: (i) 90 Days after the Effective Date for all Units in which Defendants have received notice that a child under six years or a pregnant occupant has come to reside as of the Effective Date and related Common Areas;  and (ii) the date provided in any NYC DOHMH Commissioner's Order to Abate ("COTA"), if such date occurs sooner than one year after the Effective Date. Each Unit must be inspected and evaluated rather than a sampling of Units.  With each quarterly Progress Report, Defendants shall provide to (a) such Unit's occupants a report containing the information specified by 24 C.F.R. § 35.125; and (b) the Housing Specialist a report containing the information required by 40 C.F.R. § 745.227(b)(4) (for inspections) and/or 40 C.F.R. § 745.227(d)(11) (for risk assessments), as applicable (a "LBP Inspection and Risk Assessment Report").

47.    Lead-Based Paint Hazard Reduction. Defendants shall control (by Interim Controls and/or Abatement) Lead-Based Paint Hazards identified during the Lead-Based Paint Inspection and Risk Assessment using Interim Controls and/or Abatement within 30 days of issuance of an LBP Inspection and Risk Assessment Report.  If Defendants learn of Lead-Based Paint Hazards or of Deteriorated Paint on surfaces that are not without Lead-Based Paint by means other than a Lead-Based Paint Inspection and Risk Assessment (including a visual assessment for Deteriorated Paint as provided in Paragraph 48), they shall control (by Interim Controls and/or Abatement) such Lead-Based Paint Hazards or Deteriorated Paint within 30 Days of such Lead-Based Paint Hazards or Deteriorated Paint being made known to Defendants. If Defendants are notified by a government entity of a legal requirement to undertake additional risk assessment, inspections, remediation, Abatement, or other actions required by applicable law to be undertaken in light of Lead-Based Paint Hazards or violations, Defendants shall perform such additional actions as required by law. Defendants shall provide notice to the Housing Specialist of Interim Controls or Abatements in advance of conducting that work where they are required to provide notice to a local, state, or federal agency by law.

48.    Lead-Based Paint Operations & Maintenance Plan; Visual Assessments. Within 180 days of the Effective Date, for all Units and Common Areas that have not yet received a Lead-Based Paint Inspection Determination, Defendants shall implement a Lead-Based Paint Operations & Maintenance Plan requiring annual visual inspection of each Unit and Common Area for Deteriorated Paint, to be completed by June 1 of each year and requiring control of Deteriorated Paint that is or may be a Lead-Based Paint Hazard using Interim Controls and/or Abatement within 30 days of the visual inspection. The Lead-Based Paint Operations & Maintenance Plan is subject to the approval of the Housing Specialist, in consultation with the Plaintiffs and Defendants, and must also comply with the New York City Childhood Lead Poisoning Prevention Act requirements for annual inquiry about children under six residing in the units, annual investigatory and inspection follow-up, as provided in N.Y.C. Admin. Code § 27-2056.4, and the requirements of the Lead Safe Housing Rule for any federally subsidized (including insured) units, *see, e.g.*, 24 C.F.R. Part 35, Subpart M (for tenant-based voucher rental assistance); *id.* Subpart G (for multifamily mortgage insurance); *id.* Subpart H (for project-based assistance). Defendants shall comply with the approved Lead-Based Paint Operations & Maintenance Plan.

49.    Comprehensive Abatement of Lead-Based Paint.  Within five years of the Effective Date, Defendants shall: (1) Abate by replacement or removal all Lead-Based Paint identified on

Chewable, Friction, or Impact Surfaces within the Properties in a manner compliant with local, state, and federal law, including 24 C.F.R. § 35.1325 and 40 C.F.R. § 745.227(e) and the New York City Childhood Lead Poisoning Prevention Act, N.Y.C. Admin. Code §§ 27-2056.1-2056.18 and obtain a Lead-Based Paint Inspection Determination that those surfaces are free of Lead-Based Paint, and (2) abate by replacement, removal, permanent enclosure, or permanent encapsulation—with the choice of these four methods to be made solely in the discretion of Defendants, subject to the HUD Guidelines and applicable federal, state, and local law—all other Lead-Based Paint identified within the Properties.   Defendants shall obtain a Lead-Based Paint Inspection Determination identifying areas (other than Chewable, Friction, or Impact Surfaces) where Lead-Based Paint remains but has been Abated by permanent enclosure or encapsulation. For the avoidance of doubt, "permanent" shall have the meaning set forth in 24 C.F.R. § 35.110. Notwithstanding the foregoing deadline, Defendants shall abate Units and associated Common Areas by the following earlier dates, where applicable: (i) the vacancy turnover of a Unit; (ii) 45 days after notification by a government agency of a violation of Lead-Based Paint Laws; (iii) 45 days after learning that a child under 6 years old or pregnant occupant has come to reside in a Unit; or (iv) where N.Y.C. DOHMH has issued a COTA, the deadline for Abatement set in the COTA. Defendants' time to complete the abatement work required by this Paragraph may be extended by the Housing Specialist, on a Unit-by-Unit basis, if Defendants establish to the Housing Specialist's satisfaction that Defendants were diligent in attempting to complete this abatement work in a particular Unit but, for reasons outside of Defendants' control (not to include financial circumstances), Defendants need additional time to do so.

50.    <u>Abatement Plan</u>.  Within 15 months of the Effective Date, Defendants shall submit a plan ("Abatement Plan") to the Housing Specialist and Plaintiffs setting forth a schedule for completing the comprehensive abatement required by Paragraph 49.  The Abatement Plan shall include interim deadlines for accomplishing portions of the abatement.  Once approved by the Housing Specialist, Defendants shall implement the Abatement Plan. Defendants may seek amendments to the Abatement Plan schedule, which shall be approved by the Housing Specialist so long as they are consistent with the deadline for Abatement set forth in Paragraph 49.

51.    <u>Renovation and Interim Control Standards</u>. When disturbing Lead-Based Paint during Renovations (as defined by 40 C.F.R. § 745.83) and Interim Controls (as defined by 24 C.F.R. § 35.1330), or any other activity besides Abatement, Defendants shall employ Lead-Safe Work Practices (or, if acting through contractors or subcontractors, ensure that the contractor or subcontractors do so) and comply with the following requirements, in addition to following any other applicable legal requirements, including but not limited to N.Y.C. Admin. Code §27-2056.11:

a.    Ensuring that only properly trained and certified firms and workers are assigned to perform work to which Lead-Safe Work Practices apply in accordance with 24 C.F.R §§ 35.1330(a)(4), 35.1350(b) and/or 40 C.F.R. §§ 745.85(a), 745.90, as applicable.

b.    Obtaining and maintaining certification as a certified renovation firm if any of the workers described in this Paragraph are Defendants' employees, and

the work they do is covered by 40 C.F.R. Part 745, Subpart E, in accordance with 40 C.F.R. §§ 745.81, 745.89.

c.    Ensuring equipment, supplies, and materials necessary to perform Lead-Safe Work Practices in accordance with 24 C.F.R § 35.1350 and 40 C.F.R. § 745.85 are readily available to trained and certified workers, as applicable.

d.    Ensuring that firms and workers assigned to perform Renovations or Interim Controls use the RRP Renovation Checklist attached to this Consent Decree as Appendix H and establish and maintain records necessary to demonstrate compliance.

e.    Ensuring that occupants of Properties in which Renovations or Interim Controls to which Lead-Safe Work Practices apply will be performed are informed of the work to be performed and the risks involved in accordance with 24 C.F.R § 35.1345(b)(2) and 40 C.F.R. §§ 745.84 and 745.85.

f.    Complying with the occupant notification and information distribution regulations set forth at 24 C.F.R. § 35.125 and 40 C.F.R. § 745.84, as applicable.

g.    Containing or causing to be contained any work area for which Lead-Safe Work Practices are required under applicable law by isolating the work area and waste generated so that no dust or debris leaves the work area in accordance with 24 C.F.R. § 35.1345 and 40 C.F.R. § 745.85(a), as applicable.

h.    Containing, collecting, and transporting waste from the renovation in accordance with 40 C.F.R. § 745.85(a)(4).

i.    Performing cleanup of any work area to which Lead-Safe Work Practices apply until no dust debris or residue remains above de minimis levels in accordance with 24 C.F.R. §§ 35.1340, 35.1345, 35.1350 and 40 C.F.R. § 745.85(a) and (b) and conducting and passing a Clearance Examination in accordance with 24 C.F.R. § 35.1340 (including follow-up as required by that section's subsection (e) after any clearance failures), as provided by 40 C.F.R. § 745.85(c), before tenants are permitted into the work area, in accordance with Paragraph 54.

j.    Retaining records required by 24 C.F.R. § 35.175, 40 C.F.R. § 745.84, and N.Y.C. Admin. Code §27-2056.17.

52.    The Housing Specialist may, at its discretion, conduct inspections of the work being conducted under this Section of the Consent Decree in a reasonable manner to ensure that it is being done in compliance with the Consent Decree. If the Housing Specialist determines that work has not been done in compliance with the Consent Decree—either by inspection or by a review of the records provided by Defendants— the Housing Specialist may direct Defendants to correct the

20

deficiencies in the work or the documentation and may require re-testing or additional work to affect a correction. The Housing Specialist shall allow Defendants a reasonable time for such correction. The Housing Specialist may require additional reporting to demonstrate the corrective action.

53.    <u>Abatement Standards.</u> In performing any Abatements, whether pursuant to this Consent Decree or otherwise, Defendants shall comply with the following (or, if acting through contractors or subcontractors, ensure that the contractors or subcontractors comply with the following), in addition to any other applicable legal requirements, including but not limited to N.Y.C. Admin. Code § 27-2056.8:

a.    Defendants shall ensure that each firm performing the abatement is certified as an abatement contractor in accordance with 40 C.F.R. §§ 745.220(a) and 745.227(a)(2).

b.    Defendants, or their abatement contractors, shall ensure that a certified supervisor shall be onsite or otherwise available in accordance with 40 C.F.R. § 745.227(e)(2), and that all other workers performing abatement are, at a minimum, certified abatement workers. 40 C.F.R. §745.227(e)(1).

c.    Defendants, or their abatement contractors, shall notify EPA of Lead-Based Paint Abatement activities electronically using EPA's Central Data Exchange (CDX) in accordance with 40 C.F.R. § 745.227(e)(4), or by alternate means permitted by EPA if CDX is not operational.

d.    Defendants, or their abatement contractors, shall notify occupants of Lead-Based Paint Abatement activities in the same manner as required for activities covered by the RRP Rule pursuant to 40 C.F.R. § 745.84.

e.    Defendants, or their abatement contractors, shall prepare and implement written occupant protection plans for all Abatement projects in accordance with 40 C.F.R. § 745.227(e)(5).

f.    Defendants, or their abatement contractors, shall specify methods of collection and laboratory analysis in accordance with 40 C.F.R. § 745.227(f).

g.    Defendants, or their abatement contractors, shall ensure that a Clearance Examination is performed; that clearance is attained before tenants are permitted into the work area, in accordance with Paragraph 54; and that a clearance examination report is provided by a Lead-Based Paint inspector/risk assessor certified and licensed as applicable for the property location, in accordance with 40 C.F.R. § 745.227(e)(8)-(9). The Lead-Based Paint inspector/risk assessor must be independent of the Lead-Based Paint Abatement firm, supervisor, and contractors performing the Abatement work, in accordance with 24 C.F.R. § 35.1340(f).

21

h. Defendants, or their abatement contractors, shall ensure that the certified supervisor on each Abatement prepares an Abatement report in accordance with 40 C.F.R. § 745.227(e)(10) within 15 days of the conclusion of all work.

i. Defendants shall maintain records in accordance with 40 C.F.R. § 745.227(i) and 24 C.F.R. § 35.175.

54. <u>Clearance Examinations</u>.    As part of any Abatement, Interim Controls, or Renovation, Defendants shall ensure that the following requirements are complied with, by including the requirements in all of their contracts with certified firms and persons conducting Abatement, Interim Controls, or Renovation:

a. Daily and final cleanups shall be conducted in accordance with Chapter 14 of the HUD Guidelines and the Lead-Based Paint Activities Rule at 40 C.F.R. § 745.277(e).

b. Clearance Examinations shall be conducted by a certified lead risk assessor or inspector, who is a third party, independent of the owner, in each Unit, Common Area, or building upon completion of final cleanup.  If the Clearance Examination report and analysis of dust samples from an EPA-accredited laboratory indicate that clearance is not achieved, Defendants shall repeat the cleaning procedures identified above under Paragraph 54(a), repeat dust clearance sampling within five (5) calendar days of the failed clearance examination, and repeat this procedure until clearance has been attained.  Containment will be maintained, and tenants will not be permitted into the work area until, clearance is attained.

55. Defendants shall ensure that Clearance Examinations are not conducted by the same individual or same or affiliated business entity conducting the rest of the Lead-Based Paint Work that is being evaluated by the Clearance Examination.

56. <u>Child with an Elevated Blood Lead Level.</u>  During the course of this Consent Decree, if Defendants learn of a child under the age of 18 residing in a Unit who has an elevated blood lead level as defined by New York City Health Code § 173.13(d)(2), Defendants shall comply with that provision and all other applicable laws and additionally shall report the occurrence to the Housing Specialist.  The Housing Specialist will take appropriate steps to limit further disclosure of the identity of children with elevated blood lead levels, except where necessary in the Housing Specialist's judgment to the effective implementation of this Consent Decree.

57. <u>Occupant Education on Lead-Based Paint Hazards.</u>  Defendants shall implement once at each Property occupant education on the hazards of lead-based paint and methods of minimizing potential exposures.  In particular, Defendants shall, at each Property: (a) set up, in the lobby or other common space adjacent to the Property's main entrance, a table (the "Lead Education Table") at which occupants can receive information on the hazards of lead-based paint

and methods of minimizing potential exposures; (b) maintain the Lead Education Table—meaning that the Lead Education Table remains stationed in the lobby or other common space adjacent to the main entrance, with copies of the required educational material refreshed throughout the day—for at least ten days; (c) for at least three days, ensure that the Lead Education Table is staffed for at least two hours each day (after 7 p.m. for at least two of the three days) by a qualified trainer (the "Trainer") who is experienced in educating occupants on the hazards of lead-based paint and methods of minimizing potential exposures, who will be available to answer occupants' questions; (d) post notices in locations reasonably designed to inform occupants of the Lead Education Table, and the dates and times the Trainer will be staffing it, at least one month before it is established and notify Housing Specialist of the same; (e) make available at the Lead Education Table copies of EPA's *Protect Your Family From Lead Paint in Your Home* pamphlet English, Spanish, Arabic, French, Chinese, Russian, Somali, Tagalog and Vietnamese (copies in these languages may be found https://www.epa.gov/lead/protect-your-family-lead-your-home-english); (f) make available at the Lead Education Table copies of the NYC Health Department flyer "Protect Children From Lead Hazards" in English, Haitian-Creole, Korean, Polish, Bengali and Urdu, all available at: https://www.nyc.gov/site/doh/health/health-topics/lead-poisoning-prevention.page;     and     (g) certify in the next Progress Report that the Lead Education Table was implemented and these requirements complied with at that particular Property. The Housing Specialist, in its discretion, may visit one or more Lead Education Tables.

58.     <u>Prioritization of Lead-Based Paint Work</u>.    In scheduling Lead-Based Paint Abatement or Interim Control activities, priority shall be given to those Units and Properties where Defendants have been informed that or are otherwise aware that children under the age of six or pregnant women presently reside.

59.     <u>Lead-Based Paint Compliance Policies</u>.    Within 180 days of the Effective Date, Defendants will submit a written policy (the "LBP Compliance Policy") to the Housing Specialist designed to ensure that all of Defendants' employees, contractors, and subcontractors performing responsibilities related to the Lead-Based Paint Laws comply with those laws. This policy will provide:

a.     For the Lead Disclosure Rule: (a) adequate training of employees, (b) adequate protocol to ensure that leasing agents know of and disclose Lead-Based Paint and/or Lead-Based Paint Hazards within Units and Common Areas, and (c) adequate supervision of employees, contractors, and subcontractors, including regular and unannounced paper audits by Defendants.

b.     For Lead Safe Work Practices: (a) adequate training of employees, (b) adequate controls to ensure that contractors and subcontractors perform work in accordance with this Consent Decree, (c) adequate supervision of employees, contractors, and subcontractors, to include regular, unannounced spot checks while work is being done, and (d) regular and unannounced audits of records.

Once such a policy is approved by the Housing Specialist, in consultation with Plaintiffs, Defendants shall implement and abide by the approved policy for the duration of the Consent

Decree. The Housing Specialist, in consultation with Plaintiffs, may approve modifications to this policy proposed by Defendants in the future.

### *Substandard Conditions*

60.    <u>Current Substandard Conditions</u>. By 180 days after the Effective Date, Defendants shall correct, to the satisfaction of the Housing Specialist, all Substandard Conditions in Properties (i) of which Defendants have received actual notice as of the Effective Date or (ii) for which a violation has appeared on N.Y.C. HPD's "HPD Online" website on or before the Effective Date. Nothing in this Paragraph shall relieve Defendants from their obligations under applicable law to correct violations identified by N.Y.C. HPD or other governmental agencies pursuant to the timeline for correction set out in applicable law or agency order, which may require correction sooner than 180 days.

61.    <u>Future Substandard Conditions</u>. At all times thereafter, Defendants shall take all reasonable steps to prevent Substandard Conditions from occurring. "All reasonable steps" shall include, but are not limited to, compliance with applicable Indoor Asthma and Allergen Trigger laws with respect to all Properties and Units therein. Upon receiving actual notice of any Substandard Condition or having a violation related to such condition appear on N.Y.C. HPD's HPD Online website (a "Known Substandard Condition"), Defendants shall promptly remediate it. If, in the view of the Housing Specialist, a Known Substandard Condition threatens an occupant's health or safety, the Housing Specialist shall issue an Action Plan directing Defendants to take action with respect to that Known Substandard Condition and shall have the power to implement some or all of the actions required by an Action Plan should Defendants fail to implement the Action Plan.

62.    <u>Substandard Conditions Screen</u>. Within one year of the Effective Date, Defendants shall conduct, through contractors approved by the Housing Specialist, a visual inspection for Substandard Conditions, including for pests and other asthma allergen triggers, in all Properties. Each Unit must be inspected rather than a sampling of Units. Within 15 days of completing a Substandard Conditions Screen for a Unit or Common Area, a written report addressing the findings of the Substandard Conditions Screen (a "Substandard Conditions Inspection Report") shall be provided to tenants and the Housing Specialist.

63.    For the purpose of Paragraphs 60 and 61, "actual notice" includes (but is not limited to) conditions that have been reported by a tenant to Defendants or their employees, or that the Housing Specialist has reported to Defendants, even if Defendants have not yet acted on that report.

64.    <u>Substandard Condition Remediation at Turnover</u>. Without limiting Defendants' obligations to remediate Substandard Conditions at other times, upon tenant turnover, Defendants shall remediate all visible mold and pest infestations and any underlying defects in the Unit, thoroughly cleaning and vacuuming all carpeting and furniture, if provided, consistent with safe work practices outlined in the N.Y.C. Asthma Free Housing Act.

65.    <u>Indoor Allergen Supplemental Disclosure.</u> Within 120 days of the Effective Date, Defendants shall provide by regular mail, email (where an email address is known by Defendants), or hand delivery signed for by a tenant, to every lessee in the Properties an indoor allergens information fact sheet from the N.Y.C. DOHMH entitled "What Tenants Should Know About Indoor Allergens (Local Law 55 of 2018)." This disclosure may be included in the same mailing and email as the supplemental lead-based paint disclosure required by Paragraph 44.

### Compliance Officer

66.    <u>Compliance Officer.</u>  Defendants shall employ a qualified Compliance Officer acceptable to the Plaintiffs for the duration of the Consent Decree.  In consultation with the Housing Specialist, within 90 Days of the Effective Date, Defendants shall appoint an individual with appropriate qualifications and experience, acceptable to the Plaintiffs, to serve as Compliance Officer, who will oversee Defendants' compliance with all applicable legal requirements, including this Consent Decree, and will serve as the point of contact between Defendants, Plaintiffs, and the Housing Specialist. The Compliance Officer may be an existing officer or employee of Defendants, if they are otherwise appropriately qualified. In the event that Defendants' Compliance Officer ceases to work in that position, Defendants shall appoint a replacement within 30 Days.

### Progress Report

67.    Within 20 Days following the end of each calendar quarter ending more than 180 Days after the Effective Date, Defendants shall provide to the Housing Specialist a quarterly report (the "Progress Report"), with copy to counsel for Plaintiffs, including:

a.    Proof, in the initial Progress Report, of notifications sent pursuant to Paragraph 45;

b.    A list of Units, Common Areas, and Properties for which a report of an Inspection and Risk Assessment or a Substandard Conditions Inspection Report was issued in the prior quarter, with a copy of such reports if not previously provided to the Housing Specialist;

c.    A list of Units, Common Areas, and Properties for which an Inspection and Risk Assessment has identified Lead-Based Paint Hazards, or a Substandard Conditions Screen has identified Substandard Conditions during the prior quarter, with the date on which such Lead-Based Paint Hazards and Substandard Conditions were or are to be eliminated.

d.    For Lead-Based Paint Hazards and Substandard Conditions identified in subsection (c) that have not yet been eliminated, a proposed schedule according to which each such condition will be eliminated.

e.    A list of Units for which the Defendants have been unable to obtain access to conduct activities required by this Consent Decree, including any documented efforts to reach those tenants, during the prior quarter;

f.     A list of Units and Common Areas in which Renovations, Interim Controls, or Abatements were performed in the prior quarter, with records showing compliance with Lead-Based Paint Laws during such activity;

g.     A list of Units, Common Areas, and Properties for which Defendants received a Lead-Based Paint Inspection Determination in the prior quarter, with a copy of that determination;

h.     The status of compliance with any Action Plans issued under Paragraph 69;

i.     A list of Units, Common Areas, and Properties that Defendants ask the Housing Specialist to designate as Completed Units, Completed Common Areas, or Completed Properties, respectively, and any Property that Defendants ask the Housing Specialist to determine that it would qualify as a Completed Property but for the presence of Deferred Units;

j.     Any housing or health code notices issued by any state or local governmental authority relating to Substandard Conditions in the prior quarter;

k.     Other information and records necessary to document Defendants' compliance (and any non-compliance) with the Consent Decree during the prior quarter;

l.     Other information requested by the Housing Specialist to be included in Progress Reports to facilitate the Housing Specialist's performance of its duties under this Consent Decree, including but not limited to information necessary to apply the rent abatement credit in Paragraph 84; and

m.     A list of any violations of the Consent Decree known to Defendants and not already known to the Housing Specialist that occurred during the prior quarter, the cause of the violation, and the remedial steps taken, or to be taken, to prevent or minimize such violation.

68.     The initial progress report shall contain the information described in Paragraph 67 not only for the prior quarter but since the Effective Date.

***Housing Specialist Plans***

69.     <u>Action Plans</u>.  No later than 30 days after receipt of a Progress Report, the Housing Specialist shall issue an Action Plan identifying specified actions that Defendants must take to eliminate Lead-Based Paint Hazards and Substandard Conditions identified in the Progress Report and to prevent their recurrence, including through changes to certain policies or procedures, and specified deadlines for taking such actions.  Such actions and deadlines may, but need not, be the actions and deadlines proposed by Defendants in the Progress Report. Defendants shall comply with Action Plans, which may be modified by the Housing Specialist upon request of the Defendants.

70.     <u>Interim Deadlines</u>.  Action Plans shall include interim deadlines for any actions that cannot be completed within 60 days.

71.     <u>Considerations for Plans</u>. In Action Plans, the Housing Specialist shall endeavor to (i) prioritize matters presenting the greatest health and safety risks, (ii) ensure that work performed meets legal and professional standards and is of a quality that will reduce the likelihood of recurrence, (iii) ensure that all work performed will be performed in such a way as to protect the health and safety of occupants of the Properties; and (iv) ensure that the Action Plans call for actions that are cost-effective methods to ensure the health and safety of occupants of the Properties.

72.     For avoidance of doubt, nothing in Action Plans shall relieve Defendants of their obligation to affirmatively inspect for, identify and eliminate conditions under applicable local, state, or federal law or pursuant to the terms of contracts with governmental entities or under this Consent Decree.

73.     The Housing Specialist shall seek to consult with affected tenants prior to issuing an Action Plan.

74.     The Housing Specialist may amend an Action Plan or issue a replacement.

### *Work Completion*

75.     <u>Work Completion</u>.  For each Unit, Common Area, or Property that Defendants have proposed to be a Completed Unit, Completed Common Area, or Completed Property pursuant to Paragraph 67(i), the Housing Specialist will promptly determine, through inspection of relevant documentation or, as the Housing Specialist reasonably determines in its discretion is appropriate, inspection of the Unit, Common Area, or Property or confirmation with the Unit's occupants, whether Work Completion has occurred and shall notify Defendants in writing of its conclusions. For each Property that Defendants have asked the Housing Specialist to determine pursuant to Paragraph 67(i) would have been a Completed Property but for the presence of Deferred Units, the Housing Specialist will promptly determine, through inspection of relevant documentation or, as the Housing Specialist reasonably determines in its discretion is appropriate, inspection of the Property or confirmation with the Property's occupants, whether Work Completion has occurred but for Deferred Units and shall notify Defendants in writing of its conclusions.  The Housing Specialist shall make best efforts to complete these reviews and inspections within thirty days of each Progress Report.  If the Housing Specialist has determined that the Work Unit, Work Common Area, or Work Property has achieved Work Completion, it will be deemed a "Completed Unit," "Completed Common Area," or "Completed Property," provided, however, that "Completed" status will not impact the jurisdiction of local, state, or federal regulators to issue violations found in Units, Common Areas, or Properties. If the Housing Specialist determines that any Unit, Common Area or Property that Defendants included in a Progress Report pursuant to Paragraph 67(i) is not Completed, the Housing Specialist shall specify the work needed to be done for that Unit, Common Area, or Property to be designated as Completed in the Action Plan for the following quarter.

76.    The Housing Specialist shall, in the Action Plan for the following quarter, state the Units, Common Areas, or Properties the Housing Specialist has determined to be Completed since the last Action Plan was issued.  If the Housing Specialist thereafter identifies non-compliance with Lead-Based Paint Laws related to the condition of Lead Based Paint or a Substandard Condition in a Completed Unit, Completed Common Area, or Completed Property, or in a Property that the Housing Specialist had determined would be a Completed Property but for the presence of Deferred Units,  that Unit, Common Area, or Property will lose its designation as "Completed" (or its status as a property that would be a Completed Property but for the presence of Deferred Units) until such time as the Housing Specialist determines that non-compliance with Lead-Based Paint Laws or Substandard Condition has been corrected.

### *Guaranty of Performance; Failure of Performance*

77.    <u>Financial Assurance</u>. To guarantee its remediation and compliance work under this Consent Decree, including the cost of the testing and Abatement required by Paragraphs 46 and 49 above, which Defendants estimate will cost at least $10,000,000, within 30 Days after the Effective Date, Defendants shall provide financial assurance, in the form of cash held by a nationally chartered financial institution in an interest-bearing account pursuant to an escrow agreement or trust agreement acceptable to the Plaintiffs, with a value of $2,000,000 (the "Financial Assurance").  At least once a year thereafter, the Housing Specialist will estimate the cost of the remaining work to be performed under this Consent Decree in the following year and notify the Parties of that revised amount.  If that revised amount is less than the then-current value of the Financial Assurance, Defendants may reduce the value of the Financial Assurance to the cost estimate amount.  If the revised amount is greater than the then-current value of the Financial Assurance, Defendants must increase the value of the Financial Assurance in a form agreed to by the Plaintiffs by the difference within 60 Days after the notification.  Should Defendants dispute the Housing Specialist's new estimated cost, the dispute shall be resolved per the dispute resolution provisions in Section XV (Dispute Resolution) below.  The escrow agreement or trust agreement referenced above shall include language authorizing funds to be paid as provided in Paragraph 78 (Failure of Performance) and shall make clear that Defendants' interest in the funds subject to this agreement is solely a contingent interest as to amounts by which the Housing Specialist may reduce the value of the Financial Assurance as provided in this Paragraph and amounts not used pursuant to Paragraph 78 and remaining at termination of this Consent Decree.

78.    <u>Failure of Performance</u>.  If the Housing Specialist determines that Defendants fail to successfully implement an Action Plan or a portion thereof or are incapable of successfully implementing such plan or a portion thereof, the Housing Specialist may notify Defendants of such determination, after which Defendants shall have the remainder of the quarterly period until the next Progress Report or 60 days, whichever is greater, or such later deadline as the Housing Specialist sets for good cause, to correct the failure. If the Housing Specialist determines that Defendants have not corrected that failure within that time period, the Housing Specialist may implement some or all of the actions required by the Action Plan using contractors engaged by the Housing Specialist. If Defendants fail to pay for such work, the Housing Specialist may direct any third-party responsible for the Financial Assurance to make such payment or take appropriate steps to fund such work.

*Occupant Protections*

79.    <u>Notice of Work</u>. Defendants shall provide occupants reasonable advance written notice of work, which shall be provided no less than 10 calendar days prior to performance of non-emergency work, unless the occupant consents to a shorter time period.  Defendants shall make reasonable efforts to schedule the work in a way that minimizes inconvenience to the occupants.

80.    <u>Relocation at Occupants' Option.</u> Within 30 Days of the Effective Date, Defendants will submit a written policy ("Relocation Policy") to the Housing Specialist providing: (a) occupants the option to elect to postpone or refuse work required by this Consent Decree (except where such work is required under otherwise applicable law) and (b) occupants the right to temporarily relocate during work when such work either (i) would substantially inconvenience the occupant, as will be further defined in the Relocation Policy, or could not be safely performed otherwise, or (ii) would be performed in a Unit that is subject to the Lead Safe Housing Rule, when required by that Rule, 24 C.F.R. § 35.1345(a)(2) ("Relocation-Eligible Work"). As part of the Relocation Policy, occupants shall have the right, for the duration of any Relocation-Eligible Work, to be temporarily relocated, at Defendants' cost, to a nearby dwelling unit, no more than a mile away, or as close as reasonably available, of adequate size for that household. The relocation unit shall be free of Substandard Conditions including but not limited to lead-based paint hazards and without cost to the relocated tenant and/or occupant who shall, under no circumstance, be considered to have abandoned or surrendered their tenancy rights to their apartment in which Relocation-Eligible Work is performed.  Once such a policy is approved by the Housing Specialist, Defendants will implement and abide by the Relocation Policy for the duration of this Consent Decree.  The Housing Specialist may amend the Relocation Policy after consultation with Plaintiffs and Defendants.

81.    <u>Work Refusal or Postponement.</u>  Tenants shall have the right to elect to postpone or refuse any work required under this Consent Decree during their tenancy (unless such work cannot be postponed under applicable local, state, and federal law).  A tenant will be deemed "non-responsive" if Defendants are unable to obtain the tenant's, their designated representative's, or their authorized occupant's agreement to schedule work after: (1) three or more written notices, in the language customarily used between Defendants and the tenant, provided at least a week apart from one another; (2) three or more calls to the tenants' last-known phone number to schedule work; and (3) at least one in-person attempt to contact the tenant at their Unit.  If a tenant is non-responsive or elects to postpone or refuse work under this Consent Decree, the Defendants shall provide notice to the Housing Specialist, who shall attempt to contact any such tenants, their designated representative, or authorized occupant and confirm that the eligible tenants wish to postpone or refuse that work.  If the Housing Specialist confirms that a tenant is refusing work, or if the tenant is not responsive to the Housing Specialist, the Housing Specialist shall designate the Unit a "Deferred Unit" until the tenant agrees to have deferred work performed or until Unit turnover, whichever occurs sooner.  Failure to perform work in a Unit designated as a Deferred Unit during the period of designation shall not constitute a violation of this Consent Decree (unless such work cannot be postponed under applicable local, state, and federal law). Defendants and the Housing Specialist shall attempt to contact a tenant and obtain consent to access a Deferred Unit at least once during each following quarter by written notice and one in-person attempt.  If Defendants and the Housing Specialist remain unable to obtain consent to access the unit (and

29

work can be postponed under applicable local, state, and federal law) until vacancy of the Deferred Unit, Defendants will perform the Deferred Work upon vacancy, whether or not vacancy occurs within the term of this Consent Decree. For the avoidance of doubt, when a Property is transferred pursuant to Paragraph 19, Defendants' obligation to perform any remaining Deferred Work in that Property is subject to the provisions of Paragraph 19 concerning that obligation.

82.    <u>Coordination of Work</u>. Defendants shall coordinate access for required annual inspections and remediation of lead and indoor allergen hazards as well as other substandard conditions, so as to minimize the number of times that occupants must provide access. In no event should occupants be compelled by Defendants to move from their apartments unless required by applicable law during the performance of work to protect occupants' health and safety.

83.    <u>Effect of Work on Rent.</u> Defendants agree that any work done to comply with this Consent Decree or Lead-Based Paint Laws or to remediate Substandard Conditions within the meaning of this Consent Decree shall not entitle Defendants, by virtue of that work, to rent increases. For clarification, no work performed to comply with the requirements of this Consent Decree shall provide the basis to increase the rent of any unit, whether unregulated or regulated, including that remediation work shall not serve as a basis for Major Capital Improvement ("MCI") or Individual Apartment Improvement ("IAI") increases under local and state law or for an increase in payments to be made under any local, state or federal housing subsidy program.

84.    <u>Rent Abatement Credit</u>. With respect to any tenant whose Unit is found by the Housing Specialist to have then-current non-compliance with Lead-Based Paint Laws or Substandard Conditions (including those who have agreed to be relocated) a rent abatement credit shall be applied to the tenant's rental account pursuant to an abatement schedule adopted by the Housing Specialist in consultation with Defendants (except insofar as the Unit is a Deferred Unit). The Housing Specialist shall determine the amount of the credit based on the number and severity of conditions and as a percentage of the market rent or legal regulated rent without regard to whether the rent is subsidized with public income sources (*e.g.*, Section 8 or N.Y.C. Family Eviction Prevention Supplements). The credit shall be applied to the tenant's portion of the rent and shall continue on a monthly basis until such time as the Housing Specialist determines that the Substandard Conditions have been corrected to Work Completion (as defined herein) and notifies the tenant to resume regular payment. A tenant shall not be entitled to a credit to the extent the Substandard Conditions are de minimis or are corrected promptly (as determined by the Housing Specialist) after initial notice of the condition or if the Housing Specialist determines that the tenant is refusing to allow access to correct the non-compliance with the Lead-Based Paint Laws or Substandard Conditions.

85.    <u>Temporary Freeze on Collectability of Rent Increases</u>. Defendants also agree that the total monthly collectible rent increase for Units in which a percentage rent abatement credit as described in Paragraph 84, shall be frozen until the Unit is deemed a Completed Unit or Deferred Unit. Nothing in the prior sentence, shall restrict or relieve the Defendants from their duty to offer timely lease renewals which may seek to increase the legal regulated rent of rent-regulated tenants in accordance with applicable New York City Rent Guidelines Board orders. For sake of clarity, the legal regulated rent for units in receipt of a rent abatement may increase during a remediation period unless otherwise prohibited by an administrative decision, stipulation or court order,

registered with the NYS Division of Housing and Community Renewal, but the monthly dollar amount representing those increases may not be collected from the tenants until such time as the Unit has been deemed Completed pursuant to Paragraph 75 and 76 herein.

## X.    RESTITUTION FUND

86.    In consultation and under the direction of the State of New York, the Housing Specialist will determine eligibility, determine fund allocation considering harm and risk of harm, and disburse funds from the Restitution Fund to the tenant of record or the authorized occupant who has lived in a Unit of any Property or Previously Transferred Property: (a) who has had Lead-Based Paint Hazards or a Substandard Condition in their Unit or any Common Area within their Property during the six years prior to the Effective Date; or (b) who, while under the age of eighteen, has tested positive for elevated blood lead levels since January 1, 2015. If, after distribution of restitution funds as provided by the prior sentence, funds are remaining in the account held by the Housing Specialist, the Housing Specialist and the State of New York will confer about the appropriate way to disburse remaining funds.  In no event will those funds revert back to Defendants and Defendants shall have no input into the manner of funds disbursement.

87.    Defendants shall cooperate with the Housing Specialist and provide any information necessary to determine those eligible for payment from the Restitution Fund, including but not limited to providing a list of tenants of record or permitted occupants known to Defendants meeting the criteria in Paragraph 86 above within 90 calendar days after the Effective Date.

88.    For the avoidance of doubt: (a) no portion of such restitution payments represent reimbursement to any State or City or other person or entity for the costs of any investigation or litigation, (b) the entire restitution payment is properly characterized as described in Paragraph 27 and this Section X (Restitution Fund), and (c) no portion of the restitution payment constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, or other punitive assessments.

## XI.    DEFENDANTS' REPORTING REQUIREMENTS

89.    In addition to the Progress Report required by Paragraph 67, Defendants shall promptly report to Plaintiffs and the Housing Specialist whenever any of the following may pose an immediate threat to a tenant or other occupant's health or welfare: any violation of this Consent Decree, or any other event affecting Defendants' performance under this Decree, or the condition of its Properties.

90.     All reports and notices required under this Consent Decree shall be electronically submitted to the persons designated in Section XIX (Notices).

91.    Each report submitted by Defendants under this Section shall be signed by Morris Lieberman, in his individual capacity, and the Compliance Officer or an executive officer or principal of Lilmor on behalf of all other Defendants and include the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

92.    This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

93.    The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligations otherwise required by law, or by any other federal, state, or local law, regulation, permit, or other requirement.

94.    Any information provided pursuant to this Consent Decree may be used by the Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## XII.    APPROVAL OF PLAN AND OTHER DELIVERABLES; PERMITS

95.    After review of any plan, report, or other item that is required to be submitted to the Housing Specialist pursuant to this Consent Decree, the Housing Specialist shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

96.    If the submission is approved pursuant to Paragraph 95(a), Defendants shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 95(b) or (c), Defendants shall take all actions required by the approved plan, report, or other item that the Housing Specialist determines are technically severable from any disapproved portions.

97.    If the submission is disapproved in whole or in part pursuant to Paragraph 95(c) or (d), Defendants shall within 30 days correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Defendants shall proceed in accordance with the preceding Paragraph.

98.    If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, the Housing Specialist may again require Defendants to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies, subject to the right of the Plaintiffs to seek stipulated penalties as provided in Section XIII (Stipulated Penalties).

99.    <u>Obtaining Permits</u>.  Where any compliance obligation under this Section requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely and complete applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XIV (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely and complete applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## XIII.  STIPULATED PENALTIES

100.    Defendants shall be liable for stipulated penalties to the Plaintiffs for violations of this Consent Decree as specified below, unless excused under Section XIV (Force Majeure).  A violation includes failing to perform any obligation required by the terms of the Sections and Paragraphs of this Decree enumerated below, including any action plan, work plan, or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

101.    <u>Late Payment of Civil Penalty</u>.  If Defendants fail to pay the civil penalty required to be paid under Section VII (Penalty and Restitution Payment) when due, Defendants shall pay a stipulated penalty of $5,000 per day for each day that the payment is late to the particular Plaintiff.

102.    <u>Requirements Relating to Lead-Based Paint, Action Plans, Transfers of Interest, Housing Specialist, and Certain Other Matters</u>.  The following stipulated penalties shall accrue per violation per day for each violation of the requirements set forth in clauses (b) and (c) of Paragraphs 17 and 19, Sections VI (Transfers of Interests), VII (Penalty and Restitution Payment), VIII (Housing Specialist), and Paragraphs 44 to 59 and 77 of Section IX (Injunctive Requirements) of this Consent Decree or the requirements of an Action Plan pursuant to Paragraph 69 of Section IX (Injunctive Requirements).

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | Days 1-10 |
| $750 | Days 11-20 |
| $1,000 | Days 21 and thereafter |

103.    <u>Reporting Requirements</u>.  The following stipulated penalties shall accrue per violation per day for each violation of the requirements set forth in Paragraph 67 of Section IX (Injunctive Requirements) or Section XI (Defendants' Reporting Requirements) of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | Days 1-30 |
| $750 | Days 31-60 |
| $1,000 | Days 60 and thereafter |

104.    Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to

33

accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

105.    Defendants shall pay any stipulated penalty within 30 days after receiving the United States' written demand.

106.    The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

107.    Stipulated penalties shall continue to accrue during any Dispute Resolution with respect to that violation but need not be paid until the following:

    a.    If the dispute is resolved by agreement or by a decision of the United States that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States within 30 days after the effective date of the agreement or the receipt of the United States' decision or order.

    b.    If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing within 60 days of receiving the Court's decision or order, except as provided in subparagraph (c), below.

    c.    If any Party appeals the District Court's decision, Defendants shall pay all accrued penalties determined to be owing within 15 days of receiving the final appellate court decision.

108.    Defendants shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 24, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation or violations the penalties are being paid.

109.    Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the Plaintiffs for Defendant's violation of this Consent Decree or applicable law.

## XIV.    FORCE MAJEURE

110.    "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest

34

extent possible. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

111.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendants shall provide notice orally or by electronic transmission to Plaintiffs and the Housing Specialist pursuant to Section XIX (Notices), within seven business days of when Defendants first know that the event might cause a delay. Within seven days thereafter, Defendants shall provide in writing to the Plaintiffs and the Housing Specialist an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or reasonably should have known.

112.    If Plaintiffs agree that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

113.    If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a force majeure event, Plaintiffs will notify Defendants in writing of its decision.

114.    If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XV (Dispute Resolution), it shall do so no later than 20 days after receipt of Plaintiffs' decision. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 110 and 111. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to the Plaintiffs and the Court.

## XV.    DISPUTE RESOLUTION

115.    Unless otherwise expressly provided in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes raised

by Defendants arising under or with respect to this Consent Decree. Nothing in this Section limits Plaintiffs' right to seek judicial enforcement of the Consent Decree.

116.    <u>Informal Dispute Resolution</u>. Other than a Minor Dispute as defined in Paragraph 124, any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the Plaintiffs a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 days from the date the dispute arises (the "Informal Negotiation Period"), unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the Plaintiffs shall be considered binding unless, within 21 days after the conclusion of the Informal Negotiation Period, Defendants invoke formal Dispute Resolution procedures as set forth below.

117.    <u>Formal Dispute Resolution</u>. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on the Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

118.    The Plaintiffs shall serve their Statement of Position within 45 days of receipt of Defendants' Statement of Position. The Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the Plaintiffs. The Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

119.    Defendants may seek judicial review of the dispute by filing with the Court and serving on the Plaintiffs, in accordance with Section XIX (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 14 business days of receipt of the Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

120.    The Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court. Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

121.    Standard of Review

      a.    Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, in any dispute concerning the Lead-Based Paint Laws brought under Paragraph 117 pertaining to the adequacy or appropriateness of any item requiring approval by the Housing Specialist under this Consent Decree pursuant to Paragraphs 95 through 98 and in any other dispute concerning a decision or action of an agency of the

United States ordinarily accorded review on the administrative record under applicable principles of administrative law, Defendants shall have the burden of demonstrating, based on the administrative record submitted by the United States, if any, that the position of the United States is arbitrary and capricious or otherwise not in accordance with the then applicable legal standard.

    b.    Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 117, Defendants shall bear the burden of demonstrating that their position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

122.    To the extent any Party would otherwise have the right to appeal an adverse ruling by the District Court, nothing in this Consent Decree limits that right.

123.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 107. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIII (Stipulated Penalties).

124.    <u>Minor Disputes</u>. Notwithstanding the foregoing, Paragraphs 117 to 122 shall not apply to disputes regarding Housing Specialist determinations relating to specific Units or Common Areas, except as to those conditions that Plaintiffs contend violate the Lead-Based Paint Laws. Such Unit- or Common Area-specific disputes shall not be subject to formal dispute resolution or judicial review. For such minor disputes, the decision of the Housing Specialist after informal discussion with Defendants shall be final.

## XVI. INFORMATION COLLECTION AND RETENTION

125.    Upon reasonable notice to Defendants (or as otherwise authorized by applicable law), the Plaintiffs and their representatives, and the Housing Specialist and its agents, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

    c.    obtain samples and, upon request, results of any samples taken by Defendants or their representatives, contractors, or consultants;

    d.    obtain documentary evidence, including photographs and similar data; and

       e.     assess Defendants' compliance with this Consent Decree.

126.    Until three years after the termination of this Consent Decree, Defendants shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures and does not shorten the Defendants' obligation to retain documents for ten years under the NYC Childhood Lead Poisoning Prevention Act (NYC Admin, Code § 27-2056.17). At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall, within a reasonable time, provide copies of any documents, records, or other information required to be maintained under this Paragraph.

127.    At the conclusion of the information-retention period provided in the preceding Paragraph, Defendants shall notify the Plaintiffs at least 90 days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the Plaintiffs, Defendants shall deliver copies of any such requested documents, records, or other information to the Plaintiffs.

128.    In response to a request by the Plaintiffs under Paragraphs 126 or 127, Defendants may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege or protection recognized by federal law, including the attorney work product doctrine. If Defendants assert such a privilege or protection, they shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege or protection asserted by Defendants. However, no documents, records, or other information required to be created or generated pursuant to this Consent Decree shall be withheld on grounds of privilege.

129.    Defendants may also assert that information required to be provided under this Section is protected as TSCA-specific Confidential Business Information ("CBI") under 15 U.S.C. § 2613 or as general CBI under 40 C.F.R. Part 2. As to any information that Defendants seek to protect as CBI, Defendants shall follow the procedures set forth in the applicable statutory or regulatory provisions.

130.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State of New York pursuant to applicable federal, state or local laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal, state or local laws, regulations, or permits.

131.    Nothing in this Consent Decree shall in any way limit Defendants from identifying information submitted to the Plaintiffs or the Housing Specialist that qualifies as confidential

business information, trade secrets, or information otherwise protected from disclosure for purposes of the Freedom of Information Act or state law equivalents. At least 15 days before the United States produces any such designated information pursuant to a Freedom of Information Act request, it shall advise Defendants.

## XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

132.    This Consent Decree resolves only the civil claims of the United States and the State of New York against Defendants for the violations alleged in the Complaint filed in this action through the Date of Lodging.

133.    The Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 132. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Lead Disclosure Rule, the Toxic Substances Control Act, the Anti-Fraud Injunction Act, or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 132. The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Properties, whether related to the violations addressed in this Consent Decree or otherwise. Nothing in this Consent Decree shall limit any future action that an agency of the United States or local or State agency may take to administer its programs or, except as expressly provided in Paragraph 132, limit an agency of the United States' authority to enforce any relevant statutory or program requirement.

134.    In any subsequent administrative or judicial proceeding initiated by the Plaintiffs for injunctive relief, civil penalties, other appropriate relief relating to the Properties or Defendants' violations, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the Plaintiffs in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 132.

135.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The Plaintiffs do not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of any Lead-Based Paint Laws or with any other provisions of federal, state, or local laws, regulations, or permits.

136.    This Consent Decree does not limit or affect the rights of the Parties against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against the Parties, except as otherwise provided by law.

137.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.  Nothing in this Consent Decree, including but not limited to Section III (Admissions), or any evidence underlying the Consent Decree, shall be admissible in any proceeding other than a proceeding brought by the United States and/or the State of New York to enforce the terms of this Consent Decree.  Nothing in this Consent Decree shall be construed as preventing Defendants from raising any and all defenses and asserting any and all affirmative claims in any other civil proceedings brought by the United States, the State of New York or any third party, provided that doing so would not otherwise violate any term of this Consent Decree.

## XVIII. COSTS

138.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the Plaintiffs respectively shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the restitution fund payment, civil penalty, or any stipulated penalties due but not paid by Defendants.

## XIX.   NOTICES

139.    Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and delivered by reputable carrier, with a copy by email, addressed as follows:

| | |
|---|---|
| As to the United States by email: | zachary.bannon@usdoj.gov<br>jacob.lillywhite@usdoj.gov<br><br>Re: Lilmor Consent Decree |
| As to HUD by email: | leadregulations@hud.gov |
| As to HUD by mail: | Bruce Haber<br>Office of Lead Hazard Control and Healthy Homes<br>Program and Regulatory Support Division<br>451 7th Street, SW, Room 8236<br>Washington, DC 20410 |
| As to EPA by email only: | Re: Lilmor Consent Decree<br>yu.jeannie@epa.gov<br>somma.jerry@epa.gov |
| As to the People of the State of New York, OAG, by email: | Re: Lilmor Consent Decree<br>Jane.Landry-Reyes@ag.ny.gov<br>Brent.Meltzer@ag.ny.gov |

|  |  |
|---|---|
| As to the People of the State of<br>New York, OAG by mail: | Re: Lilmor Consent Decree<br>Jane Landry-Reyes, Brent Meltzer<br>Housing Protection Unit<br>Office of the New York State Attorney General<br>28 Liberty Street, New York, NY 10005 |
| As to Lilmor Management LLC, by<br>email: | Re: Lilmor Consent Decree<br>morris@lilmor.com<br>bryna@lilmor.com<br>sgroff@nixonpeabody.com<br>tsini@nixonpeabody.com<br>jlaufer@lauferlaw.com<br>agoldberg@lauferlaw.com |
| As to Morris Lieberman, by email: | Re: Lilmor Consent Decree<br>morris@lilmor.com<br>bryna@lilmor.com<br>sgroff@nixonpeabody.com<br>tsini@nixonpeabody.com<br>jlaufer@lauferlaw.com<br>agoldberg@lauferlaw.com |
| As to the Lilmor-Managed<br>Properties LLCs, by email: | Re: Lilmor Consent Decree<br>morris@lilmor.com<br>bryna@lilmor.com<br>sgroff@nixonpeabody.com<br>jlaufer@lauferlaw.com<br>agoldberg@lauferlaw.com |
| As to the Housing Specialist: | Address and e-email to be provided by the<br>Housing Specialist after selection |

140.     Any Party or the Housing Specialist may, by written notice to the other Parties and Housing Specialist, change its designated notice recipient or notice address provided above, or whether notice should be provided by email, U.S. Mail, or both.

141.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing and simultaneous emailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XX.    EFFECTIVE DATE

142.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXI.    RETENTION OF JURISDICTION

143.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XV (Dispute Resolution) and XXII (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XXII.    MODIFICATION

144.    Except as otherwise set forth herein, the terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

145.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XV (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 121, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIII. CERTAIN REPRESENTATIONS AND WARRANTIES

146.    Defendants each represent and warrant that the list of entities in Appendix A includes (a) every entity that either Morris Lieberman or Lillian Lieberman exercised any control over, since March 1, 2012, if that entity has owned, directly or indirectly, any residential rental properties at any point during that period; and (b) every entity that has owned residential rental properties at some point since March 1, 2012, where Lilmor managed or performed maintenance or other work at any of those properties at any point during that period.  For the avoidance of doubt, "exercised any control over" in this Paragraph means that Morris Lieberman and Lillian Lieberman, individually or jointly, directly or indirectly, held a controlling ownership interest in the entity, served as the managing agent of the entity, or controlled the managing agent of the entity (where the managing agent was a corporate entity).

147.    Defendants each represent and warrant that the list of properties in Appendix C includes every residential rental property in which a Defendant (directly or indirectly, in whole or in part) held any interest or exercised any control since January 1, 2024, provided that either (a) Morris Lieberman or Lillian Lieberman (directly or indirectly) exercised any control over it, since March 1, 2012; or  (b)  Lilmor managed or performed maintenance or other work at that property since March 1, 2012.  For the avoidance of doubt, "Morris Lieberman or Lillian Lieberman . . . exercised any control over" in this Paragraph means that Morris Lieberman and Lillian Lieberman, individually or jointly, directly or indirectly, held a controlling ownership interest in a property,

42

served as the managing agent of the property's owner, or controlled the managing agent of the property's owner (where the managing agent was a corporate entity).

148.    Defendants each represent and warrant that the list of properties in Appendix B includes every residential rental property in which a Defendant (directly or indirectly, in whole or in part) has not held any interest or exercised any control since January 1, 2024, but for which (a) Morris Lieberman or Lillian Lieberman (directly or indirectly) exercised some control over it, since March 1, 2012; or (b) Lilmor managed or performed maintenance or other work at that property since March 1, 2012.

149.    Each of the signatories to this Consent Decree for any of the Defendants represent and warrant, individually, that the signatory is fully authorized to enter into the terms and conditions of this Consent Decree on behalf of the party or parties for which the signatory is signing and legally bind that party or parties to all terms and conditions of this Consent Decree.

## XXIV. PROPERTY REMOVAL AND TERMINATION

150.    Defendants shall be entitled to remove a Completed Property, or a Property that would be a Completed Property but for the presence of Deferred Units (subject to the following sentence) from the list of "Properties" to which this Consent Decree applies ("Removal of a Property") after the Housing Specialist determines that (a) Defendants have maintained continuous satisfactory compliance with this Consent Decree with respect to that Property for a period of two years after the Substandard Conditions identified in the Substandard Condition Screen for that Property were remediated (or the date of acquisition, for a Newly Acquired Property), and (b) Defendants have been in satisfactory compliance with the requirements of this Consent Decree except those specific to other Properties for a period of at least three years (together with subparagraph (a), the "Removal Requirements").  The preceding sentence shall not apply to a Property that would be a Completed Property but for the presence of one or more Deferred Units unless: (i) Defendants have provided the occupants of any Deferred Units with a notice in the form of Appendix F advising the occupants, with at least 60 days' notice, that obligations under this Consent Decree to complete the Deferred Work prior to vacancy will no longer apply after Removal if occupants do not promptly provide access (provided that any work otherwise required by law will continue to be required); (ii) Defendants perform any Deferred Work for which occupants of Deferred Units provide access after receiving this notice; and (iii) the Housing Specialist has either confirmed that the tenants of any remaining Deferred Units do not wish for the Deferred Work to be performed prior to Removal or that the tenants have not responded to the Housing Specialist's attempts to confirm the same. Notwithstanding the foregoing, Removal of a Property shall not obviate any provision of this Consent Decree (including Paragraph 81 (Work Refusal or Postponement)) that expressly obligates Defendants for a period of time extending beyond the date of that Removal.

151.    Once the Removal Requirements have been met for a Completed Property, Defendants may serve upon the Plaintiffs a Request for Removal of a Property, together with all necessary supporting documentation.

152.    Following receipt by the Plaintiffs of Defendants' Request for Removal, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendants have met the Removal Requirements.  If the Plaintiffs agree that the Removal Requirements have been met for a Completed Property, the Parties shall submit, for the Court's approval, a joint stipulation to effect that Removal.

153.    If the Plaintiffs do not agree that the Removal Requirements have been met, Defendants may invoke Dispute Resolution under Section XV (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of any dispute regarding termination until 30 days after service of its Request for Removal.

154.    Defendants shall be entitled to terminate this Consent Decree once (1) the last Property (excluding Newly Acquired Properties) has been Removed and (2) Defendants have maintained continuous satisfactory compliance with their obligations under this Consent Decree as to Newly Acquired Properties that have not been Removed for a period of two years or, for Newly Acquired Properties that have been owned or managed by Defendants for less than two years, for the amount of time owned or managed by Defendants; and provided that Defendants will remain obligated to conduct any work (including Deferred Work) required by this Consent Decree where the Decree expressly obligates Defendants beyond the date of that Removal.   At that time, the Parties shall submit, for the Court's approval, a joint stipulation effecting that termination.

## XXV.  PUBLIC PARTICIPATION

155.    This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7.   At the time of publication of this notice, Defendants will distribute to each lessee of a Unit in the Properties, by regular mail and email (where an email address is known by Defendants), a summary of the terms of this Consent Decree in the form of Appendix I.  For lessees with whom Defendants customarily communicate in a language other than English, Defendants shall also include a certified translation of Appendix I into that lessee's language.  Additionally, in the event that the United States, in their discretion, determine to schedule a public meeting(s) regarding the proposed Consent Decree, Defendants will post in the lobbies of each of the Properties such notice of meeting as the Plaintiffs may provide.

156.    The Plaintiffs reserve the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the Plaintiffs have notified Defendants in writing that they no longer support entry of the Decree or only support entry of a modified Decree.

## XXVI. SIGNATORIES/SERVICE

157.    Each undersigned representative of Defendants, the U.S. Attorney for the Southern District of New York, the undersigned representative of the New York State Office of the Attorney General certifies that they are fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this Consent Decree the Party that they represent.

158.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendants agree to accept service of process by the methods provided in Section XIX (Notices) with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXVII.    INTEGRATION

159.    Except for the Parties' separate agreement regarding Financial Assurance (the "Financial Assurance Agreement"), which remains in full force and effect, this Consent Decree and its attachments constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than the Financial Assurance Agreement and deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXVIII.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

160.    For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2),  Paragraphs 15, 27-96, 99, 125-127, and 130 is restitution, remediation, or required to come into compliance with law.

## XXIX. FINAL JUDGMENT

161.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Plaintiffs and Defendants.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXX.   APPENDICES

162.    The following Appendices are attached to and part of this Consent Decree:

Appendix A: List of Lilmor-Managed Properties LLCs

Appendix B: List of Previously Transferred Properties

Appendix C: List of Properties.

Appendix D: List of Excluded Multifamily Properties

Appendix E: List of Excluded Single Family Properties

Appendix F: Notice Titled "Last Chance to Receive Court-Ordered Repairs"

Appendix G: HPD Letter Agreement

Appendix H: Checklist for Renovations Regulated by the RRP Rule

Appendix I: Notice of Settlement and Right to Comment

SO ORDERED.

Dated: May 28, 2025
New York, New York

_____
ANALISA TORRES
United States District Judge

FOR THE UNITED STATES OF AMERICA:


Dated:  New York, New York                    DAMIAN WILLIAMS
        December 13, 2024                    United States Attorney for the
                                        Southern District of New York
                                        *Attorney for Plaintiff the United States of America*

By:  _____
                      ZACHARY BANNON
                      JACOB LILLYWHITE
                      Assistant United States Attorneys
                      86 Chambers Street, 3rd Floor
                      New York, New York 10007
                      Telephone: (212) 637-2728/2800
                      Facsimile: (212) 637-2717
                      E-mail:  zachary.bannon@usdoj.gov
                                  jacob.lillywhite@usdoj.gov

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

**DAVID UHLMANN**  Digitally signed by DAVID UHLMANN
Date: 2024.11.21 17:10:23 -05'00'

_____
Date

DAVID M. UHLMANN
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

**PAUL SIMON**  Digitally signed by PAUL SIMON
Date: 2024.11.26 14:12:20 -05'00'

_____
Date

PAUL SIMON
Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007-1866


JEANNIE YU
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007-1866

FOR THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT:

LISA MULRAIN
Digitally signed by LISA MULRAIN
Date: 2024.11.12 14:39:34 -05'00'

_____
Date

LISA V. MULRAIN
Associate General Counsel for Finance, Procurement and Administrative Law
U.S. Department of Housing and Urban Development
451 7th Street, SW
Washington, DC 20410

LEE RICHARDSON
Digitally signed by LEE RICHARDSON
Date: 2024.11.12 11:20:47 -05'00'

_____
Date

LEE ANN RICHARDSON
Acting Assistant General Counsel for Administrative Law
U.S. Department of Housing and Urban Development
451 7th Street, SW
Washington, DC 20410

FOR THE STATE OF NEW YORK:

Dated: New York, New York
      /2/3/  , 2024

            LETITIA JAMES
            New York State Office of the Attorney General
            *Attorney for Plaintiff the People of the State of New York*

By:                

            JANE LANDRY-REYES
            Assistant Attorney General, Housing Protection Unit
            BRENT MELTZER
            Chief, Housing Protection Unit
            28 Liberty Street
            New York, New York 10005
            Telephone: (212) 416-8220
            E-mail:  Jane.Landry-Reyes@ag.ny.gov
                     Brent.Meltzer@ag.ny.gov

11/4/2024
Date

LILMOR MANAGEMENT, LLC

By:

11/4/2024
Date

MORRIS LIEBERMAN

12/21/24
Date

By: _Esther Weiss trustee_
Name:                    Louis Ari Schwartz
Title: Managing Member

354 E 21st Street Realty Corp.

Date

By: _____
Name
Title: Managing Member

P Bigg Realty LLC

Date

By; _____
Name:
Title: Managing Member

51

LILMOR MANAGEMENT, LLC

_____        By: _____
Date


MORRIS LIEBERMAN

_____        _____
Date


_____        By: _____
Date              Name:
                  Title: Managing Member


354 E 21st Street Realty Corp.

_____        By: _____
Date              Name:
                  Title: Managing Member


P Bigg Realty LLC
11/29/2024        By: _____
Date              Name:
                  Title: Managing

51

45-55 Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


55 Winthrop St LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


130 Clarkson Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member


250-251 E 29 Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member


251 E 29 St LLC

_____
Date

By: _____
Name:
Title: Managing Member


52

45-55 Realty LLC

_____
Date

By: _____
    Name:
    Title: Managing Member


55 Winthrop St LLC

_____
Date

By: _____
    Name:
    Title: Managing Member


130 Clarkson Realty LLC

12/2/2024
Date

By: _____
    Name:
    Title: Managing Member


250-251 E 29 Realty LLC

12/2/2024
Date

By: _____
    Name:
    Title: Managing Member


251 E 29 St LLC

12/2/2024
Date

By: _____
    Name:
    Title: Managing Member

52

1590 W 8 St LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


105 Ave P Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


888 Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


100 Linden Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


131 Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

53

C & Z Realty LLC

_____          By: _____
Date                             Name:
                                 Title: Managing Member


2003 Realty, LLC

11/21/2024          By: _____
_____       Name: Lillian Lieberman
Date                     Title: Member

SIGN


1429 Carroll Street LLC

_____          By: _____
Date                             Name:
                                 Title: Managing Member


59 Logan St LLC

_____          By: _____
Date                             Name:
                                 Title: Managing Member


1269 E 18 Street Realty LLC

_____          By: _____
Date                             Name:
                                 Title: Managing Member


54

C & Z Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

2003 Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member

1429 Carroll Street LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

59 Logan St LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

1269 E 18 Street Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

54

334 Eastern Pkwy Realty LLC

11/29/2024    By: _____
Date            Name:
               Title: Managing Member


840 Realty LLC

11/29/2024    By: _____
Date            Name:
               Title: Managing Member


333 Realty LLC

11/29/2024    By: _____
Date            Name:
               Title: Managing Member


1909 Realty LLC

11/29/2024    By: _____
Date            Name:
               Title: Managing Member


1690 President Street LLC

11/29/2024    By: _____
Date            Name:
               Title: Managing Member


645 Realty LLC


55

11/29/2024
Date

By: _____
Name:
Title: Managing Member

3402 Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

1439 Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member

103-35 120 St Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

20-30 Merle Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member

1921 Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member

56

_____          By: _____
Date                          Name:
                              Title: Managing Member


                         3402 Realty LLC

_____          By: _____
Date                          Name:
                              Title: Managing Member


                         1439 Realty LLC

12/2/2024                By: _____
Date                          Name:
                              Title: Managing Member


                         103-35 120 St Realty LLC

_____          By: _____
Date                          Name:
                              Title: Managing Member


                         20-30 Merle Realty LLC

12/2/2024                By: _____
Date                          Name:
                              Title: Managing Member


                         1921 Realty LLC

12/2/2024                By: _____
Date                          Name:
                              Title: Managing Member


56

410 Westminster LLC

By: _____
_____                    Name: _____
Date                             Title: Managing Member


580-585 Realty LLC

By: _____
_____                    Name: _____
Date                             Title: Managing Member


2251 Realty LLC

By: _____
11/29/2024                       Name: _____
Date                             Title: Managing Member


209 Realty LLC

By: _____
11/29/2024                       Name: _____
Date                             Title: Managing Member


40-71 Realty LLC

By: _____
11/29/2024                       Name: _____
Date                             Title: Managing Member


712 Realty LLC

By: _____
11/29/2024                       Name: _____
Date                             Title: Managing Member

57

410 Westminster LLC

By: _____
Name:
Title: Managing Member

12/2/2024
Date

580-585 Realty LLC

By: _____
Name:
Title: Managing Member

12/2/2024
Date

2251 Realty LLC

By: _____
Name:
Title: Managing Member

_____
Date

209 Realty LLC

By: _____
Name:
Title: Managing Member

_____
Date

40-71 Realty LLC

By: _____
Name:
Title: Managing Member

_____
Date

712 Realty LLC

By: _____
Name:
Title: Managing Member

_____
Date

57

723 Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

2420 Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

1684 Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

1660 Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member

1011 Neilson Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

1012 Nameoke Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member

58

723 Realty LLC

_____        By: _____
Date                    Name:
                        Title: Managing Member


2420 Realty LLC

_____        By: _____
Date                    Name:
                        Title: Managing Member


1684 Realty LLC

_____        By: _____
Date                    Name:
                        Title: Managing Member


1660 Realty LLC

12/2/2024          By: _____
Date                    Name:
                        Title: Managing Member


1011 Neilson Realty LLC

_____        By: _____
Date                    Name:
                        Title: Managing Member


1012 Nameoke Realty LLC

_____        By: _____
Date                    Name:
                        Title: Managing Member

58

1633 West 10th Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


Alit Realty LLC

_____
Date

By: _____
Name:
Title: Managing Member


1301 Avenue K Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


1311 Avenue K Realty LLC

11/29/2024
Date

By: _____
Name:
Title: Managing Member


E&S Realty Management LLC

_____
Date

By: _____
Name:
Title: Managing Member

1633 West 10th Realty LLC

_____    By: _____
Date            Name:
                Title: Managing Member

Alit Realty LLC

*12/2/2024*    By: _____
Date            Name:
                Title: Managing Member

1301 Avenue K Realty LLC

_____    By: _____
Date            Name:
                Title: Managing Member

1311 Avenue K Realty LLC

_____    By: _____
Date            Name:
                Title: Managing Member

E&S Realty Management LLC

*12/2/2024*    By: _____
Date            Name:
                Title: Managing Member

59

11/21/2024
Date

915 84th Street, LLC

By: _____
Name: Lillian Lieberman
Title: Manager and Member

SIGN HERE

11/21/2024
Date

2001 Avenue P, LLC

By: _____
Name: Lillian Lieberman
Title: Manager and Member

SIGN HERE

11/21/2024
Date

2065 Ocean Avenue, LLC

By: _____
Name: Lillian Lieberman
Title: Manager and Member

SIGN HERE

| Appendix A Lilmor-Managed Properties LLCs | Appendix B Previously Transferred Properties | Appendix C Properties |
|---|---|---|
| | 192-198 Nagle Avenue, New York, NY 10034 | |
| | 200-208 Nagle Avenue, New York, NY 10034 | |
| | 776 Crown Street, Brooklyn, NY 11213 | |
| | 200 East 19th Street, Brooklyn, NY 11226 | |
| | 271 Parkside Avenue, Brooklyn, NY 1122 | |
| | 1616 President Street, Brooklyn, NY 11213 | |
| | 575 Herkimer Street, Brooklyn, NY 11213 | |
| 354 E 21th Street Realty Corp. | | 354 East 21st Street, Brooklyn, NY 11226 |
| P Bigg Realty LLC | | 2077 East 12th Street, Brooklyn, NY  11229 |
| 45-55 Realty LLC | | 45 Hawthorne Street, Brooklyn, NY 11225 |
| 55 Winthrop St LLC | | 55 Winthrop Street, Brooklyn, NY 11225 |
| 130 Clarkson Realty LLC | | 130 Clarkson Avenue, Brooklyn, NY 11226 |
| 250-251 E 29 Realty LLC | | 250 East 29th Street, Brooklyn, NY 11226 |
| 251 E 29 St LLC | | 251 East 29th Street, Brooklyn, NY 11226 |
| 1590 W 8 St LLC | | 1590 West 8th Street, Brooklyn, NY 11204 |
| 105 Ave P Realty LLC | | 105 Avenue P, Brooklyn, NY 11204 |
| 888 Realty LLC | | 888 Montgomery Street, Brooklyn, NY 11213 |
| 100 Linden Realty LLC | | 100 Linden Blvd, Brooklyn, NY 11226 |
| 131 Realty LLC | | 131 Lincoln Road, Brooklyn, NY 11225 |
| C & Z Realty LLC | | 1629 West 10th Street, Brooklyn, NY 11223 |
| 2003 Realty LLC | | 2003 Avenue J, Brooklyn, NY 11210 |
| 1429 Carroll Street LLC | | 1429 Carroll Street, Brooklyn, NY 11213 |
| 59 Logan St LLC | | 59 Logan Street, Brooklyn, NY 11208 |
| 1269 E 18 Street Realty LLC | | 1269 East 18th Street, Brooklyn, NY 11230 |
| 334 Eastern Pkwy Realty LLC | | 334 Eastern Parkway, Brooklyn, NY 11225 |
| 840 Realty LLC | | 840 East 17th Street, Brooklyn, NY 11230 |

| Appendix A Lilmor-Managed Properties LLCs | Appendix B Previously Transferred Properties | Appendix C Properties |
|---|---|---|
| 1909 Realty LLC | | 1909 Quentin Road, Brooklyn, NY 11229 |
| 333 Realty LLC | | 333 Neptune Avenue, Brooklyn, NY 11235 |
| 1690 President Street LLC | | 1690 President Street, Brooklyn, NY 11213 |
| 645 Realty LLC | | 645 Ocean Parkway, Brooklyn, NY 11230 |
| 3402 Realty LLC | | 3402 Avenue I, Brooklyn, NY 11210 |
| 1439 Realty LLC | | 1439 Ocean Avenue, Brooklyn, NY 11230 |
| 103-35 120 St Realty LLC | | 103-35 120th Street, Richmond Hill, NY 11419 |
| 20-30 Merle Realty LLC | | 20-30 Merle Place, Staten Island, NY 10305 |
| 1921 Realty LLC | | 1921 Avenue I, Brooklyn, NY 11230 |
| 410 Westminster LLC | | 410 Westminster Road, Brooklyn, NY 11218 |
| 580-585 Realty LLC | | 585 East 16th Street, Brooklyn, NY 11226 |
| | | 580 East 17th Street, Brooklyn, NY 11226 |
| 2251 Realty LLC | | 2251 81st Street, Brooklyn, NY 11214 |
| 209 Realty LLC | | 209 East 16th Street, Brooklyn, NY 11226 |
| 40-71 Realty LLC | | 40-71 Elbertson Street, Elmhurst, NY 11373 |
| 712 Realty LLC | | 712 East 27th Street, Brooklyn, NY 11210 |
| 723 Realty LLC | | 723 East 27th Street, Brooklyn, NY 11210 |
| 2420 Realty LLC | | 2420 Glenwood Road, Brooklyn, NY 11210 |
| 1684 Realty LLC | | 1684 West 10th Street, Brooklyn, NY 11223 |
| 1660 Realty LLC | | 1660 East 21st Street, Brooklyn, NY 11210 |
| 1011 Neilson Realty LLC | | 1011 Neilson Street, Far Rockaway, NY 11691 |
| 1012 Nameoke Realty LLC | | 1012 Nameoke Street, Far Rockaway, NY 11691 |
| 1633 West 10th Realty LLC | | 1633 West 10th Street, Brooklyn, NY 11223 |
| Alit Realty LLC | | 1902 Avenue L, Brooklyn, NY 11230 |
| 1301 Avenue K Realty LLC | | 1301 Avenue K, Brooklyn, NY 11230 |
| 1311 Avenue K Realty LLC | | 1311 Avenue K, Brooklyn, NY 11230 |

| Appendix A<br>Lilmor-Managed Properties LLCs | Appendix B<br>Previously Transferred Properties | Appendix C<br>Properties |
|---|---|---|
| E&S Realty Management LLC | | 1173 52nd Street, Brooklyn, NY 11219 |
| 915 84th Street LLC | | 915 84th Street, Brooklyn, NY 11228 |
| 2001 Avenue P LLC | | 2001 Avenue P, Brooklyn, NY 11229 |
| 2065 Ocean Avenue LLC | | 2065 Ocean Avenue, Brooklyn, NY 11230 |

# Appendix D – Excluded Multifamily Properties

1599 West 10th Street, Brooklyn, New York 11204

1901 Avenue P, Brooklyn, New York 11229

# Appendix E – Excluded Single-Family Properties

1040 East 24th Street, Brooklyn, New York 11210

1052 East 24th Street, Brooklyn, New York 11210

Appendix F to the Consent Decree in
*United States of America, et al. v. Lilmor Management LLC, et al.*, No. 24 Civ. 9520 (___) (S.D.N.Y.)

# LAST CHANCE TO RECEIVE
# <u>COURT-ORDERED REPAIRS</u>

Pursuant to a federal court order and a settlement with the United States of America and the State of New York, the property manager Lilmor Management LLC and the owner of your apartment building are currently required to perform the following repair, maintenance, or renovation work in your apartment, **<u>at no cost to you</u>**:

- [LIST DEFERRED WORK FOR THAT UNIT]

This is your **<u>last chance</u>** to have this work performed under that court order. Please contact [identity of housing specialist] immediately at either [email address] or [phone number] to schedule this work. [Housing specialist] will work with your building owner or property manager to schedule the work at a time that is convenient for you and your family.

**<u>If you do not contact [housing specialist] by [date no less than sixty days from mailing of notice]</u>**, you will **<u>lose your right to these repairs under the terms of the court order</u>**.

If you have questions, or if you want additional information, please contact [housing specialist] or visit [housing specialist website]. This court order was entered in the lawsuit *United States of America, et al. v. Lilmor Management LLC, et al.*, No. ___ Civ. _____ (S.D.N.Y.)

Appendix G to the Consent Decree in
*United States of America, et al. v. Lilmor Management LLC, et al.*, No. 24 Civ. 9520 ) (S.D.N.Y.)

[HPD letterhead]

[Date]

Jacob Laufer, P.C.
65 Broadway, Suite 1005
New York, NY 10006

**RE:**   *United States of America, and People of the State of New York, by Letitia James, Attorney General of the State of New York v. Lilmor Management, LLC, and Morris Lieberman, et al.*, No. __Civ.____ (   )(S.D.N.Y.).

The following constitutes a "letter agreement" between the New York City Department of Housing Preservation and Development ("HPD") and the Defendants intended to resolve and bind HPD on certain claims that are being settled in *United States of America and People of the State of New York by Letitia James, Attorney General of the State of New York v. Lilmor Management, LLC, and Morris Lieberman, et al.*, No. __Civ.____ (   )(S.D.N.Y.).[1]

The undersigned, Martha Ann Weithman, is the Assistant Commissioner of the Housing Litigation Division, Office of Enforcement and Neighborhood Services at the New York City Department of Housing Preservation and Development ("HPD") and is duly authorized to resolve and bind HPD with respect to all outstanding claims to civil penalties HPD may have against Defendants relating to any Notice of Violation issued pursuant to the N.Y.C Housing Maintenance Code in the buildings listed in Appendix C to this agreement.

---

[1] The term "Defendants" is the same definition used in the Consent Decree settling *United States of America and People of the State of New York by Letitia James, Attorney General of the State of New York v. Lilmor Management, LLC, and Morris Lieberman, et al.*, CV Index #     .  For the avoidance of doubt, nothing in this agreement waives HPD's potential civil penalties' claims against any subsequent owner of the Previously Transferred Properties listed at Appendix B to the Consent Decree.

HPD agrees to accept the monetary terms of the Consent Decree entered into in this case, by the State of New York, as full satisfaction of all claims for civil penalties for violations of the NYC Housing Maintenance Code and/or the New York City Childhood Lead Poisoning Prevention Act. (Administrative Code of the City of NY, tit 27, ch.2, subch. 2, art. 14, §27-2056.1-2056.18 and the New York City Asthma Free Housing Act, Local Law 55 of 2018 (Administrative Code of the City of NY, tit. 27, ch.2, subch. 2, art. 4 §27-2017-2019) issued against the Defendants at the buildings listed at Appendices B&C through the effective date of the Consent Decree.  For the sake of clarity, this satisfaction does not extend to the settlement or waiver of any fees and charges separately imposed by HPD (e.g.  for costs for past or current work being done by HPD's Emergency Repair Program, the Alternative Enforcement Program or another HPD enforcement program) not representing the potential civil penalties that derive from a particular HMC violation.  Nor does the waiver include those civil penalties which have already been reduced to a judgment (whether paid or unpaid) and shall not affect Defendants' obligation to satisfy such charges and judgments.

HPD further agrees not to seek civil penalties for violations that were issued and existed prior to the effective date of the Consent Decree and that may remain open after the effective date of the Consent Decree during the 180-day period when Defendants will be undertaking correction of existing violations.[2]

HPD also agrees not to seek collection of  civil penalties which may accumulate *after* the effective date of the Consent Decree for any Record Production Order ("RPO") violation that

---

[2] This does not limit HPD's ability to seek injunctive relief in the form of an Order to Correct, should hazardous or immediately hazardous conditions exist related to these existing violations, during this period.  Under the explicit terms of the Consent Decree, Defendants remain responsible for complying with timeframes for correction of HMC violations under local law.

existed *prior* to the effective date of the Consent Decree,  as long as in seeking administrative dismissal of those existing RPO violations during the 180 day period under the Consent Decree, Defendants'  produce required records kept in the year immediately prior to  the effective date of the Consent Decree and thereafter have complied with the retaining of records  Under these circumstances, no administrative fees will be imposed to obtain dismissal of these existing RPO violations.

In seeking administrative dismissal of any *new* RPO violation that may be imposed by HPD *after* the effective date of the Consent Decree, *for conditions that specifically existed before* the Consent decree's effective date, Defendants shall similarly produce records for the one year prior to the effective date of the Consent Decree and subsequent consecutive records without incurring any additional administrative fees as a condition of RPO violation dismissal. However, for the sake of clarity, to obtain clearance of any future RPO violations that are *not* related to past record keeping claims arising under the Consent Decree, Defendants will be required to comply with all terms of Local Law 122, including resolution of civil penalties and/or payment of administrative fees, to obtain dismissal.

This constitutes the full agreement of HPD to fully and satisfactorily resolve the claims raised by the State of New York in *United States of America and People of the State of New York by Letitia James, Attorney General of the State of New York v.  Lilmor Management LLC and Morris Lieberman, et al.*, No. __Civ.___ (   )(S.D.N.Y).  that HPD could have pursued themselves.

_____
Martha Ann Weithman, Assistant Commissioner
Housing Litigation Division,
Office of Enforcement and Neighborhood Services
Department of Housing Preservation & Development

# Appendix H

## CHECKLIST FOR RENOVATIONS REGULATED BY THE LEAD RENOVATION, REPAIR, AND PAINTING (RRP) RULE

## CHECKLIST FOR RENOVATIONS REGULATED BY THE RRP RULE

### I      PURPOSE

To facilitate the documentation of compliance with the U.S. Environmental Protection Agency's Lead Renovation, Repair, and Painting (RRP) Rule 40 C.F.R. Part 745, Subpart E, or any applicable U.S. EPA-Authorized State or Tribal program regulating lead-based paint safe work practices. Not all aspects of compliance with the Rule can be fully captured with a checklist and additional logs, records and photos may need to be kept. In addition, any discrepancy between the requirements in this document and the RRP Rule, the RRP Rule prevails.[1]

### II      GENERAL PROJECT INFORMATION:

Property Address: _____

_____
                         City                                            State                                        Zip

Property Owner: _____

Address: _____

City:_____State:_____Zip code:___Phone: (  ) _____

Email: _____

Contractor/subcontractor firm name and RRP certification number (copy of the firm certificate must be kept in project file):


_____

Firm Name                                        Certification Number         Expiration date

Assigned EPA-certified Renovator name & certification number (copy of training certificate must be available on the work site and kept in project file):

_____

Renovator Name                                     Certification Number         Expiration date

Project Start Date: _____ Expected Completion Date: _____

Brief description of Renovation Project (include painted surfaces disturbed and estimated square footage of paint to be disturbed):

_____

_____

_____

_____

[1] Use of the checklist is intended as an adjunct to the requirements of 40 C.F.R. Part 745 and an aid to future compliance therewith. Adherence to the provisions of the checklist shall not be a substitute for compliance with the provisions of 40 C.F.R. Part 745 nor provide a defense to the failure to do so.

_____

☐ Contractor has reviewed scope of work and has secured sufficient supplies to perform all required activities covered in this checklist.

**III     LEAD TESTING INFORMATION [40 C.F.R. § 745.82(a)] Select A or B below:**

_____A)   Testing for lead was performed to exclude components from the RRP Rule.
Check one of the following boxes and **attach documentation.**

☐ A written determination from an EPA-certified Inspector or Risk Assessor that the components affected by the renovation are free of paint or other surface coatings that contain lead equal to or in excess of 1.0 mg/cm$^2$ or 0.5% by weight.[2]

☐ The assigned certified Renovator, using an EPA-recognized test kit as defined in 40 C.F.R. §§ 745.83 and 745.88, and following the manufacturer's instructions, has tested each component affected by the renovation and determined that the components are free of paint or other surface coatings that contain lead equal to or in excess of 1.0 mg/cm$^2$ or 0.5% by weight.

_____B)   **Testing was not performed**.

**IV     EMERGENCY RENOVATIONS [40 C.F.R. § 745.82(B)]**

_____A)   Renovation qualifies as an Emergency Renovation.
**Describe emergency situation and continue to Section VI:**

_____

_____

_____B)   Renovation does not qualify as an Emergency Renovation.

**V     INFORMATION DISTRIBUTION REQUIREMENTS [40 C.F.R. § 745.84]**

_____A)   **Renovations in dwelling units**.

☐ The property owner was provided with the Renovate Right Pamphlet and (select one):

☐ A written acknowledgment[3] of receipt was obtained and is kept in the project file.

☐ A Pamphlet was delivered to the owner by certified mail at least seven (7) days prior to the start of the renovation, and the certificate of mailing is kept in the project file.

☐ If the unit is **not owner-occupied**, Distribution to occupants was ALSO made by (select one):

☐ An adult occupant was provided with the Renovate Right Pamphlet and a written

---

[2] Under local law in New York City, the definition of lead-based paint is more stringent—0.5 mg/ cm$^2$ as determined by laboratory analysis or by an x-ray fluorescence analyzer.  *See* NYC Admin. Code § 27-2056.2(7)(b).  If you would like to access sample compliance forms designed to ensure your compliance with New York City's lead-based paint laws, you can access them under the "Owner Recordkeeping Responsibilities" menu at the following link: https://www.nyc.gov/site/hpd/services-and-information/lead-based-paint.page.

[3] The written acknowledgement must include a statement recording the owner or occupant's name and acknowledging receipt of the pamphlet prior to the start of renovation, the address of the unit undergoing renovation, and the signature of the owner or occupant and the date of signature. It must be written in the same language as the text of the contract or agreement for the renovation or, in the case of non-owner-occupied unit, the same language as the lease or rental agreement or the pamphlet.

acknowledgment of receipt was obtained and is kept in the project file.

☐ A Pamphlet was delivered to the unit by certified mail at least seven (7) days prior to the start of the renovation, and a written acknowledgment of receipt was obtained and is kept in the project file.

☐ A Pamphlet was delivered to the unit by certified mail at least seven (7) days prior to the start of the renovation, but the firm performing the renovation was unsuccessful in obtaining a written receipt. A written certification that includes: the address of the unit, the date and method of delivery of the pamphlet (including certified mailing documentation), names of the person(s) delivering the pamphlet, reason for lack of acknowledgment, and signature of a firm representative with date of signature is kept in the project file.

☐ No regulated renovations in dwelling units.

_____ B) **Renovations in common areas.**

☐ The property owner was provided with the Renovate Right Pamphlet and (select one)

☐ A written acknowledgment of receipt was obtained and is kept in the project file.

☐ A Pamphlet was delivered to the owner by certified mail at least seven (7) days prior to the start of the renovation, and the certificate of mailing is kept in the project file.

***And one of the following***:

☐ A written notice was distributed to each affected unit describing the general nature and locations of the planned renovation activities including expected start and end dates, information on how occupants can obtain the Pamphlet and a copy of the final records required by 745.86(c) and (d) at no cost. A copy of the written notice is kept in the file.

☐ Informational signs were posted at all times during the renovation describing the project, renovation locations, and the anticipated end date. Signs are posted in areas where they are likely to be seen by the occupants of all affected units and are accompanied by a posted copy of the Pamphlet or information on how interested occupants can review or obtain a copy. Information on how occupants can review or obtain a free copy of the records required by 745.86 (c) and (d) are also included.

☐ No regulated renovations in common areas.

_____ C) **Renovations are in Child-Occupied Facilities (COF).**

☐ The property owner was provided with the Renovate Right Pamphlet and either a written acknowledgment of receipt was obtained and is kept in the project file or a certificate of mailing at least seven (7) days prior to the start of the renovation is kept in the project file.

☐ If the COF is not the owner of the building, an adult representative of the COF was provided with the Pamphlet and (select one of the following)

☐ A written acknowledgment[4] of receipt was obtained and is kept in the project file.

☐ A written certification statement that the Pamphlet was delivered to the facility that includes the address of the COF, date and method of delivery of the Pamphlet, names of the persons delivering the Pamphlet, reason for the lack of acknowledgment, if any, the signature of a representative of the renovation firm,

---

[4] The written acknowledgement must include a statement recording the owner or occupant's name and acknowledging receipt of the pamphlet prior to the start of renovation, the address of the unit undergoing renovation, and the signature of the owner or occupant and the date of signature. It must be written in the same language as the text of the contract or agreement for the renovation or, in the case of non-owner-occupied unit, the same language as the lease or rental agreement or the Pamphlet.

and date of said signature. A copy of the written notice is kept in the file.

☐ Parents and guardians of children using the COF have been provided with the Pamphlet, information describing the renovation, and information on how to review a copy of the records required by 745.86(c) and (d) by (select one of the following):

☐ Mailing or hand delivering the Pamphlet and renovation information to each parent or guardian of a child using the COF.

☐ Posting signs during the renovation that describe the renovation, including locations and anticipated completion dates, in areas where they can be seen, along with a posted copy of the Pamphlet or how interested parties can review or obtain a copy. Information on how occupants can review a copy at no cost of the records required by 745.86 (c) and (d) are also included.

☐ No COF undergoing regulated renovations.

## VI    WORK PRACTICE STANDARDS [40 C.F.R. § 745.85]

_____A)    **Occupant Protection** – Signs have been posted clearly defining the work area and warning occupants and other persons not involved in renovation activities to remain outside of the work area.
☐ Primary language of occupants is not English, signs posted in _____ language.

_____B)    **Containing the Work Area** – Before beginning the renovation, the work area has been isolated so that no dust or debris leaves the area while the renovation is ongoing.

_____C)    **Integrity of containment** is maintained throughout the renovation.

_____D)    **Interior Renovations:**

☐ All objects in the work area are removed or covered.

☐ HVAC ducts in the work area are closed and covered.

☐ Windows in the work area are closed.

☐ Doors in the work area are closed and sealed. Doors that must be used in the work area are covered to allow passage but prevent spread of dust.

☐ Floors in the work area are covered with taped-down plastic sheeting or other impermeable material 6 feet beyond the perimeter of surfaces undergoing renovation.

☐ All personnel, tools, and other items, including exteriors of waste containers are free of dust and debris before leaving the work area.

_____E)    **Exterior Renovations**

☐ Windows in and within 20 feet of the work area are closed.

☐ Doors in and within 20 feet of the work area are closed and sealed.

☐ Ground is covered by plastic extending 10 feet from work area.

☐ Vertical containment is installed when property line prevents 10 feet of ground covering or when necessary to prevent migration of dust and debris to adjacent property.

## VII    RESTRICTED PRACTICES[5] USED CORRECTLY [40 C.F.R. § 745.85(a)(3)]

_____A)    Machines designed to remove paint or other surface coatings through high-speed operations such as sanding, grinding, power planing, needle gun, abrasive blasting, or sandblasting **have shrouds or containment systems and are equipped with a HEPA vacuum attachment to collect dust and debris at the point of generation**. These machines are operated so that no visible dust or release of air occurs outside the shroud or containment system.

_____B)    A heat gun operating at temperatures **below 1,100 degrees Fahrenheit** is being used.

---

[5] Restricted practices include the use of high-speed operation machines and heat guns.

**VIII**      **RENOVATION WASTE [40 C.F.R. § 745.85(a)(4)]**

☐ Waste is contained on-site before removal from the work area, during removal from the work area and while being transported off-site.

☐ A chute is used, and the chute is covered.

☐ Waste that is collected from renovation activities at the end of each workday is stored under containment, in an enclosure, or behind a barrier that prevents release of and access to dust and debris.

☐ Waste transported from renovation activities is contained to prevent release of dust and debris.

**IX**      **WORK AREA CLEANING [40 C.F.R. § 745.85(a)(5)]**

☐ All paint chips and debris are picked up and sealed in heavy-duty bags.

☐ Protective sheeting is misted and folded, dirty side inward, sealed, and disposed as waste.

☐ All objects and surfaces in interior work areas and within 2 feet of the work areas are cleaned from higher to lower in the following manner:

☐ Walls: start at the ceiling and work down to the floor by either vacuuming with a HEPA filter or wiping with a damp cloth.

☐ All remaining surfaces and objects in the work area were thoroughly vacuumed, including furniture and fixtures, with a HEPA vacuum, and - except for carpet and upholstered surfaces- wiped with a damp cloth.

☐ Floors were mopped using a wet-mopping system or 2-bucket mopping method.

**X**      **POST-RENOVATION CLEANING VERIFICATION [40 C.F.R. § 745.85(b)]**

☐ Interior Renovations:

☐ The assigned certified Renovator performed a visual inspection until no dust, debris or residue is present.

☐ The assigned certified Renovator wiped windowsills, uncarpeted floors, and countertops within the work area with a wet disposable cleaning cloth using the procedures outlined in 40 C.F.R. 745.85(b).

☐ Exterior Renovations:

☐ The assigned certified Renovator performed a visual inspection until no dust, debris or residue is present.

☐ Dust clearance testing **[40 C.F.R. § 745.85(c)]** was performed in lieu of post renovation cleaning by an EPA-certified inspector, risk assessor, or dust sampling technician and was done in accordance with 745.85(c). A copy of the report is attached.

**XI**      **Actual Project Completion Date: _____**

**XII**      **Required Records [40 C.F.R § 745.86]** kept with project file for a period of three (3) years:

☐ Determinations that lead-based paint was not present on affected components.

☐ Notification records including acknowledgments of Pamphlet receipt.

☐ Documentation of compliance with the work practice requirements of 40 C.F.R. **§** 745.85.

☐ Documentation that the assigned certified Renovator was assigned, and the following responsibilities were met:

☐ The assigned certified Renovator provided training to workers on the work practice requirements of **§** 745.85. [745.90(b)(2)] *See separate training records for each worker trained.*

☐ The assigned certified Renovator was physically present when signs were posted,

work area containment was established, and while the work area cleaning was
performed.

☐ The assigned certified Renovator regularly directed work performed by other
workers, maintained containment integrity, and was available, either on-site or by
phone, at all times during the renovation.

☐ The assigned certified Renovator performed the post-renovation cleaning verification
as described in 40 C.F.R. **§** 745.85(b).

☐ The assigned certified Renovator prepared the records required by **§** 745.86(b)(1)(ii)
and (6).

_____ **A copy of this completed checklist was provided to the owner of the building, and if
different, the adult occupant, in accordance with 40 C.F.R. § 745.86(c)(2).**

Completed by:

_____
Company Name

_____          _____
Name (printed)                                                            Title

_____
Signature

Appendix I to the Consent Decree in
*United States of America, et al. v. Lilmor Management LLC, et al.*, No. 24 Civ. 9520 (___) (S.D.N.Y.)

# NOTICE OF SETTLEMENT
# AND RIGHT TO COMMENT

You are receiving this notice because you have lived at [FILL IN BUILDING ADDRESS].  The United States of America and the State of New York recently signed a settlement agreement resolving civil claims with a property manager (Lilmor Management LLC) and property owners concerning conditions in fifty-six buildings, including your building.  These claims concern noncompliance with federal and local lead-based paint safety laws and other unsafe living conditions in these apartment buildings since 2012. Before seeking approval from a federal court, the federal government is seeking comments on this proposed settlement.  If approved, the settlement would require the property manager and owners, among other things, to:

- Create a $2.925 million New York State fund, to pay compensation to tenants who faced substandard living conditions in these buildings since 2012.

- Inspect apartments in buildings currently owned by these landlords for lead-based paint and lead-based paint hazards; eliminate all lead-based paint hazards; and remove or otherwise abate all lead-based paint.

- Inspect apartments in buildings currently owned by these landlords for, and eliminate, all unsafe living conditions, like widespread and recurring mold or infestations of vermin or pests.

- Cooperate with a "Housing Specialist" firm selected by the United States and New York to supervise compliance with the settlement's requirements; and

- Pay a penalty of $3.25 million to the United States of America and a $325,000 penalty to New York City.

The United States is accepting comments on the proposed consent decree, before seeking court approval.  If you would like to provide a comment, please send it by email to pubcomment-ees.enrd@usdoj.gov or by mail to Assistant Attorney General, U.S. DOJ—ENRD, P.O. Box 7611, Washington, DC, 20044–7611, no later than [DATE].  Please write "Lilmor Settlement, DJ No. 90-5-1-1-11797" on your comment.  Any comments submitted in writing may be filed by the United States in whole or in part on the public court docket without notice to the commenter.

A full version of the consent decree is available at https://www.justice.gov/enrd/consent-decrees during the comment period.